Filed 10/15/2019 10:39 AM
Lynne Finley
District Clerk
Collin County, Texas
By Rosanne Munoz Deputy
Envelope ID: 37654964

## EXHBIT A

CAUSE NO. _____   380-05791-2019

| | | |
|---|---|---|
| NEWSTREAM HOTEL PARTNERS-IAH, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | _____ JUDICIAL DISTRICT |
| HMC HOSPITALITY OPERATING COMPANY, | § § § § | |
| Defendant. | § | COLLIN COUNTY, TEXAS |

### PLAINTIFF'S ORIGINAL PETITION

COMES NOW Newstream Hotel Partners-IAH, LLC, Plaintiff in the above matter, complaining of HMC Hospitality Operating Company, Defendant, and for causes of action would respectfully show the court:

### I.    DISCOVERY LEVEL AND RULE 47 STATEMENT

1.    Plaintiff pleads for discovery under Level 3, pursuant to TEXAS RULE OF CIVIL PROCEDURE 190.4. Plaintiff seeks damages in an amount within the jurisdictional limits of this Court, which is an amount over $100,000.00, but not more than $200,000.00, and non-monetary relief.

### II.    PARTIES

2.    Plaintiff Newstream Hotel Partners-IAH, LLC ("Newstream") is a limited liability company doing business in Collin County, Texas.

3.    Defendant HMC Hospitality Operating Company ("HMC") is a foreign corporation doing business in Collin County, Texas that can be served with process through its registered agent, Leo E. Spriggs, located at its registered office 17950 Preston Road, Suite 710, Dallas, Texas 75252, or wherever he may be found.

### III.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter herein as the amount in controversy is within the jurisdictional limits of the Court, and personal jurisdiction over the parties in this action as the Defendants are residents of, and/or principally located in, the State of Texas.

5.    Venue is proper in Collin County, Texas pursuant to §15.002(a)(3) of the Texas Civil Practices & Remedies Code as Defendant's principal office in Texas is located in Collin County, Texas. In addition, the parties contracted for venue in Collin County, Texas for any disputes arising out of or relating to the parties' agreement.

### IV.    STATEMENT OF FACTS

6.    Newstream is the owner of the Red Lion Hotel & Conference Center located at 500 N. Sam Houston Parkway East, Houston, Texas 77060 (the "Property").   Newstream has the right to operate the Red Lion Hotel & Conference Center at the Property through a License Agreement with RLH Corporation (the "License Agreement").

7.    The Property is located a few miles from the George Bush Intercontinental Airport. With eleven (11) meeting rooms and 17,000 square feet of meeting space, the Property is a venue for corporate and social events.

8.    HMC is a hotel management company that provides management services to its clients.   HMC holds itself out to the public as an expert hotel manager that provides its clients with integrity, honesty and open communication.

9.    On or about May 10, 2018, Newstream and HMC executed a Hotel Management Agreement (the "Management Agreement") for the Property. In exchange for payment of management fees and reimbursement of reasonable and necessary expenses, HMC agreed to

expertly manage the Property on behalf of Newstream according to the operational standards developed by HMC as well as those operational standards required by the License Agreement.

10.     However, HMC mismanaged the Property during the term of the Management Agreement.  Such mismanagement included, but is limited to, overstaffing the Property and overpaying employees who worked at the Property.  In addition, HMC failed to renew the Property's fixed price electricity contract, which resulted in the Property defaulting to a higher month-to-month electricity rate and incurring tens of thousands of dollars in additional charges. Further, without notifying Newstream or seeking its approval, HMC reassigned the Property's sales director to a different property managed by HMC.  Such reassignment resulted in the Property operating without a sales director for approximately fifty (50) days.

11.     HMC's actions burdened the operation and profitability of the Property.  In addition, HMC's mismanagement caused the Property to incur unreasonable and/or unnecessary fees and/or charges.  Such mismanagement resulted in HMC requesting Newstream invest additional capital into the operation of the Property.

12.     Due to the wrongful conduct of HMC, Newstream seeks award of all damages related to the improper conduct made the basis of this suit.

## V.     CAUSES OF ACTION

### COUNT 1 –BREACH OF CONTRACT

13.     The factual allegations set forth in the foregoing paragraphs are incorporated herein by reference for all purposes as if set forth in full.

14.     Newstream and HMC entered into the above-referenced Management Agreement. The agreement specifically required HMC to manage the Property in compliance with the License Agreement and its expert operational standards.

15.     Newstream fully performed or was excused from performing its obligations.

16.     HMC materially breached the Management Agreement through its mismanagement of the Property, particularly by overstaffing the Property and overpaying employees.

17.     As a result of HMC's breach of the Management Agreement, Newstream has been damaged in an amount within the jurisdictional limits of this Court.

## VI. ATTORNEYS' FEES

18.     Newstream seeks recovery of its reasonable and necessary attorney's fees from HMC through trial and all appeals pursuant the parties' contract and Chapter 38 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE.

## VII. CONDITIONS PRECEDENT

19.     All conditions precedent to Newstream's right to bring the above cause of action, and for recovery requested herein, have been performed or otherwise already occurred.

## VIII. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Newstream requests HMC be cited to appear and answer, and that upon final hearing, Newstream have the following:

(1)     judgment against HMC for actual damages (including incidental, consequential and/or special damages) within the jurisdictional limits of this Court, together with pre-judgment and post-judgment interest as allowed by law;

(2)     costs of court;

(3)     judgment against HMC for reasonable attorneys' fees for the following:

        a.   preparation and trial of this lawsuit;

        b.   post-trial, pre-appeal legal services;

    c.   an appeal to the Court of Appeals;

    d.   an appeal to the Supreme Court of Texas; and,

    e.   post-judgment discovery and collection in the event of execution

on the judgment if necessary; and,

    (4)    Newswtream be granted such other relief, at law or in equity, as is just and proper.

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**

By:   *Carlisle A. Braun*

**CARLISLE A. BRAUN**
Texas Bar No. 24058818
carlisle.braun@solidcounsel.com
**BRANDI J. MCKAY**
State Bar No. 24075380
brandi.mckay@solidcounsel.com
2600 Network Blvd., Suite 400
Frisco, TX   75034
(214) 472-2100 (Telephone)
(214) 472-2150 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

Filed 11/29/2019 11:32 AM
Lynne Finley
District Clerk
Collin County, Texas
By Rachel Mabe Deputy
Envelope ID: 38769877

CAUSE NO. 380-05791-2019

| | | |
|---|---|---|
| NEWSTREAM HOTEL PARTNERS-IAH, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | |
| HMC HOSPITALITY OPERATING COMPANY, | § § § | COLLIN COUNTY, TEXAS |
| Defendant, | § § | |
| V. | § § | |
| ROB LAWSON, SCOTT TARWATER, AND TIMOTHY NYSTROM, | § § § § | |
| Third Party Defendants. | § | 380th JUDICIAL DISTRICT |

## DEFENDANT HMC HOSPITALITY OPERATING COMPANY'S ORIGINAL ANSWER AND ORIGINAL COUNTERCLAIM

Defendant and Counter-Plaintiff HMC Hospitality Operating Company ("HMC") files its Original Answer and Original Counterclaim against Counter-Defendant Newstream Hotel Partner-LIT, LLC ("Newstream") and Third Party Defendants Rob Lawson, Scott Tarwater and Timothy Nystrom as follows:

## I.   GENERAL DENIAL

1.      Pursuant to Texas Rule of Civil Procedure 92, HMC generally denies the material allegations contained in Plaintiff's Original Petition and demands strict proof thereof.  HMC specifically reserve its rights to amend this Answer and Counterclaim to assert such any and other additional defenses, denials, counterclaims, and/or third party claims as may be warranted by discovery in accordance with the Texas Rules of Civil Procedure.

## II.   AFFIRMATIVE DEFENSES

2.      Newstream's claims arise out of a contract between the parties that contains an arbitration provision and thus its claims, as well as the claims asserted herein by HMC, should be resolved in an arbitration proceeding.

3.      Newstream's claims are barred, in whole or in part, because Newstream failed to mitigate damages, if any.

4.      Newstream's claims are barred, in whole or in part, because of the doctrine of waiver.

5.      Newstream's claims are barred, in whole or in part, because of its own prior material breach.

6.      Newstream's claims are barred, in whole or in part, because Newstream acted with unclean hands.

7.      Newstream's claims are barred, in whole or in part, based on the doctrine of estoppel.

8.      Newstream's claims are barred, in whole or in part, by the doctrines of offset, setoff, and/or recoupment.

## III.   HMC'S ORIGINAL COUNTERCLAIM

9.      Defendant/Counter-Plaintiff HMC alleges its counterclaim against Plaintiff/Counter-Defendant Newstream ("<u>Newstream</u>") and Third-Party Defendants Rob Lawson, Scott Tarwater, and Timothy Nystrom as follows:

## IV.   RULE 47 STATEMENT

10.     The relief sought in this action is within the jurisdictional limits of this Court. Specifically, HMC asserts counter claims herein relating to Newstream's breach of the hotel

management agreement between the parties and seeks monetary relief of more than $200,000 but less than $1,000,000.

## V.    DISCOVERY CONTROL PLAN

11.    HMC intends to conduct discovery in this litigation under Level 2 of Texas Rule of Civil Procedure 190.3.

## VI.    PARTIES

12.    HMC is a Dallas-based hospitality management company that contracts with hotel owners to operate and manage their hotels.

13.    Newstream is domestic limited partnership doing business in Collin County, Texas.  Newstream is a plaintiff in this action and accordingly can be served through its counsel of record.

14.    Rob Lawson ("Lawson") is an individual believed to be a resident of Tarrant County, Texas.  Mr. Lawson may be served with process at 400 Bourland Road, Keller, Texas 76248 or wherever he may be found.

15.    Scott Tarwater ("Tarwater") is an individual believed to be a resident of Tarrant County, Texas.  Mr. Tarwater may be served with process at 4613 Windmill Lane, Flower Mound, Texas  75028 or wherever he may be found.

16.    Timothy Nystrom ("Nystrom" and together with Lawson and Tarwater, the "Guarantors") is an individual believed to be a resident of Tarrant County, Texas.  Mr. Nystrom may be served with process at 1411 Stone Lakes Drive, Southlake, Texas 76092 or wherever he may be found.

## VII.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this matter because these Counterclaims are claims responding to Newstream's claims submitted in the above-entitled cause, over which this Court already has jurisdiction.

18.    Venue of this Counterclaim is proper in Collin County, Texas, pursuant to TEX. CIV. PRAC. & REM. CODE § 15.062(a) as to Counter-Defendant Newstream because the venue of the main action establishes venue as to the Counterclaim.

## VIII.    FACTUAL BACKGROUND

19.    Newstream owns a Red Lion Hotel & Conference Center located at 500 N. Sam Houston Parkway East, Houston, Texas 77060 (the "Hotel").

20.    On May 10, 2018, Newstream and HMC entered into a Hotel Management Agreement (the "Agreement") under which HMC operated and managed Newstream's Hotel.[1] HMC began operating all aspects of the Hotel for and on behalf of Newstream pursuant to the Agreement.

21.    In order to induce HMC to enter into the Agreement with Newstream, the Guarantors each executed an absolute and unconditional guaranty agreement whereby the Guarantors each jointly and severally guaranteed Newstream's performance of its obligations, including the payment of all fees owed under the Agreement (together, the "Guaranties").[2]

22.    However, Newstream failed to fulfill its obligations under the Agreement. Specifically, Newstream did not provide adequate capital and did not maintain adequate funds in

---

[1] Attached hereto as Exhibit A and incorporated herein for all purposes is a true and correct copy of the Hotel Management Agreement.

[2] Attached hereto as Exhibit B and incorporated herein for all purposes is a true and correct copy of Rob Lawson's Individual Guaranty. Attached hereto as Exhibit C and incorporated herein for all purposes is a true and correct copy of Scott Tarwater's Individual Guaranty. Attached hereto as Exhibit D and incorporated herein for all purposes is a true and correct copy of Timothy Nystrom's Individual Guaranty.

the operating account to ensure that HMC could maintain operations at the Hotel as required by Section 2.03(b) of the Agreement.[3]

23.     On July 2, 2019, HMC notified Newstream of its default under the Agreement by reason of its failure to: (i) maintain adequate funds for the operation of the Hotel, including funds necessary to cover all operating expenses; and (ii) maintain $115,000.00, the contractually-required minimum balance under the Agreement, in the bank account.  Following Newstream's failure to transfer sufficient funds to the bank account, HMC sent a second notice to Newstream on July 10, 2019 outlining Newstream's continued defaults under the Agreement.[4] In the July 10, 2019 letter, HMC again notified Newstream that its failure to maintain sufficient funds in the account impacted HMC ability to manage the Hotel in accordance with the Agreement.[5]   The July 10, 2019 letter also advised Newstream that if its monetary defaults were not cured within five business days, the Agreement would terminate by its terms.   Newstream failed to cure its monetary default within five business days, thus on July 17, 2019, the Agreement terminated as a result of Newstream's default.

24.     Pursuant to Section 13.04, if the Agreement is terminated due to Newstream's default or early termination, HMC is entitled to a Termination Payment:

> Upon termination, as a result of Owner's default or early termination, Manager shall be entitled to immediate receipt of a termination payment ("**_Termination Payment_**") payable by Manager from the Bank Account, which amount shall be liquidated damages and not a penalty, equal to the lesser of (i) two (2) years' Operating Fee Total's, or (ii) the sum of the future Operating Fee Total's due during the remaining Term of the Agreement following the termination event, but never less than the sum of six (6) months of Operating Fee Totals. The Termination Payment shall be considered fully earned and due to Manager for services then rendered and constitutes the parties' best, good faith estimate of the

---

[3] Exhibit A, § 2.03(b).

[4] Attached hereto as Exhibit E and incorporated herein for all purposes is a true and correct copy of the July 10, 2019 Default Letter.

[5] Exhibit E.

**DEFENDANT HMC HOSPITALITY OPERATING COMPANY'S**
**ORIGINAL ANSWER AND ORIGINAL COUNTERCLAIM**                              **PAGE 5**

damages which would be suffered by Manager in the event of a termination of this Agreement, the exact amount of damages being difficult or impracticable to calculate. Owner shall also reimburse Manager for any and all fees incurred in the collection of the Termination Payment, inclusive of any collection and legal fees. Any future monthly Operation Fees due shall be based upon the greater of (i) the average Operating Fees paid during the preceding months under the Term, excluding any fees paid during the Construction/Acquisition Term, or (ii) a flat monthly fee of $10,000.00.[6]

25.     In short, the Termination Payment represents the projected fees HMC would have earned through the Term of the Agreement.[7] Based on the terms of the Agreement, HMC is entitled to a $258,155.67 Termination Payment. This Termination Payment represents the sum of the Future Operating Fees HMC would have earned through July 2021, representing two years' Operating Fee Totals.

26.     Following the termination of the Agreement, HMC continued to work with Newstream and assist with the management of the Hotel to facilitate management transition to a new entity.  In addition, despite having no contractual obligation to do so, HMC agreed to Newstream's multiple requests to extend the date of transition over the next few months to assist Newstream in an orderly a transition as possible.

27.     Further, Newstream hired two HMC Executive Team members—Sherry Harvey, HMC's Director of Sales and Markecia Flores, HMC's Controller—in violation of Section 6.03(b) of the Agreement.  This Section provides:

[Newstream] agrees that it will not directly, or indirectly, employ, attempt to employ or cause to be employed anyone who serves as the General Manager or member of the Executive Team of the Hotel during the Term of this Agreement or, if this Agreement terminates for reasons other than the Manager's breach, for a period of not less than one year following the termination of this Agreement.[8]

---

[6] Exhibit A, § 13.04.

[7] Exhibit A, § 3.02.

[8] Exhibit A, § 6.03(b)

28.    Section 6.03(b) further provides that in the event Newstream violates this provision by employing a member of the Executive Team, Newstream will pay HMC an amount equal to one year's annual salary that was being paid to the Executive Team member while the Executive Team member was employed by HMC.[9]    While employed by HMC, Ms. Harvey's annual salary was $75,000. and Ms. Flores's annual salary was $62,000.00.    Newstream's decision to hire Ms. Harvey and Ms. Flores are clear violations of Section 6.03(b), thus, Newstream is liable for these amounts.

29.    As a result of Newstream's violations of the Agreement, HMC retained counsel to pursue all remaining amounts currently owed in an amount not less than $395,155.67, owed to HMC under the terms of the Agreement.

## IX.    CAUSES OF ACTION

### A.  Count One-Breach of Contract against Newstream

30.    The allegations set forth above are incorporated herein by reference.

31.    The Agreement is a valid and enforceable contract between the parties. HMC performed under the terms of the Agreement.    The acts or omissions of Newstream constitute breaches of contract.    Specifically, Newstream violated the following provisions of the Agreement: Sections 2.03(b), 13.04(b), and 6.03(b).    These breaches caused HMC to sustain injury and incur damages in the amount of not less than $395,155.67, in addition to amounts accruing, which is within the jurisdictional limits of this Court.

### B.  Breach of Contract against Guarantors

32.    The allegations set forth above are incorporated herein by reference.

33.    The Guaranties are valid and enforceable written guaranties executed by the Guarantors in favor of HMC.    Under the terms of the Guaranties, the Guarantors are required to

---

[9] *Id.*

pay all amounts due under the Agreement, if Newstream fails to make these payments. Guarantors' failure to pay amounts due under the Agreement constitutes a material breach of the Guaranties, which has caused HMC to sustain injury and incur damages in the amount of not less than $395,155.67, in addition to amounts accruing, which is within the jurisdictional limits of this Court.

## X.    CONDITIONS PRECEDENT

34.    All conditions precedent to HMC's claims for relief have been performed, have occurred, or are excused.

## XI.    ATTORNEYS' FEES

35.    HMC is entitled to its attorneys' fees pursuant to Texas Civil Practice and Remedies Code §38.001, et seq., and the terms of the Agreement.[10]

## PRAYER

WHEREFORE PREMISES CONSIDERED, HMC respectfully requests that upon trial or hearing of this matter, jugement be entered against Newstream and Guarantors, jointly and severally, as follows:

(a)    Guarantors be citied to appear and answer the allegations contained in this counterclaim;

(b)    award Newstream nothing by its suit;

(c)    award HMC a judgment against Newstream and Guarantors, jointly and severally, in an amount not less than $395,155.67;

(d)    HMC be awarded pre-judgment interest;

(e)    HMC be awarded its reasonable and necessary attorneys' fees and costs incurred as a result of having to file this action;

(f)    HMC be awarded post-judgment interest; and

---

[10] Exhibit A, § 21.10, § 13.04.

(g)     HMC be granted any and all other relief, special or general, legal or equitable, as HMC may show itself to be justly entitled to receive.


Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**


*/s/ Ross H. Parker*
Ross H. Parker
TX Bar No. 24007804
rparker@munsch.com
Aynsley K. Young
TX Bar No. 24102674
ayoung@munsch.com

500 N. Akard Street, Suite 3800
Dallas, Texas  75201
(214) 855-7500 (telephone)
(214) 855-7584 (facsimile)


**ATTORNEYS FOR DEFENDANT
HMC HOSPITALITY OPERATING
COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing O*riginal Answer and Original Counterclaim* has been served by ESERVE on this the 25th day of November, 2019, to:

Carlisle A. Braun
Brandi J. McKay
**SCHEEF & STONE, L.L.P.**
2600 Network Blvd., Suite 400
Frisco, Texas 75034
(214) 472-2100 (telephone)
(214) 472-2150 (facsimile)


*/s/ Ross H. Parker*
Ross H. Parker

4814-7088-1197v.1 004489.00028

# HOTEL MANAGEMENT AGREEMENT

between

**NEWSTREAM HOTEL PARTNERS-IAH, LLC**

and

**HMC HOSPITALITY OPERATING COMPANY**

## HOTEL NAME & ADDRESS

Red Lion Hotel & Conference Center
500 N. Sam Houston Parkway East
Houston, TX 77060
281-931-0101

EXHIBIT A

# Table of Contents

**ARTICLE 1    DEFINITIONS** ........................................................................................ **1**

   1.01   Definitions ......................................................................................................... 1
   1.02   Other Definitions ............................................................................................ 6

**ARTICLE 2    SCOPE OF AGREEMENT** ................................................................... **7**

   2.01   Subject Matter ................................................................................................. 7
   2.02   Grant to Manager ........................................................................................... 7
   2.03   Funding ............................................................................................................ 7

**ARTICLE 3    TERMS AND EXTENSIONS** ............................................................... **7**

   3.01   Commencement Date ..................................................................................... 7
   3.02   Term .................................................................................................................. 8
   3.03   Post-Termination Matters:  Reimbursements to Manager ...................... 8

**ARTICLE 4    NON-DISTURBANCE** ........................................................................... **8**

**ARTICLE 5    STANDARDS AND MANAGER'S CONTROL** ............................... **9**

   5.01   Operational/Franchise Standards ............................................................... 9
   5.02   Manager Control ............................................................................................ 9
   5.03   Contractual Authority .................................................................................. 10
   5.04   Meetings ........................................................................................................ 10
   5.05   Franchise ....................................................................................................... 11
   5.06   Definition of Marks ..................................................................................... 11
   5.07   Rights Upon Termination of Franchise .................................................... 11

**ARTICLE 6    OPERATION OF THE HOTEL** ....................................................... **11**

   6.01   Licenses ......................................................................................................... 11
   6.02   Operating Equipment and Operating Supplies ...................................... 12
   6.03   Personnel ....................................................................................................... 12
   6.04   Labor Relations ............................................................................................ 13
   6.05   Professionals and Other Specialists .......................................................... 13
   6.06   Sales, Marketing, Advertising and Additional Promotional Programs ....... 14
   6.07   Trades:  Treatment Accorded ..................................................................... 14
   6.08   Routine Maintenance and Repairs ............................................................ 15
   6.09   FF&E Replacements & Capital Expenditures .......................................... 15
   6.10   FF&E and Capital Expenditures Estimates ............................................. 16
   6.11   Emergency Repairs:  Repairs Required by Law ..................................... 16
   6.12   Reserve Fund ................................................................................................ 17
   6.13   Cash Management ........................................................................................ 18

**ARTICLE 7    FISCAL MATTERS** ............................................................................ **18**

   7.01   Accounting Matters ..................................................................................... 18
   7.02   Annual Business Plan .................................................................................. 19

EXHIBIT A

7.03   Bank Accounts .................................................................................... 21
7.04   Reimbursement of Out-of-Pocket Expenses ...................................... 21
7.05   Tax Matters ......................................................................................... 21

**ARTICLE 8      PAYMENTS TO MANAGER ................................................ 22**

8.01   Base Operating Fee ............................................................................. 22
8.02   Incentive Operating Fee ...................................................................... 22
8.03   Accounting Fee .................................................................................... 22

**ARTICLE 9      DISBURSEMENTS .................................................................. 23**

9.01   Disbursement of Funds ....................................................................... 23
9.02   Adjustment to Bank Account ............................................................... 23

**ARTICLE 10     INSURANCE ............................................................................ 23**

10.01   Insurance Coverage ........................................................................... 23
10.02   Insurance Policies ............................................................................. 24
10.03   Manager's Blanket Insurance Coverage ........................................... 25
10.04   Waiver of Subrogation ...................................................................... 25

**ARTICLE 11     RESPONSIBILITY FOR CLAIMS, ETC. .............................. 25**

**ARTICLE 12     CASUALTY AND CONDEMNATION .................................... 26**

12.01   Casualty ............................................................................................. 26
12.02   Condemnation .................................................................................... 27
12.03   Business Interruption Insurance ........................................................ 27

**ARTICLE 13     DEFAULT AND TERMINATION ........................................... 28**

13.01   Events of Default ............................................................................... 28
13.02   Termination ........................................................................................ 28
13.03   Hotel Reservations Honored .............................................................. 29
13.04   Termination Payment ......................................................................... 29

**ARTICLE 14     NOTICES .................................................................................. 30**

**ARTICLE 15     RELATIONSHIP, AUTHORITY AND FURTHER ACTIONS ............. 30**

15.01   Relationship ....................................................................................... 30
15.02   Further Actions .................................................................................. 31

**ARTICLE 16     APPLICABLE LAW AND VENUE .......................................... 31**

**ARTICLE 17     SUCCESSORS AND ASSIGNS ................................................ 31**

17.01   Assignment ........................................................................................ 31
17.02   Binding Effect .................................................................................... 32

**ARTICLE 18     AGREEMENT NOT AN INTEREST IN REAL ESTATE ......... 32**

**ARTICLE 19     FORCE MAJEURE ................................................................... 32**

19.01   Operation of Hotel ............................................................................. 32

EXHIBIT A

19.02  Extension of Time .................................................................................. 32

**ARTICLE 20      ALTERNATIVE DISPUTE RESOLUTION** ............................................. **33**

20.01  Arbitration ........................................................................................... 33
20.02  Expert Resolution ................................................................................. 34

**ARTICLE 21      GENERAL PROVISIONS** ...................................................................... **35**

21.01  Authorization ....................................................................................... 35
21.02  Interest ................................................................................................. 35
21.03  Formalities ........................................................................................... 35
21.04  Documents ........................................................................................... 35
21.05   Consents ............................................................................................. 35
21.06  Estoppel Certificate ............................................................................. 35
21.07  Extension of Date of Termination ....................................................... 36
21.08  No Representations ............................................................................. 36
21.09  Assistance with Proposed Sale, Financing, Refinancing .................... 36
21.10  Prevailing Party's Expenses ................................................................ 37
21.11  Confidentiality ..................................................................................... 37
21.02  Severability .......................................................................................... 37

<u>EXHIBITS:</u>
Exhibit "A"    -    Legal Description
Exhibit "B"    -    Insurance Requirements
Exhibit "C"    -    Sample P & L
Exhibit "D"    -    Franchise Required Language

EXHIBIT A

# HOTEL MANAGEMENT AGREEMENT

THIS HOTEL MANAGEMENT AGREEMENT (this "*Agreement*") is dated effective as of the Execution Date, by and between **HMC HOSPITALITY OPERATING COMPANY**, a Delaware Corporation ("*Manager*") and **NEWSTREAM HOTEL PARTNERS-IAH, LLC** a Texas limited liability company ("*Owner*"). Each reference in this Agreement to any of the terms and titles contained in any Exhibit attached to this Agreement shall be deemed and construed to incorporate herein the data stated under that term or title in such Exhibit.

RECITALS:

A.      Owner owns/leases the Site described in Exhibit A, on which is located/Owner intends to construct a hotel having the facilities described in Exhibit A (the "*Hotel*");

B.      Owner desires that Manager manage the Hotel, pursuant to the terms of this Agreement; and

C.      Manager (or its Affiliates) agrees to manage the Hotel, pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, Owner and Manager agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.01**    **Definitions**

As used herein the following terms shall have the respective meanings indicated below:

(a)      "*Additional Fees*" – any fees billed and due under the Agreement for services provided that are outside the services detailed in the Agreement.

(b)      "*Affiliate*" - any corporation or other entity controlled by, controlling or under common control with Owner or Manager, as applicable.  The words "control," "controlled" and "controlling" mean ownership, directly or indirectly, of fifty percent (50%) or more of the legal or beneficial ownership interest of such corporation or other entity or the power to direct or cause the direction of the operations and policies of any such entity.

(c)      "*Building*" - all buildings, structures and improvements now located or hereafter constructed on the Site and all fixtures and equipment attached to, forming a part of and necessary for the operation of such buildings, structures or improvements as a hotel (including, without limitation, heating, lighting, plumbing, sanitary system, air-conditioning, laundry, refrigeration, kitchen, elevators and similar items) and such (i) restaurants, bars and banquet, meeting and other public areas, (ii) commercial space, including concessions and shops, (iii) garage and parking

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 1

EXHIBIT A

space, (iv) storage and service areas, (v) recreational facilities and areas, (vi) public grounds and gardens, permanently affixed signage, (vii) other facilities and appurtenances and (viii) number of keyed guest rooms ("***Keyed Guest Rooms***") as presently exist on the Site or are hereafter added thereon during the Term.

(d)      "***Construction/Acquisition Term***" – The period of time to and from the Commencement Date and the Open Date of the Hotel, if applicable.

(e)      "***Fiscal Year***" - the calendar year, or partial calendar year, from January 1 to December 31, unless and until Owner and Manager otherwise mutually agree to change by amendment.

(f)      "***FF&E***" - all fixtures, furniture, furnishings and equipment (not including Operating Equipment) required for the operation of the Building as a hotel in accordance with the standards set forth in this Agreement, including, without limitation, (i) office furnishings and equipment, (ii) specialized hotel equipment necessary for the operation of any portion of the Building as a hotel, including equipment for kitchens, laundries, dry cleaning facilities, bars, restaurants, public rooms, commercial and parking space, and recreational facilities, and (iii) all other furnishings and equipment as Manager deems necessary or desirable for the operation of the Building as a hotel in accordance with the Operational/Franchise Standards.

(g)      "***Franchise***" –that certain License Agreement dated _____, between Newstream Hotel Partners-IAH, LLC and _____, which allows for the operation of the Hotel as a _____ pursuant to the Franchise Standards.

(h)      "***Franchise Standards***" – the operational and other standards expressly set forth in the Franchise and governing the operation and maintenance of the Hotel pursuant thereto.

(i)      "***Gross Room Revenues***" - that portion of Total Revenues which is derived from the sale or rental of guestrooms and suites, specifically including amounts retained as forfeited deposits and guaranteed no-show receipts.

(j)      "***Hotel***" - a collective term for the Site, the Building, the FF&E, the Operating Equipment and the Operating Supplies.

(k)      "***Income Before Fixed Charges***" - Total Revenues minus the sum of Operating Costs.

(l)      "***Mortgagee***" - the holder of any Permitted Mortgage.

(m)      "***Make Ready Date***" – the date that is one hundred eighty days prior to the planned opening date of the Hotel if it is new construction.

(n)      "***Net Profit/Loss***" – Total Revenues minus the sum of Operating Costs and Fixed or Capital Expenses.

(o)      "***Open Date***" - the date the Hotel opens for business, if new construction or undergoing renovation or new acquisition.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 2

EXHIBIT A

(p)     "*Operating Cost(s)*" - the entire cost and expense of maintaining, operating and supervising the management of the Hotel.  Operating Costs shall be the sum of such costs and expenses which are normally charged as a cost of operation, including, without limitation,

(i)     the cost of Operating Supplies and Operating Equipment,

(ii)    wages, salaries, employee benefits, payroll taxes, any and all bonus plan payouts and other costs related to employees at the Hotel;

(iii)   advertising and promotional expenses incurred directly by, or on the behalf of, the Hotel (inclusive of the Hotel's fair share of any group advertising, promotion, or marketing program performed in conjunction with other Manager run properties that Manager deems beneficial, administrative and general expenses of the Hotel, the cost of personnel training programs (including, but not limited to, Manager's annual general manager's, accounting and human resource conferences), including travel and related expenses, charges for reservation-related distribution systems (e.g., airline reservation systems), cost of independent shopping services, licensing and annual support fees for human resources related systems, the costs for any consultants and other specialists to the extent providing services to the Hotel, utility and energy costs, operating licenses and permits, and grounds and landscaping maintenance costs;

(iv)    all expenses associated with Manager's applicable employees at the Hotel to attend Manager's annual training conferences, including, but not limited to the general manager's, accounting and human resources conferences, whether or not such expenses are included in the Annual Business Plan;

(v)     all technology related expenses, including but not limited to licenses, software and hardware support fees, software, application fees, connectivity fees, internet access fees or any fees per Article 6.05 of this Agreement;

(vi)    all expenditures made for routine maintenance and repairs to keep the Hotel in good condition and repair;

(vii)   any and all license, installation, support and software fees associated with the property management and human resource related systems installed at the Property (current installation and licensing fee is $6,000 for property management system and a one-time variable per employee fee for human resource system of $10.50), monthly support is currently $600 *(will be included in Base Operating Fee)* for the property management system and $400 for the human resource system*(will be included in Base Operating Fee)* , but may be increase during the Term, but no more than fifteen percent (5%) annually  *("Systems Fees")*.  Actual hardware fees may apply depending on existing hardware.  Fees may vary by location);

(viii)  any Additional Fees due Manager;

(ix)    reimbursable expenses due Manager;

(x)     all employee related insurance premiums including worker's compensation and any premiums associated with employee benefit plans; including but not limited to those

EXHIBIT A

expenses and charges required by the Patient Protection and Affordable Care Act or incurred by Manager as a result of the Patient Protection and Affordable Care Act;

(xi)    increases in reserves for uncollectible accounts receivable as set forth in the Approved Budgets but not limited to the budgeted amounts; and

(xii)    credit card and travel agent commissions.

(xiii)    Bankruptcy Fees.

There shall be expressly excluded from Operating Costs the following costs and expenses of the Hotel, which shall be defined as "***Fixed or Capital Expenses***":

(a)    depreciation of the Building, FF&E and Operating Equipment, and amortization of financing costs, pre-opening expenses, organizational and other costs;

(b)    debt service interest on any Permitted Mortgage;

(c)    rental payments pursuant to any existing ground lease or any equipment leases or installment sales contracts approved by Manager;

(d)    the cost of external audits (whether certified or otherwise) of Hotel operations and/or with respect to the Owner entity itself,

(e)    Base Operating Fees and Incentive Operating Fees as defined in Articles 8.01 and 8.02;

(f)    any asset management fees that might be charged by Owner or others,

(g)    property taxes, any sales or use taxes on purchases of any FF&E, Capital Expenditures or renovation related expenditures;

(h)    any and all insurance premiums and costs and expenses for other insurance to be carried by Manager pursuant to the requirements of Article 10 and Exhibit "B", with the exception of any premiums defined as an Operating Cost above;

(i)    legal and other professional fees, other than those properly included in Operating Costs;

(j)    other recurring and non-recurring ownership costs, such as Owner's entity administration, partnership expenses, loan refinancing costs and associated legal fees,  and servicing costs; and

(k)    such other cash expenditures (including Capital Expenditures), which are normally treated as a capital expenditure.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 4

EXHIBIT A

(q)    "***Operating Equipment***" - all operating equipment required for the operation of the Hotel, including chinaware, glassware, linens, silverware, utensils, uniforms and all other similar items.

(r)    "***Operating Fee Total***" – the Base Operating Fees, the Incentive Operating Fees, the Accounting Fees, the Additional Fees and the System Fees due to Manager under this Agreement.

(s)    "***Operating Supplies***" - all consumable items used in the operation of the Hotel, including food and beverages, fuel, soap, cleaning materials, guestroom amenities, paper supplies, and all other similar items.

(t)    "***Permitted Mortgage***" - any mortgage, pledge or encumbrance of or other security interest in the Hotel or any part thereof or interest therein, which is listed in Exhibit "C" attached hereto and incorporated by reference as a part hereof or a copy of which shall hereafter be provided to Manager.

(u)    "***REVPAR***" – The Revenue per Available Room (RevPAR) is the total guest room revenue divided by the total number of available rooms as reported on the STAR.

(v)    "***REVPAR Index***" – The RevPAR (Yield) Index measures a hotel's fair market share of their segment's (competitive set, market, submarket, etc.) revenue per available room. RevPAR Index is calculated:  (Hotel RevPAR / Segment RevPAR) x 100 = RevPAR Index.

(w)    "***Site***" - the parcel or parcels of real estate more particularly described on Exhibit "A".

(x)    "***Total Revenues***" - all revenues and income of any nature derived directly or indirectly from the Hotel or from the use or operation thereof, including Gross Room Revenues, food and beverage sales, telephone, telegraph, facsimile revenues, in-room video and valet service receipts, rental or other payments from lessees and sublessees (but not the gross receipts of such lessees and sublessees), and the proceeds of business interruption, use, occupancy or similar insurance.  If Manager itself operates any facilities instead of having them operated by a lessee, such as a newsstand, gift shop, business center, or other store, the gross receipts of such facility or store shall also be included in Total Revenues.  There shall be excluded from Total Revenues: (i) any gratuities or service charges added to a customer's bill and distributed as compensation to the Hotel's employees; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by Owner for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges; (v) any proceeds from the sale or other disposition of the Hotel, FF&E, or other capital assets; (vi) any interest paid with respect to the  Reserve Fund, the Bank Account or any other deposit or investment of Hotel funds; (vii) any fire and extended coverage insurance proceeds; (viii) any condemnation awards; and (ix) any proceeds of financing or refinancing of the Hotel. Total Revenues shall be determined on an accrual basis and in accordance with GAAP.

EXHIBIT A

**1.02    Other Definitions**

As used herein the following terms have the meanings set forth in the respective Articles or Exhibits indicated below:

AAA – Subsection 20.01(b)
Accounting Fee – Section 8.03
Annual Business Plan - Subsection 7.02(b)(i)
Approved Budget - Subsection 7.02(b)(i)
Arbitration Rules – Subsection 20.01(b)
Bank Account - Section 7.03
Bankruptcy Fees – Section 7.01(e)
Base Operating Fee - Section 8.01
Capital Expenditures - Section 6.09
Capital Expenditures Budget - Section 6.10
Commencement Date - Section 3.01
Defaulting Party - Subsection 13.02(a)
Event of Default - Section 13.01
Executive Team – Subsection 6.03(b)
Expert - Subsection 20.02(b)
FF&E Replacement Budget - Section 6.10
Force Majeure - Section 19.01
General Manager – Subsection 6.03(b)
Hazardous Materials – Subsection 6.11(c)
Incentive Operating Fee - Section 8.02
Initial Term - Section 3.02
Interested Persons - Section 21.06
Licenses - Section 6.01
License Indemnity – Section 6.01
Losses – Article 11
Marks – Section 5.06
Minimum Balance - Subsection 2.03(b)
Mold – Subsection 6.11(c)
Non-Defaulting Party - Subsection 13.02(a)
Operating Budget - Subsection 7.02(b)(i)
Operational/Franchise Standards -Section 5.01
Payroll Burden – Section 6.03
Renewal Term - Section 3.02
Reserve Fund - Subsection 6.12(a)
Reserve Percentage – Subsection 6.12(a)
Systems – Section 8.03
Temporary Stop – Section 8.01
Term - Section 3.02
Termination Payment - Section 13.04
Trade Name – Section 5.05
Uniform System of Accounts - Subsection 7.01(a)
WARN Act - Section 3.03

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 6

EXHIBIT A

## ARTICLE 2
## SCOPE OF AGREEMENT

### 2.01    Subject Matter

The subject matter of this Agreement is the Hotel referred to in Exhibit "A". Subject to the terms of this Agreement, Owner hereby engages Manager, and Manager hereby accepts such engagement, to operate all aspects of the Hotel for and on behalf of Owner and as the exclusive operator of the Hotel during the Term.

### 2.02    Grant to Manager

Owner grants to Manager the sole and exclusive right to possession of the Hotel for the Term and during the Term the sole and exclusive right to supervise and direct the management and operation of the Hotel for and on the account of Owner, and Manager hereby accepts said grant and agrees that it will supervise and direct the management and operation of the Hotel, all pursuant to the terms of this Agreement. Owner agrees that it will cooperate with Manager in every reasonable and proper way to permit and assist Manager to carry out its duties hereunder. Owner and Manager further agree that this Agreement provides for management of the Hotel, that Owner and Manager do not intend, nor does this Agreement grant or create, a franchise within the meaning of the Federal Trade Commission Act, any rule or regulation promulgated thereunder, or any other applicable law, rule, regulation or judicial decision.

### 2.03    Funding

(a)    Owner will provide all funds, in a timely manner as requested by Manager, both initially and throughout the Term, as necessary to pay for all Operating Costs and Fixed Expenses relating to the Hotel, and to perform and satisfy Owner's covenants and responsibilities under this Agreement. The performance of all activities by Manager hereunder shall be on behalf of, and for the account of, Owner. Accordingly, Manager shall be authorized to pay any Operating Costs or Fixed Expenses out of the Bank Account, except where such payments are authorized to be paid from the Reserve Fund.

(b)    Upon the Commencement Date, Owner shall deposit in the Bank Account at least $115,000.00 (the "***Minimum Balance***"); and throughout the Term, Owner shall maintain the Minimum Balance in the Bank Account.

## ARTICLE 3
## TERM AND EXTENSIONS

### 3.01    Commencement Date

The commencement date (the "***Commencement Date***") of the Term hereunder shall be 12:01 a.m. local time on May 10, 2018.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 7

EXHIBIT A

### 3.02   Term

The initial term (the "*__Initial Term__*") of this Agreement shall be the greater of either (i) sixty (60) months from and after the Commencement Date, or (ii) the Construction/Acquisition Term plus sixty (60) months. This Agreement shall automatically renew for successive sixty (60) month periods (each, a "*__Renewal Term__*") unless at least ninety (90) days written notice from either party is given to the other party prior to the expiration of the Initial Term or any subsequent Renewal Term. The Initial Term and, if applicable, any Renewal Term, shall expire on the dates above set forth, unless sooner terminated as hereinafter provided, and are herein referred to collectively as the "*__Term__*" of this Agreement.

### 3.03   Post-Termination Matters: Reimbursements to Manager

Upon any termination or expiration of this Agreement for any reason whatsoever (including, without limitation, pursuant to Section 13.02), Owner expressly agrees that Manager may remove any of its documents or systems which are proprietary to Manager (e.g., without limitation, accounting, human resource or other operating systems, employee files, manuals, any items owned by Manager or its Affiliates, any items required by law, including but not limited to the liquor inventory, software programs, stored data, internal correspondence of a proprietary nature, etc.), specifically excluding financial records, documents, correspondence or other materials proprietary to the Hotel. Following termination, Owner shall have no further rights to use or access Manager's accounting, human resource or other operating systems. Manager shall have the right to make copies of all other non-proprietary files and information relating to its management of the Hotel. Upon such termination or expiration, within five (5) days of billing thereof, Owner shall pay to Manager, in addition to any other amounts due pursuant to this Agreement (i) Manager's reasonable out-of-pocket costs incurred by reason of requests by Owner for assistance after termination of this Agreement and not otherwise reasonably expected of Manager in the orderly termination of its management at the Hotel, (ii) any unpaid fees and other charges and reimbursements due Manager hereunder, and (iii) to the extent reasonable and consistent with Manager's standard practices and industry standards, termination-related employee expenses, including payments of accrued and earned sick and vacation time, pension, accrued 401K plan match, bonus and other termination payments due to employees, (iv) fees earned at a billable rate of two hundred dollars ($200.00) per hour for any and all post-termination services required or requested, either verbally or in writing, by Owner. In the event of any such termination, Owner shall be responsible for compliance with the Worker Retraining and Notification Act ("*__WARN Act__*") and any penalties, fines or expenses related to the same. This Section 3.03 shall survive the expiration or termination of this Agreement.

### ARTICLE 4
### NON-DISTURBANCE

Owner covenants that Manager, during the Term of this Agreement, shall have peaceable and quiet possession of the Hotel and shall be entitled to operate the Hotel in accordance with the terms of this Agreement, free from disturbance by Owner or by any person through whom Owner shall derive its title to or right to occupy and use the Hotel or by any other person or persons claiming by, through or under Owner or otherwise. Owner covenants that throughout the Term, it will pay, keep, observe and perform all payments, terms, covenants, conditions and obligations to

EXHIBIT A

be made, kept, observed or performed by Owner under any lease, concession or other agreement, mortgage or security agreement in respect of the Hotel, and will provide all funds as shall be necessary to perform Owner's obligations hereunder.  Manager will not be required to subordinate its interests under this Agreement to any third party.  Owner further covenants, at its own expense, to undertake and prosecute or to permit Manager to undertake and prosecute all appropriate actions, judicial or otherwise, required to assure such quiet and peaceable possession and management by Manager.  Owner also covenants and agrees to pay, prior to delinquency, all taxes and assessments which are assessed against the Hotel or may become a lien on any component thereof and which may be due and payable during the Term, unless payment thereof is in good faith being contested by Owner, enforcement is stayed and the amount so contested is escrowed or guaranteed in a form satisfactory to Manager.  Owner represents that it has good and indefeasible title to the Site, free and clear of all encumbrances which would impair Manager's ability to operate the Hotel pursuant to this Agreement.   Upon Manager's request, Owner agrees to furnish to Manager copies of all documents by and through which Owner has the right of possession to the Hotel and consequently the ability to enter into this Agreement, including a valid title policy insuring Owner's interest in the Site.

**ARTICLE 5**
**STANDARDS AND MANAGER'S CONTROL**

### 5.01   Operational/Franchise Standards

Manager covenants to and shall manage the Hotel at the expense of Owner; and in accordance with the terms of this Agreement and the operational standards developed by Manager in connection with its hotel management business, as such operational standards are modified, revised or amended from time to time (the "***Operational Standards***").  In the event the Hotel will be subject to a third party franchised brand, the Manager will also incorporate such Franchise Standards into the Operational Standards.  Owner shall cooperate with Manager throughout the Term (as the same may be extended) so that Manager shall be able to manage the Hotel in accordance with the Operational Standards.  Manager may modify the Operational Standards from time to time during the Term of this Agreement as determined by Manager for the management of the Hotel, however, Manager will make no material changes as it relates to FF&E Replacements and Capital Expenditures without Owner's approval, except as required to comply with the Franchise Standards.

### 5.02   Manager Control

Owner hereby covenants to provide Manager with uninterrupted control in management of the Hotel during the Term of this Agreement.  Owner further covenants it will not interfere with the day-to-day management of the Hotel.   Manager shall have the right to determine the Operational/Franchise Standards, including, without limitation, operating policy, standards of operation, quality of service and any other matters affecting customer relations or the efficient management and operation of the Hotel.  Without limiting the foregoing, Manager shall have the right, subject to the other provisions of this Agreement, to determine the terms of guest admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, charges for rooms and commercial space, credit policies, prices and other guest charges, receipt, holding and disbursement of funds, maintenance of bank accounts, and, from Owner's

EXHIBIT A

funds, the procurement of inventories, supplies and services, promotion and publicity, including, without limitation, the right to provide complimentary rooms and the use of other Hotel facilities to existing or potential customers, employees and others. Manager shall have the right to institute legal proceedings with regard to the Hotel or its operations in its own name, without the consent of Owner, or in Owner's name, with the prior written consent of Owner.

### 5.03    Contractual Authority

Subject to the limitations contained elsewhere in this Agreement, Manager is and shall be authorized to make, enter into and perform in the name of, for the account of, on behalf of and at the expense of Owner, as an authorized representative but not an agent of Owner, any operating contracts and agreements deemed necessary by Manager to carry out and place in effect the terms and conditions of this Agreement, including the execution by Manager in Owner's name of equipment leases and the like relating to the Hotel. Notwithstanding anything to the contrary in the foregoing, Manager shall not, without Owner's prior written approval, execute any contract in Owner's name which (a) is not provided for in the Approved Budget, whether in total or partially; (b) extends beyond one (1) year and is not cancelable by Owner without penalty thereafter upon sixty (60) days' notice or less; (c) involves Capital Expenditures; or (d) provides for aggregate payments by Owner over the life of the contract (taking into account Owner's early termination rights, if any) in excess of $50,000. Manager shall execute in the Owner's name all leases of retail space in the Hotel, all of which shall be subject to the reasonable approval of both Owner and Manager.

### 5.04    Meetings

Unless otherwise agreed to by the parties, one or more of Owner's Representatives and one or more of Manager's Representatives, together with such additional support personnel as either party may reasonably deem necessary or appropriate, shall meet from time to time, but at least on a mutually agreed upon date on or before thirty (30) days prior to the beginning of each Fiscal Year. Meetings with respect to the Hotel shall be held more frequently than once per Fiscal Year as mutually agreed to by Owner and Manager. Such meetings shall be held at the Hotel or with the agreement of the parties at the Manager's office or any other location, as mutually agreed upon by the parties. At each such annual meeting, the parties will review the status of the following: (i) results of operations; (ii) capital replacements; and (iii) Annual Business Plan, or whatever both parties otherwise deem pertinent. An agenda of the additional items, if any, to be discussed at each meeting shall be prepared by Owner and delivered to Manager not less than fifteen (15) days prior to each meeting. Manager shall be entitled to add additional items to the agenda proposed by Owner by providing written notice to Owner within ten (10) days after the date Manager receives Owner's proposed agenda.

### 5.05    Franchise

Effective as of the Commencement Date, Owner expects to have entered into the Franchise. During the remainder of the Term, the Hotel shall operate under the trade name **"Red Lion Hotel & Suites"** ("*Trade Name*") pursuant to the Franchise. At Owner's sole cost and expense as otherwise provided in this Agreement, Owner shall be obligated to comply with any product improvement plan, Operational/Franchise Standards changes, or other requirements of the

EXHIBIT A

Franchise, as may be imposed from time to time.  All costs, fees, royalties and expenses due and payable under, and to establish the Franchise shall be paid as Operating Costs.  This Section 5.05 shall survive the termination of this Agreement.

### 5.06    Definition of Marks

As used herein, "*Marks*" shall mean the Trade Name and any other name, service marks, trademarks, slogans and the like (including all improvements and additions whenever made to or associated with any of the Marks by the parties or anyone else) now or hereafter used by Manager pursuant to the Franchise or otherwise.

### 5.07    Rights Upon Termination of Franchise

If the termination of this Agreement or Owner's failure to comply with the standards of the Franchise results in the termination of the Franchise for any reason, including failure to authorize expenditures necessary to satisfy Franchise Operational/Franchise Standards, Owner shall pay all Franchise termination fees and expenses resulting from the same and shall reimburse Manager the Termination Payment under this Agreement.  This Section 5.07 shall survive the termination of this Agreement.

## ARTICLE 6
## OPERATION OF THE HOTEL

### 6.01    Licenses

Owner warrants that to its actual knowledge there are no covenants or restrictions, which would prohibit or limit Manager, provided that the necessary licenses and permits ("*Licenses*") therefor have been obtained, from operating the Hotel, including restaurants, lounges and other facilities, in accordance with the Operational/Franchise Standards.  In cooperation with Owner, Manager or an Affiliate of Manager shall apply for, process and take all necessary steps to procure (in Manager's name, and/or Owner's name to the extent required by local authorities), at Owner's sole cost and expense, all Licenses required for the operation of the Hotel and related facilities, including, at Manager's option, all liquor licenses for the sale of alcoholic beverages in the Hotel. Owner agrees to assist Manager with all requirements in connection with the application of such Licenses.  Manager undertakes to comply with any conditions set out in any such licenses and permits and at all times to operate and manage the Hotel in accordance with such conditions and any other legal requirements.  Upon the expiration or sooner termination of this Agreement, Manager agrees, to the extent permitted by applicable law, to assign, transfer and convey to Owner or its designee all of Manager's right, title and interest in and to all such Licenses (excluding liquor licenses), without additional charge (other than any expenses of transfer, which shall be Reimbursed Expenses); provided that Owner shall reasonably compensate Manager for its services and fully indemnify, defend and hold harmless (the "*License Indemnity*") Manager and its Affiliates, and their respective agents, officers, employees, directors and shareholders, from and against any and all losses, costs, liabilities, expenses and claims (whether administrative or judicial and including, without limitation, any attorneys' fees and expenses), arising from Owner's use of such Licenses pursuant to this Section 6.01.  The License Indemnity shall survive the termination

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 11

EXHIBIT A

of this Agreement.  Owner will also reimburse Manager for any out-of-pocket expenses incurred by Manager in connection with maintaining the Licenses for Owner's use.

**6.02    Operating Equipment and Operating Supplies**

Manager shall procure as an Operating Cost all Operating Supplies and Operating Equipment as Manager deems necessary to the normal and ordinary course of operation of the Hotel and to operate the Hotel in accordance with the Operational/Franchise Standards.

**6.03    Personnel**

(a)    All personnel employed at the Hotel at all times shall be the employees of Manager or an Affiliate of Manager, or employees under a co-employment association or relationship of Manager.  As deemed necessary by Manager, other employees of Manager or an Affiliate of Manager may be assigned temporarily or on a part-time basis to perform services at the Hotel, and the allocable portion of such temporary or part-time employee's salary (including employee benefits) while performing services at the Hotel, and actual expenses incurred by such employee in traveling to and from the Hotel, will be reimbursed to Manager by Owner, as an Operating Expense, and such employees will be entitled to complimentary lodging, food and beverages, and other amenities, and use of Hotel facilities while performing such services.  Manager shall have absolute discretion to hire, fire, promote, supervise, direct and train all employees at the Hotel, to fix their compensation and benefits, and generally to establish and maintain all policies relating to employment and employment benefits.  All costs of every kind and nature pertaining to all employees at the Hotel arising out of the employer-employee relationship, including, without limitation, salaries, benefits (including medical related, non-refundable retirement plan participation funding of 10% of earned wages for eligible employees), vacation, sick and personal days and accruals at the accrual rate established by Manager, any payroll processing costs *("Payroll Burden")*, bonuses, relocation costs, reasonable employment-related legal costs (including but not limited to those costs, attorneys' fees, and/or expenses incurred by Manager as a result of an audit conducted or claim asserted under any federal, state, or local employment laws by any employee, or any federal, state or local employment agency or entity) costs incurred in connection with governmental laws and regulations and insurance roles, and such other expenses as Manager, in its reasonable discretion, may deem appropriate (e.g., costs of defense of employees charged with a crime in connection with the performance of their duties at the Hotel and costs of defending claims brought by Hotel employees against Owner, Manager or the Hotel) shall be an Operating Cost, and Owner shall reimburse, indemnify and hold harmless Manager from all costs, expenses, liabilities and claims incurred in connection therewith.  Owner shall pay Manager monthly, in advance, on the 1st of each month, all payroll and Payroll Burden related costs for Executive Team employees that are paid directly by Manager.  Payroll Burden costs as of the Commencement Date are fifty-eight (58) percent and are adjusted annually.

(b)    Owner agrees that it will not directly, or indirectly, employ, attempt to employ or cause to be employed anyone who serves as the General Manager or member of the Executive Team of the Hotel during the Term of this Agreement or, if this Agreement terminates for reasons other than the Manager's breach, for a period of not less than one year following the termination of this Agreement.  As used herein, *"**General Manager**"* shall mean any person that is in the lead position at the Hotel and directs its daily operation on behalf of the Manager and *"**Executive**"*

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 12

EXHIBIT A

**_Team_**" shall mean the General Manager and those individuals employed from time to time as the controller and/or accounting manager, director of food and beverage and director of sales of the Hotel, or serving such functions, regardless of the specific titles given to such individual(s). If Owner does employ any member of the Executive Team, in breach of this provision, then Owner will pay Manager within ten (10) days after demand, as liquidated damages, an amount equal to one year's annual salary that was being paid to such Executive Team member when employed by Manager.

(c)     Manager utilizes a third party processor, currently PAYCOM, and/or a co-employment relationship, for all payroll activities and Owner agrees to use the Manager's processor or partner, employee leasing company of choice which may change from time to time. Any and all fees associated with the payroll related activities shall be an Operating Cost of the Hotel, including a ten dollar ($10.00) per employee, per payroll, processing fee. This fee may change throughout the Term but at no time shall increase more than five (5%) percent at any one time without prior notice to the Owner.

(d)     Upon expiration or other termination of this Agreement (other than pursuant to Section 13.02 hereof as a consequence of a default on the part of Manager hereunder), an escrow fund shall be established from Total Revenues (or, if Total Revenues are not sufficient, with funds provided by Owner) to reimburse Manager for all costs and expenses incurred by Manager, such as reasonable transfer costs, severance pay, unemployment compensation, WARN Act costs and other employee liability costs arising out of either the transfer or termination of Hotel employees. If the parties fail to agree within thirty (30) calendar days, with respect to the amount of the escrow fund, at the request of either party, the amount thereof shall be determined by Expert Resolution pursuant to the provisions of Article 20.

### 6.04    Labor Relations

When and where applicable, Manager shall be responsible for negotiating labor union contracts with its union employees in accordance with the provisions of the applicable Annual Business Plan regarding compensation and other applicable guidelines contained in the Annual Business Plan or which are otherwise agreed to by Owner and Manager. In connection with said contract negotiations, Manager agrees to advise and consult with Owner on a timely basis on the status of Manager's relationship with the union, in advance of and throughout the contract negotiations. Representatives of Owner shall be entitled to confer on an immediate basis with the person or persons selected by Manager to negotiate with representatives of a labor union during the course of any labor negotiations, but Owner's representatives shall not be entitled to participate in negotiations with union representatives without the prior written consent of Manager, which consent may be withheld, whenever, in Manager's judgment, the presence of Owner's representatives during the negotiations, would be detrimental to Manager's negotiations.

### 6.05    Professionals and Other Specialists

Manager shall have the right to retain legal counsel and such other professionals, consultants, and specialists as Manager deems necessary in connection with the management of the Hotel, the cost of which shall be an Operating Cost, whether budgeted or not. Owner agrees and acknowledges that it is difficult, if not impossible, to project these costs.

EXHIBIT A

Manager is not, and does not purport to be an expert, specialist or professional as it relates to the IT (information technology field, including any PCI DSS Compliance) field. As such, Manager as a course of action hires professionals in this field to provide these services for the Hotel. Nothing in this Agreement is designed to profess Manager's ability to perform these functions, and furthermore, Owner agrees that Manager is not responsible under this Agreement for performing such, and indemnifies Manager, per Article 11, for any and all IT related activities performed, or not performed, at the Hotel including but not limited to PCI DSS Compliance. Manager will, if requested by Owner, hire professionals to handle such activities, but in no way makes any guarantees or assurances that such professionals will prevent any fines or penalties for failures to maintain any related compliances or systems.

### 6.06   Sales, Marketing, Advertising and Additional Promotional Programs

(a)    Manager shall arrange, contract for and carry out such advertising and promotion of the Hotel as Manager shall deem advisable and consistent with the Approved Budget. Funds for advertising and promotion of the Hotel may be expended exclusively for or with respect to the Hotel and may be administered at and through Manager's regional or home office. In the case of any joint or cooperative advertising or promotion (or other joint or cooperative efforts such as development and/or publication of standardized directories for hotel rooms), the costs thereof (without markup or profit to Manager or any Affiliate) shall be equitably allocated by Manager between the Hotel and any other affiliated hotels participating therein, considering the relative benefits received therefrom by each of the participants.

(b)    Manager shall include Hotel in its proprietary in-house revenue management program that will be specifically directed to driving and maximizing revenue at the Hotel. This program is designed to replace franchise related services. The monthly cost for this program shall be one thousand four hundred dollars ($1,100.00) and may be increased annually but by no more than 5% in any one year.

(c)    Manager shall reasonably coordinate with tour programs marketed by airlines, travel agents and government tourist departments when Manager deems the same to be advisable and in the best interests of the Hotel. Manager, in its sole discretion, may cause the Hotel to participate in sales and promotional campaigns and activities involving complimentary rooms/suites, food and beverages, and other amenities to bona fide travel agents, tourist officials, airline representatives and other travel industry professionals where such is customary in the travel industry or in Manager's practice and policy.

### 6.07   Trades: Treatment Accorded

Manager may arrange for and make trades of goods and/or services (including, but not limited to, room/suite occupancy, food, beverages, incidental charge items and taxes relating to any thereof) furnished or to be furnished to others at the Hotel, for goods and/or services (including, but not limited to, advertising, air and ground transportation, rental vehicles and taxes relating to any thereof) furnished or to be furnished to or for the benefit of the Hotel or Manager. In such event, if the goods and/or services received in a particular trade are for the use or benefit of the Hotel (and not for the exclusive use or benefit of Manager), there shall be included in Total Revenues the then posted standard room rates and/or other standard charges for the goods and/or

EXHIBIT A

services given therefore in such trade and the same amount shall be deemed contemporaneously expended as Operating Costs for such goods and/or services received.

### 6.08    Routine Maintenance and Repairs

Subject to the availability of sufficient funds therefore, Manager shall maintain the Hotel in good repair and condition and in conformity with the Operational/Franchise Standards and applicable laws and regulations, and shall make or cause to be made such routine maintenance, repairs and minor alterations, as Manager, from time to time, deems necessary for such purposes and in order for the Hotel to maintain a competitive position in the market place. The cost of such routine maintenance, repairs and alterations shall be paid from Total Revenues and shall be treated as an Operating Cost; to the extent that Hotel revenues are insufficient therefore, Owner shall, upon Manager's request, provide sufficient funds to pay for such costs when due. Expenditures under this Section 6.08 shall not be paid from the Reserve Fund. The determination of whether an expenditure is for an FF&E Replacement under Section 6.09 or, in the alternative, for routine repairs and maintenance under this Section 6.08 shall be made in accordance with this Agreement, Manager's accounting policy, and the Uniform System of Accounts. If and to the extent that the Uniform System of Accounts does not address and resolve the categorization of an expenditure, Manager shall make the determination, in good faith.

### 6.09    FF&E Replacements & Capital Expenditures

In addition to routine maintenance, repairs and alterations under Section 6.08, and subject to the limitations of the Approved Budget, Manager shall have the further right to replace FF&E and make such Capital Expenditures as Manager deems to be beneficial to the Hotel or its operation or which Manager determines to be necessary in order to maintain the Hotel's competitive position in the market place or to maintain the Hotel in accordance with the Operational/Franchise Standards. Expenditures under this Section 6.09 shall, to the extent provided in Section 6.10 hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account. The determination as to whether the expenditure is a Capital Expenditure will be made in accordance with generally accepted accounting principles for hotels (*"GAAP"*). As used herein, "*Capital Expenditures*" shall mean and include repairs, alterations, improvements, renewals and replacements to the Hotel which are normally capitalized under GAAP, including, without limitation, those items defined as FF&E repairs, alterations, improvements, renewals or replacements to the Building's structure or to its mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation systems, exterior and interior repainting, and resurfacing building walls, floors, roofs and parking areas and expenditures for computer hardware, software, materials, and related labor expenses. Design and installation of FF&E Replacements shall be under Manager's supervision. Design and completion of Capital Expenditures, if requested by Owner, shall be under Manager's supervision. To the extent Manager supervises or directs Capital Expenditures, or otherwise provide any project management services related thereto, Manager may agree to do so; provided, Manager shall be entitled to additional compensation therefor equal to four percent (4%) of all costs related to the Capital Expenditures. To the extent Owner engages any contractors, subcontractors or third parties to complete any work, repairs or improvements at the Hotel, such work shall be at the Owner's sole cost and expense. Owner agrees to indemnify and hold Manager harmless from all claims, costs, expenses and

EXHIBIT A

liabilities arising from the same and further agrees that all such work shall be coordinated through Manager so as to minimize any disruption of the Hotel's operation by Manager.

### 6.10    FF&E and Capital Expenditures Estimates

Manager shall prepare plans and estimates of the expenditures necessary, in such detail as Owner shall reasonably require, for (a) FF&E Replacements (the "*FF&E Replacement Budget*"), and (b) Capital Expenditures (the "*Capital Expenditures Budget*") during each ensuing Fiscal Year, and shall submit such FF&E Replacement Budget and Capital Expenditures Budget to Owner for approval as a part of the Annual Business Plan described in Section 7.02.

### 6.11    Emergency Repairs: Repairs Required by Law

(a)    In the event a condition should exist in, on or about the Hotel of an emergency nature, including those defined as Capital Expenditures hereunder, which condition requires immediate action to preserve and protect the Hotel, to assure its continued operations, or to protect Hotel guests or employees, Manager, on behalf of and at the sole cost and expense of Owner, is authorized to take all steps and to make all expenditures necessary to repair and correct any such condition, whether or not provisions have been made in the Approved Budget for any such emergency expenditures.  Manager shall not expend more than $25,000 on any one occasion pursuant to this Subsection 6.11(a) without Owner's prior approval, unless Manager determines that the emergency condition constitutes an immediate threat to the life or safety of Hotel guests or employees or will result in further damage to the Hotel; and in any event, Manager shall advise Owner as promptly as possible of any expenditures made or to be made under this Subsection 6.11(a).  Expenditures under this Subsection 6.11(a) shall, to the extent provided in Subsection 6.12(a) hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account.

(b)    In the event that, at any time during the Term, repairs to or additions, changes or corrections in the Hotel of any nature shall be required by reason of any laws, ordinances, rules or regulations now or hereafter in force, or by order of any governmental or municipal power, department, agency, authority or officer, whether such repairs are Capital Expenditures or otherwise, such repairs, additions, changes or corrections shall be made at the direction of Manager and paid for by Owner, unless (and except for so long as) compliance therewith is in good faith being contested by Owner and enforcement is stayed in a manner reasonably satisfactory to Manager.  Expenditures under this Subsection 6.11(b) shall, to the extent provided in Subsection 6.12(a) hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account.

(c)    To the extent any "*Hazardous Materials*" are found at the Hotel, Manager shall have the right, but not the obligation, to perform any environmental assessments at the Hotel and remediate any such Hazardous Materials from the Hotel; provided, Owner shall be responsible for all costs, expenses, liabilities and other claims resulting from the same and agrees to comply with all applicable laws with respect to the proper remediation of such Hazardous Materials.  Owner's failure to comply with this provision shall give Manager the immediate right to terminate this Agreement without notice under Section 13.02.  To Owner's knowledge, (a) no Hazardous Materials are or have been manufactured, generated, processed, used, handled, stored, disposed,

EXHIBIT A

released or discharged at, on, in, over, under or from the Hotel, the Site or the real property adjacent to the Hotel, (b) there are no soil, water, air, mineral, chemical or environmental conditions or contamination at, on, in, over, under or from the Hotel, the Site or real property adjacent to the Hotel that does, or with the passage of time will, require any remediation, abatement, removal, clean up, monitoring or other corrective action, or notice or reporting to any Governmental Authority or employees or patrons of the Hotel, pose any threat to the health and safety of the employees or patrons of the Hotel or the environmental or natural resources in general, or otherwise require, based on Applicable Law or standards of prudent ownership, any remediation, abatement, removal, clean up, monitoring or other corrective action, (c) there exists no identifiable threat of the contamination of the Site by release of Hazardous Materials, substances or wastes or otherwise from existing sources adjacent to the Hotel, and (d) there are no underground storage tanks on the Site. "*__Hazardous Materials__*" means any of the following: (i) any "hazardous waste," "solid waste," "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "contaminant" as those or similar terms are defined or regulated under any Environmental Laws; (ii) any mold, mildew, fungus, or other potentially dangerous organisms ("*__Mold__*"); (iii) asbestos (whether or not friable) and asbestos-containing materials; (iv) any volatile organic compounds, including oil and petroleum products; (v) any substances which because of their quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitute or may reasonably be expected to constitute or contribute to a danger or hazard to health, safety or welfare of any person or to the environment, including any polychlorinated biphenyls (PCBs), infectious medical wastes (including tissue, syringes, needles, blood samples or any material contaminated with bodily fluids of any type), toxic metals, etchants, explosives, reactive metals and compounds, pesticides, herbicides, urea formaldehyde foam insulation and chemical, biological and radioactive wastes; (vi) radon gas; (vii) any other substance the presence of which on the Hotel is prohibited by any Environmental Laws; and (viii) any other substance which by any Environmental Laws requires special handling or notification of any Governmental Authority in its collection, storage, treatment, or disposal.  However, for the purposes of the covenants and representations, but not the indemnification obligations, set forth in this Agreement, the term "Hazardous Materials" shall not include small quantities of materials, chemicals or substances normally used in connection with the use, management, operation, or ownership of the Hotel, provided that such materials, chemicals or substances are generated, produced, stored, handled, used transported and disposed in a safe and prudent manner in strict compliance with all Environmental Laws.

### 6.12    Reserve Fund

(a)    At the Commencement Date, Owner shall deposit and maintain $0.00 as a minimum in the Reserve Fund and thereafter deposit each month during the Term, an additional amount equal to 0.0% of Gross Room Revenues for the preceding month (the "*__Reserve Percentage__*").  The amounts so deposited in the Reserve Fund shall be recorded on the Hotel's books of account as "Reserve Fund." All deposits to, and the balance in, the Reserve Fund, from time to time, shall be placed into and maintained in, an interest-bearing account (the "*__Reserve Fund__*") established in Owner's name at a bank of Owner's selection with Manager's designees being the only authorized signatories on said account.  Any expenditure for FF&E Replacements and Capital Expenditures during any Fiscal Year, to the extent provided for in the Approved Budget, may be made without Owner's further approval and shall be made by Manager from the Reserve Fund (including accrued interest and unused accumulations from earlier years).  Any

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 17

EXHIBIT A

amounts remaining in the Reserve Fund at the close of each Fiscal Year shall be carried forward and retained in the Reserve Fund until fully used as herein provided.

(b)     To the extent the Reserve Fund is insufficient at a particular time or to the extent the Reserve Fund plus anticipated contributions for the ensuing year are below the amount provided therefore in the Approved Budget for the ensuing year, then in either such event, Manager shall give Owner written notice thereof at least forty-five (45) calendar days before the anticipated date such funds will be needed.  Owner shall supply the necessary funds by deposit to the Reserve Fund at least thirty (30) calendar days prior to the anticipated date such funds will be needed. Upon termination of this Agreement for whatever reason, Manager's right to expend any unused portion of the Reserve Fund shall terminate and the balance of the fund shall be paid over to Owner, less any sums then due Manager.

### 6.13   Cash Management

Manager shall manage all cash balances from the operation of the Hotel and may invest the same on behalf of Owner, from time to time, as reasonably determined by Manager.

### ARTICLE 7
### FISCAL MATTERS

### 7.01   Accounting Matters

(a)     Manager shall strive to maintain an accurate accounting system, in accordance with the definitions of this Agreement, substantially in the form and layout of the P&L in Exhibit C, and the Uniform System of Accounts with its management of the Hotel.  For all purposes under this Agreement, "*Uniform System of Accounts*" shall mean the Uniform System of Accounts for the Lodging Industry, Ninth Revised Edition, 1996, as adopted by the American Hotel and Motel Association and any future amendments thereto as may be approved by Manager. Definitions in this Agreement will prevail over a dispute in terminology. The books and records reflecting the Hotel operations shall be maintained either at the Hotel, at the principal office of Manager or at a regional accounting office, at Manager's option.  Such books and records will be compiled using Manager's proprietary accounting system which use shall be offered to Owner during the Term of this Agreement for the fees detailed in the Agreement.  Owner, the Mortgagee(s), and the independent accounting firms of Owner, the Mortgagee(s) and Manager shall each have the right and privilege of examining said books and records at any reasonable time during normal business hours following fifteen (15) calendar days advance notice to Manager.  Any such review shall be completed without material disruption to the Hotel operations.

(b)     Upon request of Owner and at Owner's sole cost and expense, a certified audit of the Hotel operations shall be performed by a nationally recognized, independent Certified Public Accounting firm with expertise in the lodging industry as appointed by Owner.  Manager shall cooperate in good faith with Owner and its representatives to facilitate such audit.

(c)     Manager shall prepare and furnish to Owner, within twenty (20) calendar days after the end of each calendar month, one copy of the profit and loss statement for the Hotel setting forth the financial position and results of operations of the Hotel for such calendar month and the calendar year-to-date, with comparisons to the then current Operating Budget and the previous

EXHIBIT A

year's results if the previous year's results have been prepared by Manager or provided to Manager in an acceptable form, for an additional fee. These documents will be provided in an online format where the Owner can download them and print as many copies as they require. Additional hard copies may be provided by Manager at Owner's prior written request, at Owner's cost of $135.00 per additional copy. Manager shall also provide Owner with such additional operating and financial data as Owner may reasonably request, the cost of providing said data to be an Operating Cost of the Hotel.

(d)     Owner may from time to time request that Manager provide services outside the normal services defined by this Agreement, which Manager may accept or decline in its sole discretion.

(e)     Manager shall not be required to provide any additional reporting requirements or any services for the Owner, or appointed trustee or receiver of the court, as the result of a bankruptcy filing by Owner. If Owner files bankruptcy, and Manager is asked to provide services outside of the normal services defined by this Agreement as a result, Manager may at its own discretion decide to do so for additional fees, which fees shall be paid together with all other amounts under this Agreement as a first priority administrative expense in any such bankruptcy proceeding. Should Manager provide such services, Owner agrees to pay Manager Additional Fees of $500.00 per financial projection or report as defined in Section 7.04 of this Agreement, and an additional variable fee of $100.00 per hour for any other services provided (the ***"Bankruptcy Fees"***). The Bankruptcy Fees shall be considered Operating Costs whether or not they are included in the Approved Budget and will be considered earned and due when billed.

### 7.02   Annual Business Plan

(a)     Manager shall submit to Owner an Operating Budget for Fiscal Year one at least ninety (90) days prior to the Open Date, if applicable, or within ninety (90) days of the Commencement Date if the Hotel is already open as of the Commencement Date. Upon submission, the Annual Business Plan for Fiscal Year one shall be subject to review and approval by Owner in the manner described in Subsection 7.02(b) hereof. Until such time as an Approved Budget becomes effective with respect to operation of the Hotel for Fiscal Year one, Manager shall operate the Hotel in accordance with the standards it currently operates similar hotels.

(b)     At least thirty (30) days prior to the commencement of each subsequent Calendar Year, Manager shall submit to Owner an annual forecast for the operation of the Hotel for such Fiscal Year containing revenue projections and budgets of expenses (the "***Operating Budget***"). The Operating Budget shall be substantially in form consistent with Exhibit C. Manager shall, at the same time, also submit to Owner the FF&E Replacement Budget and the Capital Expenditures Budget, which, together with the Operating Budget, will comprise the "***Annual Business Plan***". Manager shall provide Owner, upon request, additional detail, information and assumptions used in preparation of the Annual Business Plan. Manager shall review the Annual Business Plan with Owner, and subject to Owner's approval, which shall not be unreasonably withheld, Manager shall implement such Annual Business Plan during the successive Fiscal Year (during which it shall be referred to as the "***Approved Budget***"). Owner shall approve the proposed Annual Business Plan or state its specific objections thereto (or to any specific item or items therein) within thirty (30) days after the Annual Business Plan is submitted by Manager to Owner. In the event Owner

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 19

EXHIBIT A

objects to the Annual Business Plan or any specific line item or items of the Annual Business Plan prior to commencement of the Fiscal Year in question, pending resolution thereof, the Annual Business Plan or the specific line item or items of expense (not revenue) that have not been approved shall be suspended and replaced for the Fiscal Year in question by an amount equal to the amount of such budget item or items for the Fiscal Year prior thereto.  If either Owner or Manager determines that the Annual Business Plan, or any specific line item or items therein, cannot be agreed to by the parties, then either Manager or Owner may require the matter to be submitted to Expert Resolution in accordance with Article 20 hereof.  Notwithstanding the foregoing, in the event Owner fails to respond with any objections to the Annual Business Plan, in writing, within thirty (30) days after submittal by Manager, then the Annual Business Plan shall be deemed approved.  **FAILURE OF OWNER AND MANAGER TO REACH AGREEMENT ON AN APPROVED BUDGET SHALL AT NO TIME BE CONSIDERED AN EVENT OF DEFAULT UNDER THIS AGREEMENT.**

(c)    Notwithstanding anything to the contrary contained in this Agreement, Manager may, without Owner's approval, make aggregate expenditures in any year which exceed the Approved Budget, provided that such excess does not exceed such expenditures as provided in the Approved Budget by more than five percent (5%).  In addition, Manager may expend in excess of said five percent (5%) limitation under the following circumstances (provided such expenditures are reasonable in nature and amount based on such circumstances):

(i)    as the result of increased costs due to increases in the volume of Total Revenues (by reason of increased occupancy rates or otherwise); or

(ii)    as the result of increases in franchise fees, travel agent fees, or legal fees for Hotel related activities; or

(iii)    as the result of an emergency, as described in Section 6.11, or of uncontrollable expenditures, such as insurance, real estate taxes, weather-related costs, and increases in the cost of utilities based upon changes in utility rates; or

(iv)    as the result of earned benefits from employee bonus plans; or

(v)    as Manager deems necessary in good faith to maximize Net Profit/Loss.

References in this Agreement to the limitations imposed by the Approved Budget (and phrases of similar import) shall be deemed to incorporate Manager's authority to expend funds in excess of the Approved Budget as set forth in this Section 7.02(c).  Manager shall promptly notify Owner of any expenditures that have been or are expected to be made in excess of the Approved Budget and of the reasons therefore.  Delivery of the monthly profit and loss statement will satisfy this notice requirement.

(d)    Manager makes no assurances that the actual performance of the Hotel shall correspond to its estimates in the Annual Business Plan.  Manager agrees to use all reasonable efforts to operate the Hotel within the Approved Budget and in a manner designed to maximize Gross Rooms Revenues and Income Before Fixed Charges.

EXHIBIT A

(e)      At the time of the review by Owner with Manager of the Annual Business Plan and at any additional meetings during the Fiscal Year reasonably called by Owner and Manager, Manager shall, as needed, consult with Owner on matters of policy concerning operations, sales, room rates, wage scales, personnel, general overall operating procedures, economics and operation and other matters affecting the operation of the Hotel.

### 7.03   Bank Accounts

Manager shall establish in the name of Owner and for Owner's account such bank accounts ("***Bank Account***") as Manager deems necessary for the management of the Hotel at a bank or banks approved by Owner into which all funds advanced to the Hotel by Owner or otherwise derived from the operation of the Hotel shall be deposited.  All Bank Accounts shall provide that Manager's designees shall be the only parties authorized to draw upon the Bank Accounts. Manager shall have control of such Bank Account, and any and all monies received from the operation of the Hotel shall pass through such Bank Account.  Nothing herein contained shall be construed to deprive Manager of the right to maintain petty cash funds at the Hotel and to make payments therefrom pursuant to the standard practices employed in the hospitality industry; provided Manager shall make a complete accounting for the same as required under this Agreement.

### 7.04   Reimbursement of Out-of-Pocket Expenses and Additional Fees

It is agreed that Owner shall reimburse Manager and its Affiliates for actual, reasonable and necessary out-of-pocket costs incurred as an Operating Cost by them in the performance of this Agreement.  Such costs shall include, but not be limited to, reasonable travel, entertainment, telephone, telegraph, reproduction, electronic communication, postage, air express, costs of recruitment (including applicable agent's fee), franchise conference attendance, training seminars or similar fees benefiting Hotel or facilitating Manager's performance under this Agreement and other incidental expenses.  Additionally, any financial proformas, budgets, forecasts or similar projections in excess of those referenced in Article 7.02 of this Agreement, will be billed at a rate of $500.00 per projection and payable to Manager in accordance to this Article.  It is agreed that Manager shall be entitled to reimbursement of these expenses directly from the Bank Account at the time incurred.  Such reimbursements shall be in addition to the Operating Fee Total and other fees and payments due hereunder.  Any Additional Fees earned and billed will be billed at an hourly rate of $200.00 per hour.

### 7.05   Tax Matters

(a)      Manager shall prepare and remit taxes for operational taxes only, including occupancy, sales and use, beverage and telecommunications as required by the Hotel's respective governmental jurisdiction.  Tax accounts will be established in the Owner's name by Manager. Beverage taxes will be reported under the respective Beverage License Holder's tax account. Owner's tax filing information is:

|  |  |
|---|---|
| Entity Name: | Newstream Hotel Partners-IAH, LLC |
| Federal Tax ID Number: | _____ |

EXHIBIT A

Type of Organization:        Limited Liability Company
State Organized:             Texas

(b)      Manager is not responsible for the preparation or returns or remittance of payments for local, state or federal income taxes due by Owner.  Owner will be responsible for all income tax matters.

(c)      Should Owner desire Manager to engage the services of a property tax consultant for any disputes, or should Owner desire Manager to ensure timely payment of any and all property taxes (both real and personal), Owner will advise Manager of this election, in writing.  Owner understands that Manager will not provide these services unless directed to do so by Owner.

## ARTICLE 8
## PAYMENTS TO MANAGER

### 8.01    Base Operating Fee

In consideration of the management of the Hotel by Manager, Owner agrees to pay to Manager the Operating Fee Total.  The "***Base Operating Fee***" shall mean and refer to a fee equal to a monthly fee of (i) $5,000.00 for each month of the Construction/Acquisition Term until the Make Ready Date, if applicable, or (ii) the greater of (a) 3.5% of Total Revenues, or (b) $5,000.00 for each month (or prorata portion thereof) during the Term of this Agreement.  The Base Operating Fee for the immediately preceding month shall be paid monthly, in arrears by no later than the 10th of the month, to Manager from the Bank Account.

### 8.02    Incentive Operating Fee

In addition to the Base Operating Fee, beginning with Fiscal Year two, Owner also agrees to pay Manager an amount equal to 10% of the year-over-year increase, calculated monthly, in Income Before Fixed Charges ("***Incentive Operating Fee***").  For the purposes of calculating Incentive Operating Fee for the second Fiscal Year when the Fiscal Year one is a partial period (less than twelve months), the month-over-month Incentive Operating Fee comparison shall be calculated by subtracting either (i) the applicable line item in the Fiscal Year two Operating Budget (for such months with no Actual Income Before Fixed Charges), or (ii) the actual monthly Income Before Fixed Charges for the prior year to the extent available, from the actual monthly Income Before Fixed Charges of the second Fiscal Year.  The Incentive Operating Fee shall not exceed one (1.0) percent of Total Revenues for any Fiscal Year period.  The Incentive Operating Fee shall be calculated and paid monthly to Manager from the Bank Account following the issuance of the monthly financial statements.

### 8.03    Accounting Fee

Owner also agrees to pay Manager a fee (***"Accounting Fee"***) in an amount equal to $1,000.00 per month for accounting services and for the use of Manager's proprietary accounting system and human resource database systems (***"Systems"***).  The Systems will only be offered for use by the Owner during the Term of this Agreement.  Any subsequent use after the Term shall require a separate agreement. The Accounting Fee shall be paid monthly by no later than the 5th of the month, to Manager from the Bank Account.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO             Page 22

EXHIBIT A

## ARTICLE 9
## DISBURSEMENTS

### 9.01   Disbursement of Funds

All funds derived from the operation of the Hotel shall be deposited into the Bank Account created pursuant to the requirements of Section 7.03.  There shall in turn be disbursed by Manager for and on behalf of Owner, funds from the Bank Account toward the following items to the extent available (with appropriate reserves established to cover items payable less frequently than monthly) in the following order of priority:

(a)   all Operating Costs, including the Operating Fee Total, charges for additional services, and all reimbursable expenses due Manager;

(b)   payments pursuant to any equipment leases or installment sale contracts approved by Manager; and

(c)   all other Fixed Expenses.

### 9.02   Adjustment to Bank Account

After the disbursements pursuant to Section 9.01, any excess funds remaining in the Bank Account over the Minimum Balance shall be disbursed monthly to Owner.  Correspondingly, Owner agrees to make-up any deficiency in the Bank Account as required in Section 2.03. Notwithstanding that Manager is authorized to and shall make the above described disbursements to the extent funds are available, Owner will be solely liable for (i) all Operating Costs, specified Fixed Expenses and other Fixed Expenses and (ii) all sales taxes, excise taxes, or other taxes which may be assessed by any taxing authority against or upon Manager with respect to any payments, receipts or earnings received by Manager pursuant to this Agreement, including, without limitation, the fees received by Manager pursuant to Article 8, excluding in any case, however, any federal, state or local income, franchise or other taxes levied against Manager based upon its assets or income.

## ARTICLE 10
## INSURANCE

### 10.01   Insurance Coverage

Manager agrees to procure and maintain to the best of its ability, as either an Operating Cost or Fixed or Capital Expenses, such comprehensive general liability insurance and other insurance coverage as is set forth in said Exhibit "B".  In connection with all significant construction at the Hotel, Owner or Manager (whichever is the contracting party) will cause the general contractor to maintain, with a reputable insurer, comprehensive general liability insurance (with products, completed operations and independent contractor's coverage) in at least the amount of $5,000,000, and to issue evidence of such coverage to Owner and Manager, naming Owner and Manager as named insureds.

EXHIBIT A

If Owner chooses to employ any or all of the employees of the Hotel, then Owner is required to carry comprehensive Worker's Compensation and Employers' Liability Insurance, at the minimum limits depicted in Exhibit B of this Agreement that would have otherwise been carried by the Manager if they employed the employees. Owner is further required to provide Manager proof of such coverage by issuing Manager a Certificate of Insurance evidencing such coverage for the Owner.

**10.02   Insurance Policies**

(a)      All insurance provided for under this Article 10 shall be effected by policies issued by insurance companies of good reputation and of sound financial responsibility and shall be subject to Manager's approval. Such insurance may be carried under blanket policies covering the Hotel and other locations provided such policies otherwise comply with all of the requirements of Exhibit "B".

(b)      Certificates of Insurance shall be delivered to Owner and Manager on or before the Open Date if new construction, or the Commencement Date if an existing and operating Hotel as of the Commencement Date. All insurance policies shall be renewed, and proof of such renewals shall be delivered to Owner and Manager at least ten (10) days prior to their respective expiration dates.

(c)      All insurance policies procured by Manager under Section 10.01 shall be written in the name of Manager with Owner, any lessor, any Mortgagee(s) and any other appropriate parties designated by Owner or Manager being named thereon as additional insureds (as their respective interests may appear), except for worker's compensation insurance and other insurance with respect to which it is impractical and inappropriate to name other parties as additional insureds.

(d)      All property insurance policies shall be endorsed specifically to the effect that the proceeds of any building, contents or business interruption losses shall be made payable to Owner, the Mortgagee(s), and Manager jointly, as their interests may appear, unless otherwise required by any Mortgagee. Each party shall use all reasonable efforts to cause any policy, which it is responsible to obtain under Exhibit "B" to provide that the insurer shall not have any rights of subrogation to any claim, which either party hereto may have or acquire against the other. Neither Owner nor Manager shall have any claim against the other with respect to the failure of any insurance carrier to provide the coverage or protection placed with such carrier as contemplated by this Agreement.

(e)      Certificates of Insurance (and copies of policies, to the extent required) shall be sent to Manager and to Owner at their respective addresses set forth in Article 14 hereof and to the Mortgagee(s) at such addressees as the Mortgagee(s) shall designate.

(f)      Manager shall have the right to set insurable values of the Hotel on behalf of Owner if Owner does not request specific insured values, in writing at least ninety (90) days in advance of each new policy renewal term, be placed by Manager. If such request is made, Manager shall use reasonable efforts to accommodate Owner's request, but should Manager's insurance carrier have minimum coverage limits in excess of Owner's coverage request, Manager shall have the authority to bind coverage under those minimum limits.

EXHIBIT A

(g)    All coverage limits and deductible amounts set forth in Exhibit "B" shall be reviewed by Owner and Manager from time to time for the purpose of determining the coverage limits and deductible amounts then appropriate for properties similar in type and construction to the Hotel and for the nature of the business being conducted.  Manager and Owner shall cooperate in good faith to arrive at an agreement on such matters.

### 10.03   Manager's Blanket Insurance Coverage

Manager may, at its option (but shall not be obligated to) make available to Owner the opportunity to participate in blanket insurance policies carried by Manager for other properties, including, without limitations other affiliated hotels, and which cover all or any portion of the insurance coverage specified in Exhibit "B" (including all or any portion of that insurance required to be procured and maintained by Owner under Section 10.01).  Owner agrees to participate in such blanket policies if (a) Manager determines to make such coverage available to Owner, and (b) the premiums for, and the coverage and financial strength provided by the insurer(s) under such blanket policies applicable to the Hotel shall be competitive with the premiums for, and the coverage and financial strength provided by the insurer(s) from which Owner would otherwise obtain such insurance.  In such event, notwithstanding the provisions of Section 10.01 and Exhibit "B" hereof, Manager shall be responsible for procuring and maintaining, at the expense of Owner, all insurance coverage represented by such blanket policies.

### 10.04   Waiver of Subrogation

Anything in this Agreement to the contrary notwithstanding, Owner and Manager each hereby waives any and all rights of recovery, claim, action or cause of action, against the other, its agents (including partners, both general and limited), officers, directors, shareholders or employees, for any loss or damage that may occur to the Hotel, or any improvements thereto, or any property of such party therein, by reason of fire, the elements, or any other cause which could be insured against under the terms of the fire and extended coverage insurance policy to be carried pursuant to this Agreement, regardless of cause or origin, including negligence of the other party hereto, its agents, officers or employees and covenants that no insurer shall hold any right of subrogation against such other party.

### ARTICLE 11
### RESPONSIBILITY FOR CLAIMS, ETC.

(a)    ALL DEBTS AND LIABILITIES ARISING IN THE COURSE OF BUSINESS OF THE HOTEL OR OTHERWISE IN CONNECTION WITH THE USE, OCCUPANCY OR OPERATION THEREOF (INCLUDING, WITHOUT LIMITATION, ALL SUCH LIABILITIES UNDER OR WITH RESPECT TO ENVIRONMENTAL LAWS, HAZARDS OR CLAIMS) DURING THE TERM ARE AND SHALL BE THE OBLIGATION OF OWNER, AND MANAGER SHALL NOT BE LIABLE OR OTHERWISE RESPONSIBLE FOR ANY SUCH DEBTS OR LIABILITIES BY REASON OF ITS MANAGEMENT, SUPERVISION AND OPERATION OF THE HOTEL DURING SAID TERM, EXCEPT FOR ANY SUCH DEBT OR LIABILITY THAT ARISES BECAUSE OF MANAGER'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  **MANAGER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER AND ITS AFFILIATES, AND THEIR RESPECTIVE AGENTS,**

EXHIBIT A

OFFICERS, EMPLOYEES, DIRECTORS AND SHAREHOLDERS, FROM AND AGAINST ANY AND ALL LOSSES, COSTS, LIABILITIES, EXPENSES AND CLAIMS (WHETHER ADMINISTRATIVE OR JUDICIAL), INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES (ALL OF THE FOREGOING BEING REFERRED TO AS *"LOSSES"*), TO THE EXTENT ARISING FROM MANAGER'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (EXCLUDING, HOWEVER, ANY SUCH LOSS, COST, LIABILITY, EXPENSE OR CLAIM COVERED BY THE INSURANCE REQUIRED TO BE MAINTAINED IN ACCORDANCE WITH THIS AGREEMENT OR OTHERWISE ARISING FROM MANAGER'S ORDINARY NEGLIGENCE). THE ACT OR OMISSION OF A HOTEL EMPLOYEE WHO IS NOT THE GENERAL MANAGER, WHICH ACT OR OMISSION IS WILLFUL OR CONSTITUTES FRAUD OR GROSS NEGLIGENCE ON THE PART OF SUCH EMPLOYEE, SHALL NOT CONSTITUTE FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF MANAGER UNLESS MANAGER'S HOME OFFICE OR REGIONAL STAFF, OR THE GENERAL MANAGER, ACTED WITH GROSS NEGLIGENCE IN EMPLOYING, TRAINING, SUPERVISING OR CONTINUING THE EMPLOYMENT OF SUCH EMPLOYEE.

(b)     EXCEPT AS TO SPECIFIC ACTS OR OMISSIONS FOR WHICH MANAGER HAS AGREED TO INDEMNIFY OWNER IN PARAGRAPH (A) ABOVE, OWNER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD MANAGER AND ITS AFFILIATES, AND THEIR RESPECTIVE AGENTS, OFFICERS, EMPLOYEES, PARTNERS, MEMBERS, DIRECTORS AND SHAREHOLDERS, HARMLESS FROM AND AGAINST LOSSES OCCURRING OUT OF OR BY REASON OF THIS AGREEMENT OR OTHERWISE ARISING IN CONNECTION WITH THE OWNERSHIP, USE, OCCUPANCY OR OPERATION OF THE HOTEL, INCLUDING LOSSES ARISING OUT OF MANAGER'S ORDINARY NEGLIGENCE.

(c)     No person or entity shall be deemed to be a third party beneficiary of any term or provision of this Agreement, including, without limitation, the terms and provisions of this Article 11, and no person or entity shall have any rights of subrogation or similar rights under this Article 11, other than Affiliates of Owner and Manager, respectively, entitled to indemnification pursuant to the provisions of this Article 11. All indemnification obligations under this Agreement and the provisions of this Article 11 shall survive the expiration and any termination of this Agreement.

Manager's Initials                                    Owner's Initials

## ARTICLE 12
## CASUALTY AND CONDEMNATION

### 12.01  Casualty

(a)     If, during the Term, the Hotel incurs minor damage by fire, casualty or other cause, Owner shall, at its sole cost and expense and with all reasonable diligence, repair or replace the damaged portion of the Hotel to the reasonably same condition as existed previously. To the extent

EXHIBIT A

available, proceeds from the insurance described in Article 10 shall be applied to such repairs or replacements.

(b)     In the event damage or destruction to the Hotel from any cause materially and adversely affects the operation of the Hotel, Owner shall promptly commence and complete repairing, rebuilding or replacement of the Hotel to substantially the same character as existed prior to the damage or destruction provided replacement is justified in comparison to the anticipated profitability of the Hotel during the remaining Term, and provided that the available insurance proceeds (plus the amount of the deductible with respect thereto) permit such repair, rebuilding or replacement.  In the event Owner chooses to not undertake the repairs, rebuilding or replacements specified above, Manager may terminate this Agreement upon sixty (60) days advance written notice, respectively, to the Owner without the payment of a termination fee or other penalty of any kind; provided, however, in the event Owner or any Affiliate (but not any unrelated third party transferee of Owner) shall reopen the Hotel as a hotel within two (2) years after the date of such casualty, on or before the date of reopening, Owner shall pay Manager a termination payment in an amount equal to the aggregate amount of the Operating Fee paid to Manager hereunder during the twenty-four (24) full months immediately preceding the date of such casualty.

### 12.02   Condemnation

(a)     In the event all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Hotel shall be so taken, but the result is that it is uneconomic to continue to operate the Hotel as a hotel of the same character and class, this Agreement shall terminate.  Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any damages to which they may be entitled.

(b)     In the event a portion of the Hotel shall be taken by the events described in Subsection 12.02(a) or the entire Hotel is affected but on a temporary basis, and the result is not to make it unreasonable to continue to operate the Hotel, this Agreement shall not terminate. However, provided that Owner determines that the cost of repair, rebuilding or replacement is justified in comparison to the anticipated profitability of the Hotel during the remaining term of this Agreement, so much of any award for any such partial taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event shall be used for such purpose; the balance of such award, if any, shall be paid to Owner.

### 12.03   Business Interruption Insurance

Any proceeds from business interruption insurance payable to Owner or Manager hereunder, including, without limitation, payments made in connection with, or with respect to periods before or after, the termination of this Agreement pursuant to Sections 12.01 or 12.02, shall be fairly and equitably apportioned between Owner and Manager in accordance with their respective interests and equities to the end that the fair value of Manager's expectable compensation under this Agreement for the period covered by such business interruption insurance shall be paid to Manager.  Any business interruption insurance paid to Manager pursuant to this

EXHIBIT A

Section 12.03 in respect of the period subsequent to the date of termination of this Agreement shall be credited against any termination payment payable by Owner to Manager pursuant to Section 12.01(b).

## ARTICLE 13
## DEFAULT AND TERMINATION

### 13.01    Events of Default

It shall be an event of default hereunder (an "***Event of Default***") if any one or more of the following events shall occur:

(a)    If either party fails to timely perform any of its obligations and agreements under this Agreement;

(b)    If either party shall (i) voluntarily or involuntarily be dissolved (except that if either party is a partnership and is dissolved solely by reason of the death, insanity, disappearance, bankruptcy or lack of legal capacity of one or more of its general partners and its remaining partners, within sixty (60) days, elect, pursuant the partnership agreement of such partnership to continue such partnership's business, then such party shall not be considered as "dissolved" for the purposes hereof; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of its assets; (iii) file a voluntary petition in bankruptcy or otherwise voluntarily avail itself of any federal or state laws for the relief of debtors; (iv) admit in writing its inability to pay its debts as they become due; (v) make a general assignment for the benefit of creditors; (vi) file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law or file an answer admitting the material allegations of any petition filed against it in any bankruptcy, reorganization or insolvency proceeding; (vii) be the subject of an order, judgment or decree entered by any court of competent jurisdiction, in the application of any one or more creditors of such party adjudicating it a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of its assets, and such order, judgment or decree shall become final; or

(c)    If Franchisor terminates the Franchise due to Owner's failure to maintain the Operational/Franchise Standards.

### 13.02    Termination

(a)    Upon the occurrence of any Event of Default under Subsection 13.01(a) by or with respect to one of the parties hereto (the "***Defaulting Party***"), the other party hereto (the "***Non-Defaulting Party***") shall have the right (exercisable by the giving of notice to the Defaulting Party) to terminate this Agreement if the Defaulting Party fails to remedy such Event of Default within three (3) days after its receipt of notice to remedy if such default relates to the payment of a sum of money, immediately without notice if such default relates to Owner's failure to remedy a life-safety issue or Hazardous Materials violation under Section 6.11 and, in all other cases, within thirty (30) days after its receipt of notice to remedy; provided, however, that if such Event of Default be of a non-monetary nature and if it cannot reasonably be remedied within said thirty (30) day period, then such thirty (30) day period shall be deemed to be extended for such additional period as may reasonably be required to remedy the same if the Defaulting Party shall promptly

EXHIBIT A

commence to remedy upon receipt of notice from the Non-Defaulting Party and shall continue therewith with due diligence.

(b)     With respect to the occurrence of an Event of Default under Subsection 13.01(b), this Agreement shall terminate, at the election of the Non-Defaulting Party, upon such occurrence, or at any time after such occurrence provided such Event of Default has not been remedied.

(c)     Manager shall have the right to terminate this Agreement at will by providing written notice to Owner should it determine, in its' own discretion, that the Owner is in violation of any part or parts of Articles 2 – Subsection 2.03, Article 5,  or Article 8 or that Owner has become unreasonable in its' operational expectations for the Hotel.

(d)     Manager shall have the right to terminate this Agreement at will, without penalty of any sort, if Manager deems, in its sole discretion, that its ability to fulfill its obligations under this Agreement are being impeded by Owner, Owner's employees or representatives.

(e)     Following the first twenty-four (24) months of the Term, Owner may Terminate this Agreement at any time during the Term, by providing Manager with ninety (90) days written notice of such intent to terminate early, if the Hotel is sold to a non-affiliated entity of the Owner, owing only any fees earned and due to date, reimbursable expenses per this Agreement and the associated fees due during the subsequent ninety (90) day notice period.  If Manager is released prior to the ninety (90) days, then Owner will pay Manager liquidated damages in the amount of ninety (90) days fees, based on the average fees earned to date.  If new owner retains Manager under the terms of this Agreement or other negotiated terms, and Manager agrees to said terms, then Owner will owe only any fees earned and due to date and reimbursable expenses per this Agreement.  All other early terminations will be pursuant to the provisions of this Agreement.

(f)     If Agreement is terminated early, Manager, or it's affiliates, who have invested in the Hotel, shall be immediately repaid whatever the initial investment amount was including a return of fifteen (15) percent annual return on the amount invested.

(g)     The terms of this Agreement shall not be deemed to impair the right of any party to exercise any right or remedy, whether for damages, injunctions, specific performance or otherwise, upon any breach or wrongful termination hereof.

### 13.03   Hotel Reservations Honored

Upon termination of this Agreement for any reason, Owner agrees that Hotel reservations made by Manager in the ordinary and normal course of business, for dates not more than two (2) years after the date of termination and at rates prevailing for such reservations at the time they were made, shall be honored and remain in effect after the date of termination of this Agreement.

### 13.04   Termination Payment

Upon termination, as a result of Owner's default or early termination, Manager shall be entitled to immediate receipt of a termination payment ("**_Termination Payment_**") payable by Manager from the Bank Account, which amount shall be liquidated damages and not a penalty, equal to the lesser of (i) two (2) years' Operating Fee Total's, or (ii) the sum of the future Operating

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 29

EXHIBIT A

Fee Total's due during the remaining Term of this Agreement following the termination event, but never to be less than the sum of six (6) months of Operating Fee Totals. The Termination Payment shall be considered fully earned and due to Manager for services then rendered and constitutes the parties' best, good faith estimate of the damages which would be suffered by Manager in the event of a termination of this Agreement, the exact amount of damages being difficult or impractical to calculate. Owner shall also reimburse Manager for any and all fees incurred in the collection of the Termination Payment, inclusive of any collection and legal fees. Any future monthly Operating Fees due shall be based upon the greater of (i) the average Operating Fee Total paid during the preceding months under the Term, excluding any fees paid during the Construction/Acquisition Term, or (ii) a flat monthly fee of $10,000.00.

## ARTICLE 14
## NOTICES

All consents, approvals, notices or other communications provided for in this Agreement shall be in writing and delivered in person, or sent by reputable and traceable overnight delivery service or by postage prepaid, registered or certified mail, facsimile, or email, to the respective addresses for Owner and Manager set forth below, until such time as written notice, as provided hereby, of a change of address with a new address to be used thereafter is delivered to the other party. Notices will be deemed delivered upon confirmation of delivery at the current notice address referenced above, including verification of a successful facsimile transmission. Upon request, a party shall send copies of any notice or communication by ordinary mail as instructed by the other party.

All notices and other communications required or permitted to be given hereunder shall be given to the applicable party at the address set forth below:

| **If to Owner, to:** | **If to Manager, to:** |
|---|---|
| Newstream Hotel Partners-IAH, LLC | HMC Hospitality Operating Company |
| 301 South Oak Street | 17950 Preston Road |
| | Suite 710 |
| Roanoke, Texas 76262 | Dallas, Texas 75252 |
| | Fax: 972-934-2070 |
| Email: rob.lawson@newstreamcommercial.com | Email: Sullivan@hospitalitymgt.com |
| Attention: Rob Lawson | Attention:   Bill Sullivan |

In order to facilitate communications between Owner and Manager, the parties designate the above-referenced representatives to act pursuant to this Agreement. Upon notice to the other, the parties may, at any time, substitute or add a representative.

## ARTICLE 15
## RELATIONSHIP, AUTHORITY AND FURTHER ACTIONS

### 15.01   Relationship

Manager and Owner shall not be construed as joint venturers or partners of each other and neither shall have the power to bind or obligate the other except as set forth in this Agreement.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 30

EXHIBIT A

Notwithstanding anything to the contrary contained herein, Manager will not be deemed to have a real property estate in the Site.

**15.02** **Further Actions**

Owner agrees to execute all contracts, agreements and documents, and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

### ARTICLE 16
### APPLICABLE LAW AND VENUE

The laws of the State of Texas shall govern the interpretation, validity and performance of this Agreement. In the event any court or appropriate judicial authority shall hold or declare that the law of another jurisdiction is applicable, this Agreement shall remain enforceable under the laws of that jurisdiction. If any of the terms and provisions hereof shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall in no event affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law. The parties submit to the jurisdiction of the courts of the State of Texas in any litigation or other legal action or proceeding, arising out of or relating to this Agreement or any other dispute between the parties that is not subject to arbitration under this Section, and agree that all claims in respect of any such litigation, action or proceeding must be brought and/or defended in the state district courts of Collin County in the State of Texas, except with respect to matters that are under the exclusive jurisdiction of the Federal Courts of the United States, which shall be brought and/or defended in the Federal District Court sitting in Collin County, Texas. Owner agrees that service of process for purposes of any such litigation, action or proceeding need not be personally served or served within the State of Texas, but may be served with the same effect as if Owner were served within the State of Texas, by certified mail or any other means permitted by applicable law addressed to Owner at the address set forth herein.

### ARTICLE 17
### SUCCESSORS AND ASSIGNS

**17.01** **Assignment**

(a)    Manager, without the consent of Owner, shall have the right to assign from time to time this Agreement and its rights and interests hereunder to (i) any successor or assignee of Manager which may result from any merger, consolidation or reorganization with, or any sale or assignment to, any corporation, individual, partnership or other entity which shall acquire all or substantially all of Manager's hotel management business, and (ii) as security for any existing or future indebtedness of Manager or its Affiliates. Manager may also transfer from time to time this Agreement and its rights and interests hereunder without the consent of Owner to any Affiliate of Manager; provided, however, that no such transfer shall relieve Manager of any of its liabilities or obligations hereunder. Any such assignee shall agree to be bound by the terms and conditions of this Agreement.

(b)    Owner shall have the right, without the payment of any transfer or similar fee, to assign this Agreement to any third party acquiring the Hotel, subject to Manager's prior written consent, which consent will not be unreasonably withheld or delayed. Owner must provide at least

EXHIBIT A

thirty (30) days' notice to Manager, specifying in reasonable detail the nature of the transfer, the identity of the proposed transferee, and that the transferee has sufficient financial resources and liquidity to satisfy Owner's obligations under this Agreement. Any such assignee shall assume all obligations of Owner under this Agreement.

### 17.02   Binding Effect

Subject to the restrictions on assignment set forth elsewhere in this Agreement, this Agreement shall be binding upon and inure to the benefit of Owner and its successors and assigns, and shall be binding upon and inure to the benefit of Manager and its successors and assigns.

## ARTICLE 18
## AGREEMENT NOT AN INTEREST IN REAL ESTATE

This Agreement is not, and shall not be deemed or construed, at any time or for any purpose, to be or create any interest in real estate or any lien or other encumbrance of any kind whatsoever against the Hotel or the land upon which it is erected.

## ARTICLE 19
## FORCE MAJEURE

### 19.01   Operation of Hotel

If at any time during the term hereof it becomes necessary in Manager's reasonable opinion to cease operation of the Hotel in order to protect the Hotel and/or the health, safety and welfare of the guests and/or employees of the Hotel for reasons of Force Majeure such as, but not limited to, acts of war, insurrection, civil strife and commotion, labor unrest or acts of God (" ***Force Majeure***"), then in such event Manager may close and cease operation of all or part of the Hotel, reopening and commencing operation when Manager, in consultation with Owner, deems that such may be done without jeopardy to the Hotel, its guests and employees.

### 19.02   Extension of Time

With respect to any obligation to be performed by a party during the Term other than the payment of the Operating Fee, such party shall in no event be liable for failure so to do when prevented by any Force Majeure cause beyond the reasonable control of such party such as strike, lockout, breakdown, accident, order or regulation of or by any governmental authority, failure of supply or inability, by the exercise of reasonable diligence, to obtain supplies, parts or employees necessary to perform such obligation, or war or other emergency.   The time within which such obligation shall be performed shall be extended for a period of time equivalent to the delay from such cause.

EXHIBIT A

## ARTICLE 20
## ALTERNATIVE DISPUTE RESOLUTION

### 20.01    Arbitration.

(a)    Arbitration Required.  Subject to 20.02, the Parties agree for themselves, and each of their respective parent companies, and each their respective Affiliates, and each of the shareholders, trustees, beneficiaries, directors, officers, employees or agents of any of the foregoing, that all controversies, disputes, or claims arising from or relating to this Agreement (including the performance or non-performance of any obligations set forth herein or the relationship of the Parties hereunder) shall be subject to, and resolved in accordance with, this Article 20. For the purposes of this Article 20, the term "Party" shall refer to each of the Persons referenced in this Section 20.01(a).

(b)    Arbitration Procedures.  Any controversy, dispute, or claim between the Parties shall be submitted to final and binding arbitration upon demand by a Party by providing notice to the other Party. The arbitration shall be administered by the American Arbitration Association ("*AAA*") under its Commercial Arbitration Rules (the "*Arbitration Rules*") (if the AAA no longer exists, the Parties shall agree on a substitute arbitration service provider). The initiating Party shall file and serve its statement of claims concurrently with its delivery of an arbitration notice to the other Party. Within 20 days after the filing and service of the statement of claims, the Party against whom such claims have been asserted shall file and serve an answering statement. If a reply to the answering statement is necessary, the other Party shall file and serve such reply within 10 days after receipt of the answering statement. Each Party shall submit any claim that would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same arbitration proceeding as the claim to which it relates and any such claim that is not so submitted shall be barred. The Parties shall use good faith efforts to attempt to agree on one arbitrator, and if the Parties are unable to reach agreement within 30 days after the filing and service of all the Parties' respective pleadings, then the AAA shall appoint the arbitrator in accordance with the Arbitration Rules. The hearing of the arbitration shall be conducted in Dallas, Texas and shall commence as soon as practicable. The Parties acknowledge that the Arbitrator(s)' subpoena power is not subject to geographic limitations. The award and decision of the Arbitrator(s) shall be conclusive and binding on all Parties, and not subject to appeal, and judgment upon the award may be entered in any court of competent jurisdiction. Any right to contest the validity or enforceability of the award shall be governed exclusively by the Federal Arbitration Act or any successor law.

(c)    Arbitration Not Required for Certain Disputes.  Notwithstanding anything to the contrary in this Article 20, the Parties shall have the right to commence litigation or other legal proceedings with respect to any claims relating to the (a) preservation or protection of Manager's Marks or proprietary systems, and (b) enforcement of this Article 20.

(d)    Time Period for Claim.  Except as otherwise prohibited or limited by Applicable Law, any failure or delay of a Party in asserting a claim arising from or relating to this Agreement shall constitute a waiver of such claim and shall preclude the enforcement of any legal or equitable remedy with respect to such claim, unless written notice specifying such a claim is provided to the other Party within 24 months after the later of: (a) the date such claim arose; or (b) the date on

EXHIBIT A

which the facts giving rise to such a claim were first known (or reasonably should have been known). Nothing in this Section 20.01 shall be deemed to extend or toll any applicable statute of limitations.

**20.02   Expert Resolution.**

(a)   <u>Dispute Subject to Resolution by Expert</u>.  Notwithstanding anything to the contrary in Section 20.01, any dispute, claim, or issue arising under this Agreement with respect to (a) the proper inclusion or exclusion of items in Total Revenues, Operating Costs, or Gross Operating Profit, (b) the proper computation of Operating Fees, the Accounting Fee, or reimbursable expenses, (c) the approval of the Operating Budget, or (d) other matter as to which this Agreement expressly provides for dispute resolution by the Expert, shall be resolved in accordance with this Section 20.02; provided, however, either Party shall have the right to pursue arbitration (rather than resolution by the Expert) if the dispute involves more than $200,000.

(b)   <u>Designation of Expert</u>.  Either Party may commence the Expert resolution process by providing notice to the other Party, in which case Manager shall select three qualified candidates to be the Expert within 30 days after receipt of such notice, and Owner shall select one of such candidates as the Expert to resolve the dispute within 15 days after notification by Manager. If Owner does not select one of the candidates proposed by Manager within such time period, Manager shall select one of the candidates as the Expert. The "Expert" (herein so called) shall (i) have at least 10 years of experience in the area of expertise on which the dispute is based (e.g., for operational matters, expertise in the management of hotels in the same class as the Hotel, for accounting matters, expertise in hotel accounting for hotels in the same class as the Hotel), and (ii) not have any conflict of interest with either Party.

(c)   <u>Procedures</u>. Each Party shall be entitled to make written statements and provide documents and materials to the Expert in support of its position, and the other Party shall have the right to respond to such statements, documents or materials. All statements, documents, materials and responses submitted by a Party shall be delivered concurrently to the Expert and the other Party. The Parties shall make available to the Expert all books and records relating to the issues in dispute and shall provide the Expert with any information or assistance reasonably requested by the Expert. The Expert shall establish a timetable for the making of submissions and replies, and notifying the Parties in writing of its decision within 30 days after the date on which the Expert has been selected (or such other period as the Parties may agree).

(d)   <u>Decision by Expert</u>. The Expert resolution shall be conducted in a "baseball" format pursuant to which each Party shall submit its proposed resolution of the dispute to the Expert (with a copy provided concurrently to the other Party), and the Expert shall decide in favor of one of the positions presented by the Parties, and may not make any determination other than by choosing one of the proposals presented by the Parties. The Expert's authority shall be limited to deciding the specific issue presented to it, and shall have no authority to award damages, issue orders or take any other action whatsoever. The decision of the Expert shall be final and binding upon the Parties and shall not be capable of appeal or other challenge, whether by arbitration or otherwise, except for manifest error or fraud.

EXHIBIT A

# ARTICLE 21
## GENERAL PROVISIONS

### 21.01  Authorization

Owner represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof.  Manager represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof.  On request, each party shall furnish to the other party evidence of such authority.

### 21.02  Interest

Any amount payable to Manager which shall not be paid when due shall accrue interest at the lesser of (a) the highest legal limit, or (b) 1% over the prime interest rate as published in the Wall Street Journal, or comparable publication as agreed to by the parties, as its prime rate, as the same may be changed from time to time.

### 21.03  Formalities

Any change to or modification of this Agreement must be in writing signed by both parties hereto.  This Agreement shall be executed in one or more counterparts, each of which shall be deemed an original.  The captions for each Article are intended for convenience only.

### 21.04  Documents

Throughout the Term, Owner shall furnish Manager copies of all property tax and insurance statements, executed franchise agreements (if applicable), all financing documents (including notes and mortgages) relating to the Hotel and such other documents pertaining to the Hotel as Manager shall request.

### 21.05  Consents

Except as otherwise expressly provided in this Agreement, wherever in this Agreement it is provided that an act or proposed act of Owner or Manager is subject to the consent or approval of the other, such consent or approval shall not be unreasonably withheld or delayed.  The standard to be employed to determine reasonableness shall be the standard of practices and procedures employed at comparable hotels then being operated by Manager or its Affiliates.  If the approval or consent of one party hereto is required for any act or matter contemplated by the other party, the party desiring such consent may give to the party whose consent is desired, notice specifying in reasonable detail, the matter to which consent is requested.  Unless otherwise specified herein, if the party whose consent is requested does not, within twenty (20) business days after actual receipt of such notice, respond positively or negatively to such notice in writing, the requested consent shall conclusively be deemed given.

### 21.06  Estoppel Certificate

Either party shall, at any time and from time to time, upon not less than ten (10) days prior written request from the other, execute, acknowledge and deliver to the requesting party, in form

EXHIBIT A

reasonably satisfactory to the requesting party, a written statement certifying (if true) (i) that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) that there is no outstanding notice of an Event of Default hereunder and, to the best of such party's knowledge, no event has occurred or condition exists which, with the giving of notice or the passage of time or both, would constitute an Event of Default hereunder, and (iii) such other accurate information as may be reasonably requested by the requesting party or by any of the Interested Persons (as hereinafter defined). It is intended that any such statement delivered pursuant to this Section 21.06 may be relied upon by the requesting party, any current or prospective Mortgagee or other party providing financing to Owner or Manager (as the case may be), a prospective purchaser of the Hotel or permitted assignee of Manager's rights and interests hereunder, and the respective successors and assigns of any of the foregoing (the "*__Interested Persons__*").

### 21.07   Extension of Date of Termination

Notwithstanding any contrary provision of this Agreement, the date of termination of this Agreement, other than upon expiration pursuant to Section 3.02, shall be extended so that the date of termination after notice of termination is given to or by Manager shall be on a date which is not earlier than three (3) days plus the number of days, if any, Manager is required to give its employees advance notice of termination of employment as required by the WARN Act, or any similar federal or state statute.

### 21.08   No Representations

(a)     Owner and Manager acknowledge there have been no representations, inducements, promises or agreements made by Manager or Owner other than those specifically set forth herein.

(b)     Financial projections, budgets or similar forecasts as may have been prepared or in the future will be prepared by Manager or its Affiliates do not take into account, nor make provisions for, any rise or decline in local or general economic conditions or other factors beyond the control of Manager. Manager and its Affiliates cannot and do not warrant or guarantee in any way said financial projections, budgets or other forecasts. Any financial projections, budgets or forecasts provided have been prepared on the basis of information available at the time of such preparation and Manager's and its Affiliate's experience in the hotel industry. Said financial projections, budgets and forecasts have been prepared for information only and not as an inducement for action. Owner hereby acknowledges that in entering into this Agreement, Owner has not relied on any projection of earnings, statements as to the possibility of future success, or other similar information which may have been prepared by Manager or its Affiliates. Owner further understands and acknowledges that no guaranty is made or implied by Manager or its Affiliates as to the cost, or the future financial success or profitability, of the Hotel.

### 21.09   Assistance with Proposed Sale, Financing, Refinancing

Manager shall cooperate with and assist Owner from time to time in any attempt(s) by Owner to sell, finance or refinance the Hotel. Such cooperation may entitle Manager to additional reasonable compensation and reimbursement of all expenses. Manager shall not be deemed to be

EXHIBIT A

acting as a broker unless Owner and Manager enter into a separate written agreement engaging Manager as broker with respect to the Hotel. Such cooperation shall include, without limitation, answering prospective purchasers' or lenders' questions about the Hotel or its operations, but not require Manager to sign any subordination agreements. Manager may, at their sole discretion, agree to sign such agreement, but in no instances shall be required to as part of this Agreement. Manager shall also provide, promptly upon request by Owner, an estoppel certificate executed by Manager, as set forth in Section 21.06 above.

### 21.10   Prevailing Party's Expenses

The prevailing Party in any arbitration, litigation or other legal proceeding arising out of or relating to this Agreement shall be entitled to recover from the losing Party all reasonable fees, costs and expenses for attorneys, experts and other third parties (including its share of the AAA fees and costs) incurred by the prevailing Party in connection with such arbitration, litigation or other legal proceeding (including any appeals and actions to enforce any arbitration awards and court judgments). If a Party prevails on some, but not all, of its claims, such Party shall be entitled to recover an equitable amount of such fees, costs and expenses, as determined by the applicable Arbitrator(s) or court.

### 21.11   Confidentiality

Except as provided below, all matters disclosed in the negotiation of this Agreement and the matters set forth in this Agreement are strictly confidential. Manager and its Affiliates may use information obtained through the operation of the Hotel in the operation of other hotels provided that such use is not to Owner's material detriment. Owner and Manager shall otherwise keep strictly confidential all information of a proprietary or confidential nature about or belonging to either party or to any Affiliate of either party to which the other party gains or has access by virtue of the relationship between Owner and Manager. Except as disclosure may be required to obtain the advice of professionals or consultants, or financing for the Hotel, or in furtherance of a permitted or proposed assignment of this Agreement, or as may be required by law or by the order of any government, regulatory authority or tribunal or otherwise to comply with Legal Requirements (including reporting requirements applicable to public companies), Owner and Manager shall make every effort to ensure that such information is not disclosed to the press or to any other third person without the prior consent of the other party. The obligations set forth in this Section shall survive any termination or expiration of this Agreement. Owner and Manager shall cooperate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance of their respective obligations under this Agreement.

### 21.12   Severability

If any term or provision of any Article or Section of this Agreement, or the application thereof to any persons or circumstances, shall to any extent or for any reason be invalid or unenforceable, the remainder of this Agreement and the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of any Article or Section of this Agreement shall be valid and enforced to the fullest extent permitted by law.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 37

EXHIBIT A

[Signature Page to Follow]

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 38

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement effective the Execution Date.

OWNER:

NEWSTREAM HOTEL PARTNERS-IAH, LLC,
a Texas limited liability company

By:   NEWSTREAM HOTEL & HOSPITALITY, LLC
      Its: General Partner

By:   _____
      Name: Timothy Nystrom
      Its:    Manager

      Date:   5/10/18

MANAGER:

HMC HOSPITALITY OPERATING COMPANY,
a Delaware corporation

By:   _____
      Name: Bill Sullivan
      Its:    CFO

      Date:   5/10/2018

EXHIBIT A

**EXHIBIT "A"**

**Legal Description**

Red Lion Hotel & Conference Center
500 N. Sam Houston Parkway East
Houston, Texas 77060
281-931-0101

EXHIBIT "A" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO
Solo Page

EXHIBIT A

## EXHIBIT "B"

Manager, on behalf of Owner and at Owner's expense, shall procure the insurance coverages hereinafter set forth and ensure that they are in full force and effect on the Commencement Date and that they remain in full force and effect throughout the Term of this Agreement.  All cost(s) and expense(s) incurred by Manager in procuring the following insurance coverages shall be either Operating Costs or Fixed or Capital Expenses and shall be paid from the Bank Account(s):

| Coverages: | Amounts Of Insurance: |
|---|---|
| Workers' Compensation (Manager's employees only) | Statutory Benefits |
| | |
| Employer's Liability: | |
| Bodily Injury by Accident Each Accident | $500,000 |
| Bodily Injury by Disease Policy Limit | $500,000 |
| Bodily Injury by Disease Each Employee | $500,000 |
| | |
| Fidelity (Employee Dishonesty) | As required |
| Money and Securities | As required |
| | |
| Builders Risk | Completed value of the Hotel |

All risk for term of the initial and any subsequent Hotel construction and renovation

Real and Personal Property

Blanket Coverage

| | |
|---|---|
| Business Interruption | Calculated yearly based on estimated Hotel revenues |

Blanket Coverage for the perils insured against under Real and Personal Property in this Exhibit "B".   This coverage shall specifically cover Manager's loss of Operating Fees.  The business interruption insurance shall be for a twelve (12) month indemnity period

.

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

EXHIBIT A

<u>Commercial General Liability</u>

    Including -

| | |
|---|---|
| General Aggregate (per location) | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Personal and Advertising Injury (per occurrence) | $1,000,000 |
| Liquor Liability/Dram Shop (if applicable) | $1,000,000 |

<u>Automobile Liability</u>                          $1,000,000

    Owned Vehicles
    Non-Owned Vehicles
    Uninsured motorist where required by statute

<u>Automobile Physical Damage</u> (Optional)

| | |
|---|---|
| Comprehensive | (To value if insured) |
| Collision | |

<u>Umbrella Liability</u>

| | |
|---|---|
| Per Occurrence General Aggregate | $10,000,000 |
| Per Location | $10,000,000 |

<u>EPLI Coverage</u>

| | |
|---|---|
| Per Occurrence | $1,000,000 |

    All insurance coverages provided for under this <u>Exhibit "B"</u> shall be effected by policies issued by insurance companies (i) that are authorized to do business in the state in which the Hotel is located; and (ii) that are of good reputation and of sound and adequate financial responsibility, having a Best Rating A-VII or better, or a comparable rating if Best ceases to publish its ratings or materially changes its rating standards or procedures.

    Owner hereby authorizes Manager to utilize the services of and/or place the insurance set forth in this <u>Exhibit "B"</u> with a third party insurance carrier, in each case meeting the specifications set forth above.

    Manager shall deliver to Owner duly executed certificates, and, if requested by Owner and if available, duplicate copies of all policies of insurance to be procured hereunder, including existing, additional and renewal policies.

    Each policy or insurance maintained in accordance with this <u>Exhibit "B"</u> to the extent obtainable, shall specify that such policies shall not be canceled or materially changed without at least thirty (30) days' prior written notice to Manager.

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

<span style="color:red">EXHIBIT A</span>

Except as otherwise provided in the Agreement, Manager and Owner each waives, releases and discharges the other, but only to the extent of collectible insurance proceeds, from all claims or demands which each may have or acquire against the other or the other's subsidiaries, affiliates, directors, officers, agents, employees, independent contractors or partners, with respect to any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to property or business arising out of the ownership, management, operation and maintenance of the Hotel, regardless whether any such claim or demand may arise because of the fault or negligence of the other party or its subsidiaries, affiliates, officers, employees, directors, agents or independent contractors. Each policy of insurance maintained in accordance with this Exhibit "B" shall contain a specific waiver of subrogation reflecting the above.

All policies of insurance provided for under this Exhibit "B" shall be carried in the name of the Owner and Manager, and losses thereunder shall be payable to the parties as their respective interests may appear.  All liability policies shall name the Owner and Manager, and in each case any of their affiliated or subsidiary companies, which they may specify, and their respective directors, officers, agents, employees and partners as additional named insureds.

All such policies of insurance shall be written on an "occurrence" basis to the extent obtainable.

Manager by notice to Owner shall have the right to require that the minimum amount of insurance to be maintained with respect to the Hotel under this Exhibit "B" be increased to make such insurance comparable with prudent industry standards and to reflect increases in liability exposures, taking into account the size and location of the Hotel.

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

EXHIBIT A

## EXHIBIT "C"

## Sample P & L

*Sample Hotel*
**STATEMENT OF INCOME AND EXPENSE - RECAP**
**DECEMBER 2011**

| | Current Month | | | | | | | Year-to-Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget | % | Actual | % | Last Yr | % | | Budget | % | Actual | % | Last Yr | % |
| 21,483 | 53.9 | 21,483 | 65.2 | 21,483 | 39.4 | AVAILABLE ROOMS | 252,945 | 61.5 | 252,945 | 65.0 | 252,945 | 59.1 |
| $124.09 | | $133.25 | | $114.44 | | AVERAGE RATE | $140.98 | | $142.77 | | $136.31 | |
| $66.83 | | $86.84 | | $45.14 | | REV PAR | $86.76 | | $92.84 | | $80.57 | |
| 1,767,892 | 100.0 | 2,182,247 | 100.0 | 1,204,775 | 100.0 | TOTAL REVENUES | 27,094,357 | 100.0 | 29,594,490 | 100.0 | 25,334,284 | 100.0 |
| | | | | | | **ROOMS** | | | | | | |
| 1,435,717 | 81.2 | 1,865,645 | 85.5 | 969,723 | 80.5 | SALES | 21,944,482 | 81.0 | 23,483,451 | 79.4 | 20,379,197 | 80.4 |
| 200,596 | 14.0 | 206,949 | 11.1 | 140,346 | 14.5 | PAYROLL & BURDEN | 2,524,088 | 11.5 | 2,576,584 | 11.0 | 2,325,415 | 11.4 |
| 158,858 | 11.1 | 186,876 | 10.0 | 136,989 | 14.1 | OTHER EXPENSES | 2,110,427 | 9.6 | 2,140,201 | 9.1 | 1,986,604 | 9.7 |
| 1,076,263 | 75.0 | 1,471,821 | 78.9 | 692,389 | 71.4 | DEPARTMENT PROFIT | 17,309,968 | 78.9 | 18,766,666 | 79.9 | 16,067,178 | 78.8 |
| | | | | | | **FOOD** | | | | | | |
| 24,862 | 1.4 | 23,259 | 1.1 | 17,039 | 1.4 | OUTLET SALES | 333,866 | 1.2 | 336,580 | 1.1 | 282,484 | 1.1 |
| 121,815 | 6.9 | 136,394 | 6.3 | 84,944 | 7.1 | BANQUET SALES | 2,022,912 | 7.5 | 2,681,653 | 9.1 | 2,025,627 | 8.0 |
| 146,677 | 8.3 | 159,654 | 7.3 | 101,983 | 8.5 | NET SALES | 2,356,778 | 8.7 | 3,018,233 | 10.2 | 2,308,110 | 9.1 |
| 5,000 | 0.3 | 4,300 | 0.2 | 3,196 | 0.3 | BANQUET ROOM RENT | 86,296 | 0.3 | 70,388 | 0.2 | 88,110 | 0.3 |
| 30,000 | 1.7 | 9,651 | 0.4 | 7,639 | 0.6 | AUDIO VISUAL | 403,493 | 1.5 | 412,076 | 1.4 | 358,307 | 1.4 |
| 4,500 | 0.3 | 4,935 | 0.2 | 947 | 0.1 | OTHER SALES | 94,968 | 0.4 | 106,588 | 0.4 | 88,590 | 0.3 |
| 7,556 | 0.4 | 10,945 | 0.5 | 5,012 | 0.4 | SERVICE CHARGES | 134,619 | 0.5 | 197,768 | 0.7 | 113,940 | 0.4 |
| 193,733 | 11.0 | 189,485 | 8.7 | 118,776 | 9.9 | TOTAL REVENUE | 3,076,154 | 11.4 | 3,805,053 | 12.9 | 2,957,057 | 11.7 |
| 35,242 | 24.0 | 65,272 | 40.9 | 27,178 | 26.6 | COST OF SALES | 578,323 | 24.5 | 732,408 | 24.3 | 582,218 | 25.2 |
| 83,885 | 43.3 | 80,363 | 42.4 | 63,329 | 53.3 | PAYROLL & BURDEN | 1,022,951 | 33.3 | 1,038,625 | 27.3 | 924,210 | 31.3 |
| 35,594 | 18.4 | 41,431 | 21.9 | 23,713 | 20.0 | OTHER EXPENSES | 478,249 | 15.5 | 519,110 | 13.6 | 453,462 | 15.3 |
| 39,012 | 20.1 | 2,420 | 1.3 | 4,556 | 3.8 | DEPARTMENT PROFIT | 996,631 | 32.4 | 1,514,910 | 39.8 | 997,168 | 33.7 |
| | | | | | | **BEVERAGE** | | | | | | |
| 417 | 0.0 | 824 | 0.0 | 1,171 | 0.1 | OUTLET SALES | 6,807 | 0.0 | 14,980 | 0.1 | 8,267 | 0.0 |
| 24,484 | 1.4 | 23,989 | 1.1 | 17,031 | 1.4 | BANQUET SALES | 267,370 | 1.0 | 271,283 | 0.9 | 248,686 | 1.0 |
| 24,901 | 1.4 | 24,813 | 1.1 | 18,202 | 1.5 | NET SALES | 274,177 | 1.0 | 286,262 | 1.0 | 256,952 | 1.0 |
| 0 | 0.00 | 0 | 0.0 | 0 | 0.0 | OTHER SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.00 | 0 | 0.0 | 0 | 0.0 | SERVICE CHARGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 24,901 | 1.4 | 24,813 | 1.1 | 18,202 | 1.5 | TOTAL REVENUE | 274,177 | 1.0 | 286,262 | 1.0 | 256,952 | 1.0 |
| 3,741 | 15.0 | 7,629 | 30.7 | 2,515 | 13.8 | COST OF SALES | 41,903 | 15.3 | 42,902 | 15.0 | 38,479 | 15.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | PAYROLL & BURDEN | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | MUSIC/ENTERTAINMENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 21,160 | 85.0 | 17,184 | 69.3 | 15,687 | 86.2 | DEPARTMENT PROFIT | 232,274 | 84.7 | 243,360 | 85.0 | 218,473 | 85.0 |
| | | | | | | **MINOR DEPTS. NET** | | | | | | |
| (6,739) | -61.4 | (15,312) | -668.3 | (9,708) | -164.6 | TELEPHONE DEPT. | (54,218) | -36.3 | (78,766) | -60.7 | (50,688) | -37.7 |
| 12,637 | 63.8 | 4,488 | 38.2 | 6,994 | 59.4 | OTHER OPER. DEPTS | 218,135 | 69.0 | 271,884 | 74.3 | 179,354 | 66.0 |
| 82,775 | 100.0 | 88,269 | 100.0 | 80,397 | 100.0 | OTHER INCOME/RENTS | 1,333,752 | 100.0 | 1,524,038 | 100.0 | 1,334,928 | 100.0 |
| 1,225,108 | 69.3 | 1,568,870 | 71.9 | 790,315 | 65.6 | GROSS OPER. INCOME | 20,036,542 | 74.0 | 22,242,091 | 75.2 | 18,746,412 | 74.0 |

EXHIBIT "C" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

EXHIBIT A

*Sample Hotel*
**STATEMENT OF INCOME AND EXPENSE - RECAP**
**DECEMBER 2011**

| Budget | % | Actual | % | Last Yr | % | | Budget | % | Actual | % | Last Yr | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **ADMIN AND GENERAL** | | | | | | |
| 156,560 | 8.9 | 183,982 | 8.4 | 168,412 | 14.0 | PAYROLL & BURDEN | 1,568,660 | 5.8 | 1,522,359 | 5.1 | 1,505,267 | 5.9 |
| 68,608 | 3.9 | 36,302 | 1.7 | 46,973 | 3.9 | OTHER EXPENSES | 1,011,015 | 3.7 | 1,019,701 | 3.4 | 900,228 | 3.6 |
| 225,168 | 12.7 | 220,284 | 10.1 | 215,385 | 17.9 | TOTAL DEPT EXPENSE | 2,579,675 | 9.5 | 2,542,060 | 8.6 | 2,405,495 | 9.5 |
| | | | | | | **MARKETING** | | | | | | |
| 175,021 | 9.9 | 186,983 | 8.6 | 113,609 | 9.4 | PAYROLL & BURDEN | 1,644,438 | 6.1 | 1,687,928 | 5.7 | 1,487,896 | 5.9 |
| 169,440 | 9.6 | 220,866 | 10.1 | (65,625) | -5.4 | OTHER EXPENSES | 2,451,299 | 9.0 | 2,409,896 | 8.1 | 2,113,136 | 8.3 |
| 43,071 | 2.4 | 56,047 | 2.6 | 29,160 | 2.4 | FRANCHISE FEES | 668,286 | 2.5 | 740,512 | 2.5 | 413,989 | 1.6 |
| 387,532 | 21.9 | 463,897 | 21.3 | 77,143 | 6.4 | TOTAL DEPT EXPENSE | 4,764,024 | 17.6 | 4,838,336 | 16.3 | 4,015,021 | 15.8 |
| | | | | | | **PROPERTY OPERATION** | | | | | | |
| 46,658 | 2.6 | 42,053 | 1.9 | 41,554 | 3.4 | PAYROLL & BURDEN | 551,357 | 2.0 | 528,710 | 1.8 | 491,644 | 1.9 |
| 48,665 | 2.8 | 54,881 | 2.5 | 51,153 | 4.2 | OTHER EXPENSES | 585,937 | 2.2 | 553,175 | 1.9 | 489,280 | 1.9 |
| 105,120 | 5.9 | 61,218 | 2.8 | 61,207 | 5.1 | ENERGY COSTS | 1,517,765 | 5.6 | 1,240,399 | 4.2 | 1,283,557 | 5.1 |
| 200,443 | 11.3 | 158,152 | 7.2 | 153,914 | 12.8 | TOTAL DEPT EXPENSE | 2,655,058 | 9.8 | 2,322,283 | 7.8 | 2,264,481 | 8.9 |
| 813,143 | 46.0 | 842,333 | 38.6 | 446,442 | 37.1 | **TOTAL OVERHEAD DEPTS** | 9,998,756 | 36.9 | 9,702,679 | 32.8 | 8,684,996 | 34.3 |
| 411,965 | 23.3 | 726,537 | 33.3 | 343,873 | 28.5 | **INC BEFORE FIXD CHGS** | 10,037,786 | 37.0 | 12,539,412 | 42.4 | 10,061,416 | 39.7 |
| | | | | | | **CAPITAL EXPENSE** | | | | | | |
| 12,967 | 0.7 | 11,619 | 0.5 | 11,010 | 0.9 | TAXES | 153,036 | 0.6 | 140,433 | 0.5 | 130,228 | 0.5 |
| 41,400 | 2.3 | 0 | 0.0 | 61,772 | 5.1 | INSURANCE | 615,138 | 2.3 | 825,214 | 2.8 | 764,100 | 3.0 |
| 0 | 0.0 | 0 | 0.0 | 462,943 | 38.4 | INTEREST | 0 | 0.0 | (3,318,537) | -11.2 | 5,591,924 | 22.1 |
| 226,117 | 12.8 | 77,611 | 3.6 | 227,479 | 18.9 | RENT/LEASE | 1,073,092 | 4.0 | 932,789 | 3.2 | 1,062,539 | 4.2 |
| 44,197 | 2.5 | 54,556 | 2.5 | 30,119 | 2.5 | MANAGEMENT FEES | 677,397 | 2.5 | 739,939 | 2.5 | 633,357 | 2.5 |
| 20,000 | 1.1 | 20,000 | 0.9 | 20,000 | 1.7 | ASSET MGT. FEE | 248,807 | 0.9 | 257,054 | 0.9 | 199,081 | 0.8 |
| 344,681 | 19.5 | 163,786 | 7.5 | 813,324 | 67.5 | TOTAL CAPITAL EXPENSE | 2,767,470 | 10.2 | (423,107) | -1.4 | 8,381,228 | 33.1 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NON-OPERATING ITEMS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 8,000 | 0.5 | 9,621 | 0.4 | 6,771 | 0.6 | PARTNERSHIP EXPENSES | 48,473 | 0.2 | 117,422 | 0.4 | 244,396 | 1.0 |
| 8,000 | 0.5 | 61,902 | 2.8 | 0 | 0.0 | F,F, & E EXPENSE | 633,971 | 2.3 | 450,754 | 1.5 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DISPOSED ASSET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 260,261 | 21.6 | DEPRECIATION/AMORT. | 0 | 0.0 | 1,041,042 | 3.5 | 3,123,127 | 12.3 |
| 51,284 | 2.9 | 491,227 | 22.5 | (736,482) | -61.1 | **NET PROFIT/LOSS-** | 6,587,872 | 24.3 | 11,353,301 | 38.4 | (1,687,335) | -6.7 |
| 0 | 0.0 | 0 | 0.0 | 260,261 | 21.6 | PLUS DEPR/AMORT | 0 | 0.0 | 1,041,042 | 3.5 | 3,123,127 | 12.3 |
| 0 | 0.0 | 0 | 0.0 | 140,805 | 11.7 | LESS PRINCIPAL PAID | 0 | 0.0 | (2,532,205) | -8.6 | 1,653,052 | 6.5 |
| 51,284 | 2.9 | 491,227 | 22.5 | (617,027) | -51.2 | **CASH FLOW FROM OPER** | 6,587,872 | 24.3 | 14,926,548 | 50.4 | (217,259) | -0.9 |
| 0 | 0.0 | 0 | 0.0 | 291,778 | 24.2 | LESS CAPITAL ADDS | 1,190,000 | 4.4 | 906,135 | 3.1 | 653,931 | 2.6 |
| 51,284 | 2.9 | 491,227 | 22.5 | (908,805) | -75.4 | **CASH FLOW** | 5,397,872 | 19.9 | 14,020,413 | 47.4 | (871,190) | -3.4 |

EXHIBIT "C" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

EXHIBIT A

**EXHIBIT "D"**

**Franchise Required Language**

EXHIBIT "D" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

EXHIBIT A

## INDIVIDUAL GUARANTY

GUARANTY, dated as of May 10, 2018, by Rob Lawson, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)      He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)      He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery

- 1 -

EXHIBIT B

of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)   His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)   He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.   Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions:  (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.   No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.   Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.   (A)   If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

- 2 -

EXHIBIT B

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

(B)    This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner. This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

(C)    Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

(D)    All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

(E)    No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof. No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

(F)    Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

(G)    Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense. This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

(H)    Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

- 3 -

EXHIBIT B

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

(I)    Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

(J)    This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

(K)    Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

(L)    If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

(M)    As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

(N)    GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

**Rob Lawson, Individual**

Date:  _5-10-18_

WITNESS:

Name: _ROB LAWSON_

Address: _8600 MAZZINI COURT_

_Flower Mound, TX 75022_

WITNESS:

Name: _GARI KIELE_

Address: _529 NE 37th ST._

_Pendleton, OR. 97801_

-4-

EXHIBIT B

**INDIVIDUAL GUARANTY**

*Louis Scott Larwater*

GUARANTY, dated as of May 10, 2018, by ~~Rob Lawson~~, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)     He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)     He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery

- 1 -

EXHIBIT C

of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)  His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)  He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.  Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions:  (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.  No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.  Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.  (A)  If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

- 2 -

EXHIBIT C

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

        (B)    This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner. This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

        (C)    Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

        (D)    All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

        (E)    No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof. No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

        (F)    Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

        (G)    Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense. This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

        (H)    Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

EXHIBIT C

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

(I)    Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

(J)    This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

(K)    Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

(L)    If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

(M)    As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

(N)    GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

~~Rob Lawson~~, Individual
LOUIS SCOTT TARWATER , INDIVIDUAL
Date:    5.11.18

WITNESS:

Name:    LOUIS SCOTT TARWATER
Address:    4613 WINDMILL LANE
FLOWER MOUND, TX 75028

WITNESS:

Name:    DONNA R. TARWATER
Address:    4613 WINDMILL LANE
FLOWER MOUND, TX 75028

- 4 -

EXHIBIT C

## INDIVIDUAL GUARANTY

GUARANTY, dated as of May 10, 2018, by Timothy Nystrom, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)      He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)      He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery

- 1 -

EXHIBIT D

of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)    His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)    He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.    Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions:  (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.    No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.    Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.    (A)    If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

EXHIBIT D

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

(B)     This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner. This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

(C)     Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

(D)     All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

(E)     No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof. No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

(F)     Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

(G)     Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense. This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

(H)     Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

- 3 -

EXHIBIT D

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

(I)     Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

(J)     This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

(K)     Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

(L)     If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

(M)     As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

(N)     GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

**Timothy Nystrom**, Individual

Date: _____ 5/10/18 _____

WITNESS:

Name: ___ Tim Nystrom ___

Address: ___ 1411 Stone Lakes Dr. ___
___ Southlake, TX 76092 ___

WITNESS:

Name: _____

Address: _____

_____

- 4 -

EXHIBIT D



Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main  214.855.7500
Fax  214.855.7584
munsch.com

Writer's Direct Dial:  214.855.7511
E-Mail:  rparker@munsch.com

July 10, 2019

***Via Electronic Mail***

Newstream Hotel Partners-IAH, LLC
301 South Oak Street
Roanoke, TX 76262
E-Mail: tim.nystrom@newstreamcorp.com;
scott.tarwater@newstreamcorp.com;
felix.mara@newstreamcorp.com

Timothy Nystrom
311 South Oak Street, Suite 250
Roanoke, TX 76262
Email: tim.nystrom@newstreamcorp.com

Scott Tarwater
311 South Oak Street, Suite 250
Roanoke, TX 76262
Email: scott.tarwater@newstreamcorp.com

Rob Lawson
311 South Oak Street, Suite 250
Roanoke, TX 76262
Email: rob.starcrest@gmail.com

UC Funding, LLC
c/o Adam Lampert
Federman Steifman, LLP
414 North Orleans Street, Ste 210
Chicago, Illinois 60654
Email:  alampert@federmansteifman.com

Cathy Oniffrey
UC Funding, LLC
E-Mail: CMO@USFunds.com

  Re: Notice of Continuing Default and, if those Defaults Remain Uncured, Termination
     of the Hotel Management Agreement (the "***Management Agreement***") by and
     between HMC Hospitality Operating Company, a Delaware corporation
     ("***Manager***") and Newstream Hotel Partners-IAH, LLC ("***Owner*** ").

EXHIBIT E

Newstream Hotel Partners-IAH, LLC
Page 2
July 10, 2019

To Whom It May Concern:

On Tuesday, July 2, 2019, Manager notified Owner that Owner was in default (the "**_Default Notice_**") of the  Management Agreement.  All capitalized terms not otherwise defined within this letter are given the meaning specified within the Management Agreement.

Section 2.03(b) of the Management Agreement provides that Owner shall maintain a Minimum Balance in the Bank Account of $115,000.00.  As Owner was previously told, that required amount is not in the Bank Account.  Thus, Owner is in default of the Management Agreement.

Manager has previously notified Owner that the Hotel is chronically underfunded.  Owner has not cured this funding deficiency.  In the Default Notice, Owner was informed that the capital requirement for the month of June was $300,000.00.  Approximately $50,000.00 of that was paid to lender for Owner's interest payment and the remaining $250,000.00 was required for hotel payables, payroll, taxes, and the July interest and reserve payments.

Owner has not provided the required funding and the Minimum Balance is less than required.  Owner has not provided Manager sufficient capital to manage the Hotel in accordance with the Management Agreement.

As you have been notified previously, Owner's failure to provide sufficient operating capital prevents Manager from paying Hotel expenses and puts Manager and the Hotel at risk.  As an example of this, Manager wants to highlight a critical issue regarding the property insurance renewal.  There is a bill due for premium for the property insurance.  Manager does not have the available funds to pay this bill. Manager has notified Lender and requested that this bill be paid from escrowed funds.  If Owner does not provide the funds to cover this bill and if Lender does not do so, the bill will not be paid.  The consequence of this is that the insurance may very well lapse.

If the Owner cures the monetary default or the default is cured by Lender within five (5) days of receipt of this notice as per the Subordination Agreement, then the Management Agreement will not be terminated.  If, however, the monetary defaults are not cured within five (5) days of receipt of this notice, then the Management Agreement will be terminated as of that date pursuant to Section 13.02 of the Management Agreement and Manager will transition all responsibilities for the Hotel's Management to Owner or its designee at 5:00 p.m. Central Time, Tuesday, July 16, 2019.  Manager will cooperate with transitioning the Hotel to the new manager but such transition will need to be completed by the above-referenced date..

Please note that should the Management Agreement be terminated, then the Termination Payment Obligations set forth in Section 13.05 of the Management Agreement will be due by Owner. Owner is responsible for various payment obligations under the Management Agreement in the event of a termination.  Manager will prove a follow-up demand quantifying the Owner's remaining payment obligations under the terms of the Management Agreement should termination occur.

EXHIBIT E

Newstream Hotel Partners-IAH, LLC
Page 3
July 10, 2019


Finally, as Mr. Nystrom, Mr. Tarwater, and Mr. Lawson (collectively the "***Guarantors***") are aware, they each entered into Individual Guarantees that guaranty Owner's obligations under the Management Agreement. Although Manager need not provide notice to the Guarantors as per Section 6 of the Individual Guarantees, this Termination Notice serves to remind Guarantors of their obligations under the Individual Guarantees and reserves all of Manager's rights to proceed against the Guarantors under the Individual Guarantees.

Nothing contained in this letter waives any other existing defaults or deficiencies of Owner under or in connection with the Management Agreement  and/or Individual Guarantees and not specified herein.  By providing this letter to Owner, Manager does not waive any term, condition or provision of the Management Agreement and/or the Individual Guarantees, and Manager does not waive any right, remedy, claim, contention, position or defense, with the same being hereby reserved.


Very truly yours,

Ross Parker


RHP

cc:    Bill Sullivan (***Via E-Mail:*** sullivan@hospitalitymgt.com*)*

EXHIBIT E

Filed 12/17/2019 4:54 PM
Lynne Finley
District Clerk
Collin County, Texas
By Brandi Bullard Deputy
Envelope ID: 39332666

**CAUSE NO. 380-05791-2019**

| | | |
|---|---|---|
| NEWSTREAM HOTEL PARTNERS–IAH, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff and Counter-Defendant, | § § § | |
| v. | § § | |
| HMC HOSPITALITY OPERATING COMPANY, | § § § | 380th JUDICIAL DISTRICT |
| Defendant, Counter-Plaintiff and Third-Party Plaintiff, | § § § | |
| v. | § § § | |
| ROB LAWSON, SCOTT TARWATER AND TIMOTHY NYSTROM, | § § § | |
| Third-Party Defendants. | § | COLLIN COUNTY, TEXAS |

## COUNTER-DEFENDANT'S ORIGINAL ANSWER

Counter-Defendant Newstream Hotel Partners–IAH, LLC files this Original Answer, and would should the Court as follows:

### I.

Counter-Defendant denies each and every, all and singular, the allegations of *Defendant HMC Hospitality Operating Company's Original Answer and Original Counterclaim* or as subsequently amended, and demands strict proof thereof.

WHEREFORE, PREMISES CONSIDERED, Counter-Defendant prays that Counter-Plaintiff takes nothing by this action and that Counter-Defendant be fully released and discharged. Counter-Defendant further prays for an award of attorneys' fees under the parties' contract and/or in equity, and all costs of court from Counter-Plaintiff.

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**

By: /s/ *Carlisle A. Braun*
               **CARLISLE A. BRAUN**
               Texas Bar No. 24058818
               carlisle.braun@solidcounsel.com
               **BRANDI J. MCKAY**
               Texas Bar No. 24075380
               brandi.mckay@solidcounsel.com

               2600 Network Blvd., Suite 400
               Frisco, Texas 75034
               (214) 472-2100 Telephone
               (214) 472-2150 Facsimile

               ***ATTORNEYS FOR PLAINTIFF AND
               COUNTER-DEFENDANT***

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this document has this 17th day of December, 2019, been served upon the following counsel of record pursuant to the TEXAS RULES OF CIVIL PROCEDURE 21a:

        **<u>Via Electronic Filing/Service</u>**
        Ross H. Parker
        Aynsley K. Young
        MUNSCH HARDT KOPF & HARR, PC
        500 N. Akard Street, Suite 3800
        Dallas, Texas 75201

        *Attorneys for Defendant, Counter-Plaintiff and Third-Party Plaintiff*

        /s/ *Carlisle A. Braun*
        **CARLISLE A. BRAUN**

Filed 1/10/2020 2:43 PM
Lynne Finley
District Clerk
Collin County, Texas
By LeAnne Brazeal Deputy
Envelope ID: 40026993

CAUSE NO. 380-05791-2019

| | | |
|---|---|---|
| NEWSTREAM HOTEL PARTNERS-IAH, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | |
| HMC HOSPITALITY OPERATING COMPANY, | § § § | COLLIN COUNTY, TEXAS |
| Defendant | § § | |
| V. | § § | |
| ROB LAWSON, SCOTT TARWATER, AND TIMOTHY NYSTROM, | § § § | |
| Third Party Defendants. | § | 380TH JUDICIAL DISTRICT |

## DEFENDANT HMC HOSPITALITY OPERATING COMPANY'S
## MOTION TO STAY PROCEEDING AND COMPEL ARBITRATION

Defendant and Counter-Plaintiff HMC Hospitality Operating Company ("HMC") files its

Motion to Stay Proceeding and Compel Arbitration as follows:

## I.      SUMMARY OF MOTION

Plaintiff and Counter-Defendant Newstream Hotel Partners-IAH, LLC ("Newstream")

executed a Hotel Management Agreement (the "Agreement") with HMC regarding the

management of a Red Lion Hotel & Conference Center owned by Newstream.  The Agreement

contains a valid and enforceable agreement to arbitrate all claims between the parties.

Newstream now brings claims against HMC for breach of the Agreement and HMC has likewise

asserted claims against Newstream for its breaches of the Agreement.  In the Agreement, the

parties agreed that these claims would be subject to binding arbitration.  As a result, the Court

should stay this proceeding and compel the parties to arbitration with the American Arbitration Association ("AAA").[1]

## II.   FACTS

Newstream owns a Red Lion Hotel & Conference Center located at 500 N. Sam Houston Parkway East, Houston, Texas 77060 (the "Hotel").   Newstream's general manager is Newstream Hotels & Hospitality, LLC ("Newstream Hotels").   Timothy Castle Nystrom ("Nystrom"), Robert W. Lawson ("Lawson"), and Louis Scott Tarwater ("Tarwater") are the managers and directors of Newstream Hotels and control Newstream's operations.

On May 10, 2018, Newstream and HMC entered into a Hotel Management Agreement (the "Agreement") under which HMC operated and managed Newstream's Hotel.[2]  HMC began operating all aspects of the Hotel for and on behalf of Newstream pursuant to the Agreement.

In order to induce HMC to enter into the Agreement with Newstream, Nystrom, Lawson and Tarwater (collectively, the "Guarantors") each executed an absolute and unconditional guaranty agreement. whereby the Guarantors each jointly and severally guaranteed Newstream's performance of its obligations, including the payment of all fees owed under the Agreement (together, the "Guaranties").[3]

---

[1] HMC is involved in two substantially similar matters with related Newstream entities that arise out of and relate to the hotel management agreements between HMC and the other Newstream entities.  The Newstream entities and HMC are represented by the same counsel who have appeared on behalf of the parties in this proceeding.  These cases are styled as: 1) *Newstream Hotel Partners-ABQ, LP v. HMC Hospitality Operating Company v. Rob Lawson, Scott Tarwater and Timothy Nystrom*, Cause No. 380-05584-2019 currently pending in the 380th Judicial District Court in Collin County, Texas; and 2) *Newstream Hotel Partners-LIT, LLC v. HMC Hospitality Operating Company*, Cause No. 416-05790-2019 currently pending in the 416th Judicial District Court in Collin County Texas. HMC has similarly moved to compel these two matters to arbitration before the American Arbitration Association.

[2] Attached hereto as Exhibit A and incorporated herein for all purposes is a true and correct copy of the Hotel Management Agreement.

[2] Attached hereto as Exhibit B and incorporated herein for all purposes is a true and correct copy of Rob Lawson's Individual Guaranty. Attached hereto as Exhibit C and incorporated herein for all purposes is a true and correct copy of Scott Tarwater's Individual Guaranty. Attached hereto as Exhibit D and incorporated herein for all purposes is a true and correct copy of Timothy Nystrom's Individual Guaranty.

On July 2, 2019, HMC notified Newstream of its default under the Agreement by reason of its failure to: (i) maintain adequate funds for the operation of the Hotel, including funds necessary to cover all operating expenses; and (ii) maintain $115,000.00, the contractually-required minimum balance under the Agreement, in the bank account. Following Newstream's failure to transfer sufficient funds to the bank account, HMC sent a second notice to Newstream on July 10, 2019 outlining Newstream's continued defaults under the Agreement. In the July 10, 2019 letter, HMC again notified Newstream that its failure to maintain sufficient funds in the account impacted HMC ability to manage the Hotel in accordance with the Agreement. The July 10, 2019 letter also advised Newstream that if its monetary defaults were not cured within five business days, the Agreement would terminate by its terms. Newstream failed to cure its monetary default within five business days, thus on July 17, 2019, the Agreement terminated as a result of Newstream's default.

On October 15, 2019, Newstream initiated this proceeding alleging that HMC breached the Agreement. On November 25, 2019, HMC filed its original answer and compulsory counterclaims against Newstream and the Guarantors asserting causes of action against these parties relating to and arising out of Newstream's failure to comply with the terms of the Agreement.

HMC now files it Motion to Compel all claims to arbitration pursuant to the mandatory arbitration provision in the Agreement.

### III.    ARGUMENT AND AUTHORITY

Public policy strongly favors resolving disputes through arbitration. *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992). Because "state and federal policies continue to favor arbitration, a presumption exists favoring agreements to arbitrate [.]" *In re FirstMerit Bank, N.A.,*

52 S.W.3d 749, 753 (Tex. 2001).   Accordingly, "courts must resolve any doubts to an arbitration agreement's scope in favor of arbitration. *Id.*

A.        **The Federal Arbitration Act Governs the arbitration agreement**

The Federal Arbitration Act (the "FAA") governs arbitration clauses in contracts "evidencing a transaction involving commerce." *See* 9 U.S.C. § 2. The United States Supreme Court has explained that the phrase "involving commerce" was enacted with an intent "to exercise Congress's commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995). Given the breadth of Congress's power to regulate interstate commerce, it is not an onerous burden to show a contract involves interstate commerce. *See, e.g., In re MP Ventures of South Texas, Ltd.*, 276 S.W.3d 524, 529 (Tex. App.—San Antonio 2008, orig. proceeding) (contract to purchase and install greenhouse related to interstate commerce because materials used to construct greenhouse were transported from out of state); *In re Tenet Healthcare Ltd.*, 84 S.W.3d 760, 765 (Tex. App. – Houston [1st Dist.] 2002, orig. proceeding) (employment agreement between distribution clerk and hospital related to interstate commerce because hospital treated out-of-state patients and received goods, services, and payments from out-of-state entities); *Palm Harbor Homes, Inc. v. McCoy*, 944 S.W.2d 716, 719-20 (Tex. App. – Ft. Worth 1997, orig. proceeding) (FAA applied where component part of mobile home at issue was manufactured out of state).

The Agreement in this case clearly satisfies this standard.   HMC is a Delaware corporation and Newstream is a Texas limited liability company.  The Agreement provides for HMC's management of a hotel, owned by Newstream, in Houston.  Because the Agreement evidences a transaction involving interstate commerce between entities of different states, the FAA governs the arbitration agreement.

B.      **Two-Step Analysis under the FAA.**

Enforcement of an arbitration agreement ordinarily involves two overarching analytical steps. *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The first involves contract formation—whether the parties entered into any arbitration agreement at all. *Id*. Under the first issue, courts merely ask whether "the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017). The second involves contract interpretation to determine whether *this* claim is covered by the scope of the arbitration agreement. *Kubala*, 830 F.3d at 201.

Before reaching the second overarching issue, courts must ask who has the power to decide whether the claim is arbitrable (i.e., whether the scope of the arbitration agreement covers a particular claim). *See id*. If the agreement contains a valid "delegation clause," the court is required "to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id*. at 202 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)).

1.      **There is a valid agreement to arbitrate.**

In the present case, there is a valid arbitration agreement between HMC and Newstream. Section 20.01(b) of the Agreement provides:

> "Any controversy, dispute, or claim between the Parties shall be submitted to final and binding arbitration upon demand by a Party by providing notice to the other Party.  The arbitration shall be administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules…The award and decision of the Arbitrator(s) shall be conclusive and binding on all Parties, and not subject to appeal, and judgment upon the ward may be entered in any court of competent jurisdiction.  Any right to contest the validity or enforceability of the award shall be governed exclusively by the Federal Arbitration Act or any successor law."

Timothy Nystrom executed the Agreement in his capacity as the manager of Newstream's General Partner, Newstream Hotel & Hospitality.  Accordingly, it is undisputed

that Section 20.01(b) of the Agreement is a valid agreement to arbitrate at least "some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017).

### 2.     The arbitrator has the power to decide whether specific claims are covered by the arbitration agreement.

The Fifth Circuit has held that "[i]f there is a delegation clause, the motion to compel arbitration should be granted in almost all cases."[4] *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 202 (5th Cir. 2016). An agreement contains a valid delegation clause "if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." An arbitration clause's express incorporation of the AAA rules constitutes "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (collecting cases); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 262 (5th Cir. 2014). This is because the AAA Rules for commercial arbitration include Rule 7, which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

The arbitration agreement in the present case expressly incorporates the Commercial Arbitration Rules of the AAA.  Because there is "clear and unmistakable evidence" that the parties agreed to arbitrate the scope of the arbitration agreement, the issue of "whether the Plaintiff's claims are subject to arbitration must be decided in the first instance by the arbitrator, not a court." *Crawford*, 748 F.3d at 263. As a result, this Court is required to refer the claims

---

[4] There is one narrow exception, which is inapplicable here: Where the argument for arbitration is "wholly groundless," a court will refuse to enforce a delegation clause. *See Douglas v. Regions Bank*, 757 F.3d 460, 464 (5th Cir. 2014).

arising out of the Agreement to arbitration. Should the Court agree with this analysis, it need not

address the arguments contained in Section B.3 and 4, below.

> **3.      The arbitration agreement covers the claims between HMC and Newstream in this dispute**.

Even if there were no valid delegation clause, the broad arbitration agreement in this case

clearly covers the claims asserted by HMC and Newstream in this litigation. Texas and federal

courts have repeatedly recognized that the FAA evinces "an 'emphatic federal policy in favor of

arbitral dispute resolution.'" *In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 484

(Tex. 2001) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614,

631 (1985)). As the Texas Supreme Court has held, "[t]he policy in favor of enforcing arbitration

agreements is so compelling that a court should not deny arbitration *unless it can be said with

positive assurance* that an arbitration clause is not susceptible of an interpretation which could

cover the dispute at issue." *Prudential Securities, Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex.

1999) (emphasis in original) (citation omitted).

When analyzing the scope of an arbitration agreement, courts distinguish between broad

and narrow clauses. *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir.

1993). As stated above, this arbitration agreement in this case covers, "Any controversy, dispute,

or claim" between the parties. Clauses "containing the 'any dispute' language . . . are of the

broad type." Id. at 755 (citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co. (Pemex)*,

767 F.2d 1140, 1144 (5th Cir. 1985)). As noted in *Sedco*, "[i]t is difficult to imagine broader

general language than that contained in the ... arbitration clause, 'any dispute' . . ." *Sedco*, 767

F.2d at 1145.

Such "broad" arbitration clauses "are not limited to claims that literally 'arise under the

contract,' but rather embrace *all disputes between the parties having a significant relationship* to

the contract regardless of the label attached to the dispute." *Pennzoil Explor. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (emphasis added). The Fifth Circuit has explained that when parties agree to an arbitration clause covering "[a]ny dispute . . . arising out of or in connection with or relating to this Agreement," they "intend the clause to reach *all aspects of the relationship*." *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164-65 (5th Cir. 1998) (emphasis added).

Here, the breach of contract claims asserted by Newstream and HMC directly arise out of and relate to the Agreement and are thus subject to arbitration with the AAA as contemplated by the arbitration agreement.

**4.    HMC's claims against the Guarantors are subject to the arbitration agreement.**

Generally, only parties that sign an arbitration agreement are bound to arbitration. However, an agreement to arbitrate may also bind a non-signatory under principals of contract law and agency.  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (recognizing the six grounds to bind a non-signatory to an arbitration agreement as: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; 5) estoppel; and 6) third-party beneficiary).

Here, HMC's claims against the Guarantors are subject to the arbitration provision in the Agreement because the Agreement, including the arbitration provision, is incorporated into the Guarantors' obligations under the language of the Guaranties.  In the Guaranties, the Guarantors promised "the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by [Newstream] to HMC." Thus, the terms of the Agreement, including the arbitration provision, are incorporated by reference into each of the Guaranties.  Among the terms of the Agreement between Newstream and HMC is the

requirement that Newtream would pay HMC a termination payment upon Newstream's early termination or default.  To date, Newstream has failed to do so and HMC looks to the Guarantors' promise to unconditional perform Newstream's obligations under the Agreement, including the payment of the termination payment.

The language of the Agreement contemplates that "all controversies, disputes or claims arising from or relating to this Agreement (including the performance or non-performance of any obligations set forth herein or the relationship of the Parties hereunder)" shall be subject to Arbitration.[5]  The dispute between HMC and Newstream and, by extension the Guarantors, arise out of and relate to the failure of Newstream and the Guarantors to comply with the terms of the Agreement.  Thus, arbitration of the claims against the Guarantors is required.

**C.      HMC has not waived the right to compel arbitration.**

HMC has not substantially invoked the judicial process and therefore has not waived its right to compel arbitration. A party waives an arbitration clause only by substantially invoking the judicial process to the other party's detriment or prejudice. *Perry Homes v. Cull,* 258 S.W.3d 580, 589-90 (Tex. 2008). Whether a party has substantially invoked the judicial process depends on the totality of the circumstance; key factors include the reason for delay in moving to enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition on the merits. *Perry Homes,* 258 S.W.3d at 590-93.

The Texas Supreme Court has stated merely filing suit does not waive arbitration. *Id.* at 589-90.  Even after filing suit, a party does not waive arbitration through delay. For example, where a plaintiff took up to eight months to move to compel arbitration because it was admittedly very slow in recognizing that the arbitration clause could apply, the Texas Supreme Court has still ruled arbitration is not waived. *In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d

---

[5] Exhibit A, § 20.01(b).

692, 694 (Tex. 2008). In addition to delay in compelling arbitration, conducting discovery does not invoke the judicial process such as to waive a party's right to arbitrate. In *Richmont Holdings, Inc. v. Superiuor Recharge Systems, LLC*, though plaintiff therein delayed nineteen months and propounded requests for disclosure before compelling arbitration, there was no waiver. 445 S.W.3d 573 (Tex. 2015).

Here, HMC files its motion to compel arbitration within months of being served with this suit. While HMC has answered Newstreams' claims and filed its compulsory counterclaims in this proceeding, HMC has not conducted any discovery. As discussed above, merely asserting claims in state court does not waive arbitration. Further, HMC has not sought dispositive rulings from this Court or otherwise substantially invoked the judicial process. Further, at this early stage of litigation there will be no prejudice to Newstream in proceeding with discovery in arbitration and arbitrating its claims. HMC has thus not waived its right to arbitrate.

## IV. CONCLUSION

The Agreement is clear: all disputes between HMC and Newstream shall be submitted to final and binding arbitration with the AAA according to the AAA's rules. Both HMC and Newstream have asserted claims for breach of contract relating to the parties obligations under the Agreement. Further, HMC's claims against the Guarantors relate to Newstream's obligations under the Agreement. The dispute between the parties thus arises out of the Agreement and squarely falls within the arbitration agreement between the parties.

Accordingly, HMC respectfully requests that the Court grant this Motion to Compel Arbitration and:

    (a)    Stay this action and compel the parties to arbitrate their respective claims with the AAA as contemplated by the terms of the Agreement; and

    (b)    Grant HMC any additional relief to which it may show itself justly entitled.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

*/s/ Ross H. Parker*
Ross H. Parker
TX Bar No. 24007804
rparker@munsch.com
Aynsley K. Young
TX Bar No. 24102674
ayoung@munsch.com

500 N. Akard Street, Suite 3800
Dallas, Texas  75201
(214) 855-7500 (telephone)
(214) 855-7584 (facsimile)

**ATTORNEYS FOR DEFENDANT
HMC HOSPITALITY OPERATING
COMPANY**

## CERTIFICATE OF CONFERENCE

A conference was held on January 15, 2020, with Carlisle A. Bruan, counsel for Newstream Hotel Partners-IAH, LLC on the merits of this motion. A reasonable effort has been made to resolve the dispute without the necessity of court intervention and the effort failed. Therefore it is presented to the Court for determination.

_/s/ Aynsley K. Young_
Aynsley K. Young

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing _Motion to Stay Proceeding and Compel Arbitration_ has been served by ESERVE on this the 16th day of January, 2020, to:

Carlisle A. Braun
Brandi J. McKay
**SCHEEF & STONE, L.L.P.**
2600 Network Blvd., Suite 400
Frisco, Texas 75034
(214) 472-2100 (telephone)
(214) 472-2150 (facsimile)

_/s/ Ross H. Parker_
Ross H. Parker

4848-0043-2561v.1 004489.00028

# HOTEL MANAGEMENT AGREEMENT

**between**

**NEWSTREAM HOTEL PARTNERS-IAH, LLC**

**and**

**HMC HOSPITALITY OPERATING COMPANY**

## HOTEL NAME & ADDRESS

Red Lion Hotel & Conference Center
500 N. Sam Houston Parkway East
Houston, TX 77060
281-931-0101



# Table of Contents

**ARTICLE 1     DEFINITIONS** ........................................................................... 1

   1.01   Definitions ........................................................................................ 1
   1.02   Other Definitions ............................................................................. 6

**ARTICLE 2     SCOPE OF AGREEMENT** ...................................................... 7

   2.01   Subject Matter ................................................................................. 7
   2.02   Grant to Manager ............................................................................ 7
   2.03   Funding ........................................................................................... 7

**ARTICLE 3     TERMS AND EXTENSIONS** ................................................. 7

   3.01   Commencement Date ....................................................................... 7
   3.02   Term ................................................................................................ 8
   3.03   Post-Termination Matters:  Reimbursements to Manager ............... 8

**ARTICLE 4     NON-DISTURBANCE** .............................................................. 8

**ARTICLE 5     STANDARDS AND MANAGER'S CONTROL** ..................... 9

   5.01   Operational/Franchise Standards .................................................... 9
   5.02   Manager Control ............................................................................. 9
   5.03   Contractual Authority .................................................................... 10
   5.04   Meetings ........................................................................................ 10
   5.05   Franchise ....................................................................................... 11
   5.06   Definition of Marks ...................................................................... 11
   5.07   Rights Upon Termination of Franchise ........................................ 11

**ARTICLE 6     OPERATION OF THE HOTEL** ............................................ 11

   6.01   Licenses ......................................................................................... 11
   6.02   Operating Equipment and Operating Supplies .............................. 12
   6.03   Personnel ....................................................................................... 12
   6.04   Labor Relations ............................................................................. 13
   6.05   Professionals and Other Specialists .............................................. 13
   6.06   Sales, Marketing, Advertising and Additional Promotional Programs ........ 14
   6.07   Trades:  Treatment Accorded ........................................................ 14
   6.08   Routine Maintenance and Repairs ................................................ 15
   6.09   FF&E Replacements & Capital Expenditures ............................. 15
   6.10   FF&E and Capital Expenditures Estimates .................................. 16
   6.11   Emergency Repairs:  Repairs Required by Law ........................... 16
   6.12   Reserve Fund ................................................................................. 17
   6.13   Cash Management .......................................................................... 18

**ARTICLE 7     FISCAL MATTERS** ................................................................ 18

   7.01   Accounting Matters ....................................................................... 18
   7.02   Annual Business Plan .................................................................... 19

7.03    Bank Accounts .................................................................. 21
7.04    Reimbursement of Out-of-Pocket Expenses ........................ 21
7.05    Tax Matters ...................................................................... 21

**ARTICLE 8       PAYMENTS TO MANAGER ....................................... 22**

8.01    Base Operating Fee ......................................................... 22
8.02    Incentive Operating Fee .................................................. 22
8.03    Accounting Fee ............................................................... 22

**ARTICLE 9       DISBURSEMENTS ..................................................... 23**

9.01    Disbursement of Funds .................................................... 23
9.02    Adjustment to Bank Account ............................................ 23

**ARTICLE 10      INSURANCE ............................................................. 23**

10.01   Insurance Coverage.......................................................... 23
10.02   Insurance Policies ........................................................... 24
10.03   Manager's Blanket Insurance Coverage ............................ 25
10.04   Waiver of Subrogation ..................................................... 25

**ARTICLE 11      RESPONSIBILITY FOR CLAIMS, ETC. ...................... 25**

**ARTICLE 12      CASUALTY AND CONDEMNATION............................ 26**

12.01   Casualty........................................................................... 26
12.02   Condemnation .................................................................. 27
12.03   Business Interruption Insurance........................................ 27

**ARTICLE 13      DEFAULT AND TERMINATION ................................. 28**

13.01   Events of Default ............................................................. 28
13.02   Termination...................................................................... 28
13.03   Hotel Reservations Honored ............................................ 29
13.04   Termination Payment........................................................ 29

**ARTICLE 14      NOTICES.................................................................. 30**

**ARTICLE 15      RELATIONSHIP, AUTHORITY AND FURTHER ACTIONS............. 30**

15.01   Relationship .................................................................... 30
15.02   Further Actions ................................................................ 31

**ARTICLE 16      APPLICABLE LAW AND VENUE................................ 31**

**ARTICLE 17      SUCCESSORS AND ASSIGNS................................... 31**

17.01   Assignment ..................................................................... 31
17.02   Binding Effect ................................................................. 32

**ARTICLE 18      AGREEMENT NOT AN INTEREST IN REAL ESTATE ...... 32**

**ARTICLE 19      FORCE MAJEURE .................................................... 32**

19.01   Operation of Hotel ........................................................... 32

Table of Contents                                                                  Page ii

19.02  Extension of Time ................................................................................................. 32

**ARTICLE 20      ALTERNATIVE DISPUTE RESOLUTION** ........................................... 33

20.01  Arbitration ............................................................................................................. 33
20.02  Expert Resolution .................................................................................................. 34

**ARTICLE 21      GENERAL PROVISIONS** ....................................................................... 35

21.01  Authorization ......................................................................................................... 35
21.02  Interest .................................................................................................................... 35
21.03  Formalities ............................................................................................................. 35
21.04  Documents .............................................................................................................. 35
21.05   Consents ................................................................................................................. 35
21.06  Estoppel Certificate ............................................................................................... 35
21.07  Extension of Date of Termination ........................................................................ 36
21.08  No Representations ................................................................................................ 36
21.09  Assistance with Proposed Sale, Financing, Refinancing .................................... 36
21.10  Prevailing Party's Expenses ................................................................................. 37
21.11  Confidentiality ....................................................................................................... 37
21.02  Severability ............................................................................................................ 37

<u>EXHIBITS:</u>
Exhibit "A"    -    Legal Description
Exhibit "B"    -    Insurance Requirements
Exhibit "C"    -    Sample P & L
Exhibit "D"    -    Franchise Required Language

# HOTEL MANAGEMENT AGREEMENT

THIS HOTEL MANAGEMENT AGREEMENT (this "***Agreement***") is dated effective as of the Execution Date, by and between **HMC HOSPITALITY OPERATING COMPANY**, a Delaware Corporation ("***Manager***") and **NEWSTREAM HOTEL PARTNERS-IAH, LLC** a Texas limited liability company ("***Owner***"). Each reference in this Agreement to any of the terms and titles contained in any Exhibit attached to this Agreement shall be deemed and construed to incorporate herein the data stated under that term or title in such Exhibit.

RECITALS:

A.     Owner owns/leases the Site described in Exhibit A, on which is located/Owner intends to construct a hotel having the facilities described in Exhibit A (the "***Hotel***");

B.     Owner desires that Manager manage the Hotel, pursuant to the terms of this Agreement; and

C.     Manager (or its Affiliates) agrees to manage the Hotel, pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, Owner and Manager agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.01**     **Definitions**

As used herein the following terms shall have the respective meanings indicated below:

(a)     "***Additional Fees***" – any fees billed and due under the Agreement for services provided that are outside the services detailed in the Agreement.

(b)     "***Affiliate***" - any corporation or other entity controlled by, controlling or under common control with Owner or Manager, as applicable.  The words "control," "controlled" and "controlling" mean ownership, directly or indirectly, of fifty percent (50%) or more of the legal or beneficial ownership interest of such corporation or other entity or the power to direct or cause the direction of the operations and policies of any such entity.

(c)     "***Building***" - all buildings, structures and improvements now located or hereafter constructed on the Site and all fixtures and equipment attached to, forming a part of and necessary for the operation of such buildings, structures or improvements as a hotel (including, without limitation, heating, lighting, plumbing, sanitary system, air-conditioning, laundry, refrigeration, kitchen, elevators and similar items) and such (i) restaurants, bars and banquet, meeting and other public areas, (ii) commercial space, including concessions and shops, (iii) garage and parking

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 1

space, (iv) storage and service areas, (v) recreational facilities and areas, (vi) public grounds and gardens, permanently affixed signage, (vii) other facilities and appurtenances and (viii) number of keyed guest rooms ("***Keyed Guest Rooms***") as presently exist on the Site or are hereafter added thereon during the Term.

(d)    "***Construction/Acquisition Term***" – The period of time to and from the Commencement Date and the Open Date of the Hotel, if applicable.

(e)    "***Fiscal Year***" - the calendar year, or partial calendar year, from January 1 to December 31, unless and until Owner and Manager otherwise mutually agree to change by amendment.

(f)    "***FF&E***" - all fixtures, furniture, furnishings and equipment (not including Operating Equipment) required for the operation of the Building as a hotel in accordance with the standards set forth in this Agreement, including, without limitation, (i) office furnishings and equipment, (ii) specialized hotel equipment necessary for the operation of any portion of the Building as a hotel, including equipment for kitchens, laundries, dry cleaning facilities, bars, restaurants, public rooms, commercial and parking space, and recreational facilities, and (iii) all other furnishings and equipment as Manager deems necessary or desirable for the operation of the Building as a hotel in accordance with the Operational/Franchise Standards.

(g)    "***Franchise***" –that certain License Agreement dated _____, between Newstream Hotel Partners-IAH, LLC and _____, which allows for the operation of the Hotel as a _____ pursuant to the Franchise Standards.

(h)    "***Franchise Standards***" – the operational and other standards expressly set forth in the Franchise and governing the operation and maintenance of the Hotel pursuant thereto.

(i)    "***Gross Room Revenues***" - that portion of Total Revenues which is derived from the sale or rental of guestrooms and suites, specifically including amounts retained as forfeited deposits and guaranteed no-show receipts.

(j)    "***Hotel***" - a collective term for the Site, the Building, the FF&E, the Operating Equipment and the Operating Supplies.

(k)    "***Income Before Fixed Charges***" - Total Revenues minus the sum of Operating Costs.

(l)    "***Mortgagee***" - the holder of any Permitted Mortgage.

(m)    "***Make Ready Date***" – the date that is one hundred eighty days prior to the planned opening date of the Hotel if it is new construction.

(n)    "***Net Profit/Loss***" – Total Revenues minus the sum of Operating Costs and Fixed or Capital Expenses.

(o)    "***Open Date***" - the date the Hotel opens for business, if new construction or undergoing renovation or new acquisition.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 2

(p)    "***Operating Cost(s)***" - the entire cost and expense of maintaining, operating and supervising the management of the Hotel.  Operating Costs shall be the sum of such costs and expenses which are normally charged as a cost of operation, including, without limitation,

(i)    the cost of Operating Supplies and Operating Equipment,

(ii)    wages, salaries, employee benefits, payroll taxes, any and all bonus plan payouts and other costs related to employees at the Hotel;

(iii)    advertising and promotional expenses incurred directly by, or on the behalf of, the Hotel (inclusive of the Hotel's fair share of any group advertising, promotion, or marketing program performed in conjunction with other Manager run properties that Manager deems beneficial, administrative and general expenses of the Hotel, the cost of personnel training programs (including, but not limited to, Manager's annual general manager's, accounting and human resource conferences), including travel and related expenses, charges for reservation-related distribution systems (e.g., airline reservation systems), cost of independent shopping services, licensing and annual support fees for human resources related systems, the costs for any consultants and other specialists to the extent providing services to the Hotel, utility and energy costs, operating licenses and permits, and grounds and landscaping maintenance costs;

(iv)    all expenses associated with Manager's applicable employees at the Hotel to attend Manager's annual training conferences, including, but not limited to the general manager's, accounting and human resources conferences, whether or not such expenses are included in the Annual Business Plan;

(v)    all technology related expenses, including but not limited to licenses, software and hardware support fees, software, application fees, connectivity fees, internet access fees or any fees per Article 6.05 of this Agreement;

(vi)    all expenditures made for routine maintenance and repairs to keep the Hotel in good condition and repair;

(vii)    any and all license, installation, support and software fees associated with the property management and human resource related systems installed at the Property (current installation and licensing fee is $6,000 for property management system and a one-time variable per employee fee for human resource system of $10.50), monthly support is currently $600 *(will be included in Base Operating Fee)* for the property management system and $400 for the human resource system*(will be included in Base Operating Fee)*  , but may be increase during the Term, but no more than fifteen percent (5%) annually  (***"Systems Fees"***).  Actual hardware fees may apply depending on existing hardware.  Fees may vary by location);

(viii)    any Additional Fees due Manager;

(ix)    reimbursable expenses due Manager;

(x)    all employee related insurance premiums including worker's compensation and any premiums associated with employee benefit plans; including but not limited to those

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 3

expenses and charges required by the Patient Protection and Affordable Care Act or incurred by Manager as a result of the Patient Protection and Affordable Care Act;

(xi)    increases in reserves for uncollectible accounts receivable as set forth in the Approved Budgets but not limited to the budgeted amounts; and

(xii)    credit card and travel agent commissions.

(xiii)    Bankruptcy Fees.

There shall be expressly excluded from Operating Costs the following costs and expenses of the Hotel, which shall be defined as "***Fixed or Capital Expenses***":

(a)    depreciation of the Building, FF&E and Operating Equipment, and amortization of financing costs, pre-opening expenses, organizational and other costs;

(b)    debt service interest on any Permitted Mortgage;

(c)    rental payments pursuant to any existing ground lease or any equipment leases or installment sales contracts approved by Manager;

(d)    the cost of external audits (whether certified or otherwise) of Hotel operations and/or with respect to the Owner entity itself,

(e)    Base Operating Fees and Incentive Operating Fees as defined in Articles 8.01 and 8.02;

(f)    any asset management fees that might be charged by Owner or others,

(g)    property taxes, any sales or use taxes on purchases of any FF&E, Capital Expenditures or renovation related expenditures;

(h)    any and all insurance premiums and costs and expenses for other insurance to be carried by Manager pursuant to the requirements of Article 10 and Exhibit "B", with the exception of any premiums defined as an Operating Cost above;

(i)    legal and other professional fees, other than those properly included in Operating Costs;

(j)    other recurring and non-recurring ownership costs, such as Owner's entity administration, partnership expenses, loan refinancing costs and associated legal fees, and servicing costs; and

(k)    such other cash expenditures (including Capital Expenditures), which are normally treated as a capital expenditure.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 4

(q)    "*Operating Equipment*" - all operating equipment required for the operation of the Hotel, including chinaware, glassware, linens, silverware, utensils, uniforms and all other similar items.

(r)    "*Operating Fee Total*" – the Base Operating Fees, the Incentive Operating Fees, the Accounting Fees, the Additional Fees and the System Fees due to Manager under this Agreement.

(s)    "*Operating Supplies*" - all consumable items used in the operation of the Hotel, including food and beverages, fuel, soap, cleaning materials, guestroom amenities, paper supplies, and all other similar items.

(t)    "*Permitted Mortgage*" - any mortgage, pledge or encumbrance of or other security interest in the Hotel or any part thereof or interest therein, which is listed in Exhibit "C" attached hereto and incorporated by reference as a part hereof or a copy of which shall hereafter be provided to Manager.

(u)    "*REVPAR*" – The Revenue per Available Room (RevPAR) is the total guest room revenue divided by the total number of available rooms as reported on the STAR.

(v)    "*REVPAR Index*" – The RevPAR (Yield) Index measures a hotel's fair market share of their segment's (competitive set, market, submarket, etc.) revenue per available room. RevPAR Index is calculated:  (Hotel RevPAR / Segment RevPAR) x 100 = RevPAR Index.

(w)    "*Site*" - the parcel or parcels of real estate more particularly described on Exhibit "A".

(x)    "*Total Revenues*" - all revenues and income of any nature derived directly or indirectly from the Hotel or from the use or operation thereof, including Gross Room Revenues, food and beverage sales, telephone, telegraph, facsimile revenues, in-room video and valet service receipts, rental or other payments from lessees and sublessees (but not the gross receipts of such lessees and sublessees), and the proceeds of business interruption, use, occupancy or similar insurance.  If Manager itself operates any facilities instead of having them operated by a lessee, such as a newsstand, gift shop, business center, or other store, the gross receipts of such facility or store shall also be included in Total Revenues.  There shall be excluded from Total Revenues: (i) any gratuities or service charges added to a customer's bill and distributed as compensation to the Hotel's employees; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by Owner for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges; (v) any proceeds from the sale or other disposition of the Hotel, FF&E, or other capital assets; (vi) any interest paid with respect to the  Reserve Fund, the Bank Account or any other deposit or investment of Hotel funds; (vii) any fire and extended coverage insurance proceeds; (viii) any condemnation awards; and (ix) any proceeds of financing or refinancing of the Hotel.  Total Revenues shall be determined on an accrual basis and in accordance with GAAP.

### 1.02    Other Definitions

As used herein the following terms have the meanings set forth in the respective Articles or Exhibits indicated below:

AAA – Subsection 20.01(b)
Accounting Fee – Section 8.03
Annual Business Plan - Subsection 7.02(b)(i)
Approved Budget - Subsection 7.02(b)(i)
Arbitration Rules – Subsection 20.01(b)
Bank Account - Section 7.03
Bankruptcy Fees – Section 7.01(e)
Base Operating Fee - Section 8.01
Capital Expenditures - Section 6.09
Capital Expenditures Budget - Section 6.10
Commencement Date - Section 3.01
Defaulting Party - Subsection 13.02(a)
Event of Default - Section 13.01
Executive Team – Subsection 6.03(b)
Expert - Subsection 20.02(b)
FF&E Replacement Budget - Section 6.10
Force Majeure - Section 19.01
General Manager – Subsection 6.03(b)
Hazardous Materials – Subsection 6.11(c)
Incentive Operating Fee - Section 8.02
Initial Term - Section 3.02
Interested Persons - Section 21.06
Licenses - Section 6.01
License Indemnity – Section 6.01
Losses – Article 11
Marks – Section 5.06
Minimum Balance - Subsection 2.03(b)
Mold – Subsection 6.11(c)
Non-Defaulting Party - Subsection 13.02(a)
Operating Budget - Subsection 7.02(b)(i)
Operational/Franchise Standards -Section 5.01
Payroll Burden – Section 6.03
Renewal Term - Section 3.02
Reserve Fund - Subsection 6.12(a)
Reserve Percentage – Subsection 6.12(a)
Systems – Section 8.03
Temporary Stop – Section 8.01
Term - Section 3.02
Termination Payment - Section 13.04
Trade Name – Section 5.05
Uniform System of Accounts - Subsection 7.01(a)
WARN Act - Section 3.03

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 6

## ARTICLE 2
## SCOPE OF AGREEMENT

### 2.01 Subject Matter

The subject matter of this Agreement is the Hotel referred to in Exhibit "A". Subject to the terms of this Agreement, Owner hereby engages Manager, and Manager hereby accepts such engagement, to operate all aspects of the Hotel for and on behalf of Owner and as the exclusive operator of the Hotel during the Term.

### 2.02 Grant to Manager

Owner grants to Manager the sole and exclusive right to possession of the Hotel for the Term and during the Term the sole and exclusive right to supervise and direct the management and operation of the Hotel for and on the account of Owner, and Manager hereby accepts said grant and agrees that it will supervise and direct the management and operation of the Hotel, all pursuant to the terms of this Agreement. Owner agrees that it will cooperate with Manager in every reasonable and proper way to permit and assist Manager to carry out its duties hereunder. Owner and Manager further agree that this Agreement provides for management of the Hotel, that Owner and Manager do not intend, nor does this Agreement grant or create, a franchise within the meaning of the Federal Trade Commission Act, any rule or regulation promulgated thereunder, or any other applicable law, rule, regulation or judicial decision.

### 2.03 Funding

(a) Owner will provide all funds, in a timely manner as requested by Manager, both initially and throughout the Term, as necessary to pay for all Operating Costs and Fixed Expenses relating to the Hotel, and to perform and satisfy Owner's covenants and responsibilities under this Agreement. The performance of all activities by Manager hereunder shall be on behalf of, and for the account of, Owner. Accordingly, Manager shall be authorized to pay any Operating Costs or Fixed Expenses out of the Bank Account, except where such payments are authorized to be paid from the Reserve Fund.

(b) Upon the Commencement Date, Owner shall deposit in the Bank Account at least $115,000.00 (the "*Minimum Balance*"); and throughout the Term, Owner shall maintain the Minimum Balance in the Bank Account.

## ARTICLE 3
## TERM AND EXTENSIONS

### 3.01 Commencement Date

The commencement date (the "*Commencement Date*") of the Term hereunder shall be 12:01 a.m. local time on May 10, 2018.

### 3.02    Term

The initial term (the "***Initial Term***") of this Agreement shall be the greater of either (i) sixty (60) months from and after the Commencement Date, or (ii) the Construction/Acquisition Term plus sixty (60) months. This Agreement shall automatically renew for successive sixty (60) month periods (each, a "***Renewal Term***") unless at least ninety (90) days written notice from either party is given to the other party prior to the expiration of the Initial Term or any subsequent Renewal Term. The Initial Term and, if applicable, any Renewal Term, shall expire on the dates above set forth, unless sooner terminated as hereinafter provided, and are herein referred to collectively as the "***Term***" of this Agreement.

### 3.03    Post-Termination Matters: Reimbursements to Manager

Upon any termination or expiration of this Agreement for any reason whatsoever (including, without limitation, pursuant to Section 13.02), Owner expressly agrees that Manager may remove any of its documents or systems which are proprietary to Manager (e.g., without limitation, accounting, human resource or other operating systems, employee files, manuals, any items owned by Manager or its Affiliates, any items required by law, including but not limited to the liquor inventory, software programs, stored data, internal correspondence of a proprietary nature, etc.), specifically excluding financial records, documents, correspondence or other materials proprietary to the Hotel.  Following termination, Owner shall have no further rights to use or access Manager's accounting, human resource or other operating systems.  Manager shall have the right to make copies of all other non-proprietary files and information relating to its management of the Hotel.  Upon such termination or expiration, within five (5) days of billing thereof, Owner shall pay to Manager, in addition to any other amounts due pursuant to this Agreement (i) Manager's reasonable out-of-pocket costs incurred by reason of requests by Owner for assistance after termination of this Agreement and not otherwise reasonably expected of Manager in the orderly termination of its management at the Hotel, (ii) any unpaid fees and other charges and reimbursements due Manager hereunder, and (iii) to the extent reasonable and consistent with Manager's standard practices and industry standards, termination-related employee expenses, including payments of accrued and earned sick and vacation time, pension, accrued 401K plan match, bonus and other termination payments due to employees, (iv) fees earned at a billable rate of two hundred dollars ($200.00) per hour for any and all post-termination services required or requested, either verbally or in writing, by Owner.  In the event of any such termination, Owner shall be responsible for compliance with the Worker Retraining and Notification Act ("***WARN Act***") and any penalties, fines or expenses related to the same.  This Section 3.03 shall survive the expiration or termination of this Agreement.

### ARTICLE 4
### NON-DISTURBANCE

Owner covenants that Manager, during the Term of this Agreement, shall have peaceable and quiet possession of the Hotel and shall be entitled to operate the Hotel in accordance with the terms of this Agreement, free from disturbance by Owner or by any person through whom Owner shall derive its title to or right to occupy and use the Hotel or by any other person or persons claiming by, through or under Owner or otherwise.  Owner covenants that throughout the Term, it will pay, keep, observe and perform all payments, terms, covenants, conditions and obligations to

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 8

be made, kept, observed or performed by Owner under any lease, concession or other agreement, mortgage or security agreement in respect of the Hotel, and will provide all funds as shall be necessary to perform Owner's obligations hereunder. Manager will not be required to subordinate its interests under this Agreement to any third party. Owner further covenants, at its own expense, to undertake and prosecute or to permit Manager to undertake and prosecute all appropriate actions, judicial or otherwise, required to assure such quiet and peaceable possession and management by Manager. Owner also covenants and agrees to pay, prior to delinquency, all taxes and assessments which are assessed against the Hotel or may become a lien on any component thereof and which may be due and payable during the Term, unless payment thereof is in good faith being contested by Owner, enforcement is stayed and the amount so contested is escrowed or guaranteed in a form satisfactory to Manager. Owner represents that it has good and indefeasible title to the Site, free and clear of all encumbrances which would impair Manager's ability to operate the Hotel pursuant to this Agreement. Upon Manager's request, Owner agrees to furnish to Manager copies of all documents by and through which Owner has the right of possession to the Hotel and consequently the ability to enter into this Agreement, including a valid title policy insuring Owner's interest in the Site.

## ARTICLE 5
## STANDARDS AND MANAGER'S CONTROL

### 5.01    Operational/Franchise Standards

Manager covenants to and shall manage the Hotel at the expense of Owner; and in accordance with the terms of this Agreement and the operational standards developed by Manager in connection with its hotel management business, as such operational standards are modified, revised or amended from time to time (the "*Operational Standards*"). In the event the Hotel will be subject to a third party franchised brand, the Manager will also incorporate such Franchise Standards into the Operational Standards. Owner shall cooperate with Manager throughout the Term (as the same may be extended) so that Manager shall be able to manage the Hotel in accordance with the Operational Standards. Manager may modify the Operational Standards from time to time during the Term of this Agreement as determined by Manager for the management of the Hotel, however, Manager will make no material changes as it relates to FF&E Replacements and Capital Expenditures without Owner's approval, except as required to comply with the Franchise Standards.

### 5.02    Manager Control

Owner hereby covenants to provide Manager with uninterrupted control in management of the Hotel during the Term of this Agreement. Owner further covenants it will not interfere with the day-to-day management of the Hotel. Manager shall have the right to determine the Operational/Franchise Standards, including, without limitation, operating policy, standards of operation, quality of service and any other matters affecting customer relations or the efficient management and operation of the Hotel. Without limiting the foregoing, Manager shall have the right, subject to the other provisions of this Agreement, to determine the terms of guest admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, charges for rooms and commercial space, credit policies, prices and other guest charges, receipt, holding and disbursement of funds, maintenance of bank accounts, and, from Owner's

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 9

funds, the procurement of inventories, supplies and services, promotion and publicity, including, without limitation, the right to provide complimentary rooms and the use of other Hotel facilities to existing or potential customers, employees and others. Manager shall have the right to institute legal proceedings with regard to the Hotel or its operations in its own name, without the consent of Owner, or in Owner's name, with the prior written consent of Owner.

### 5.03   **Contractual Authority**

Subject to the limitations contained elsewhere in this Agreement, Manager is and shall be authorized to make, enter into and perform in the name of, for the account of, on behalf of and at the expense of Owner, as an authorized representative but not an agent of Owner, any operating contracts and agreements deemed necessary by Manager to carry out and place in effect the terms and conditions of this Agreement, including the execution by Manager in Owner's name of equipment leases and the like relating to the Hotel. Notwithstanding anything to the contrary in the foregoing, Manager shall not, without Owner's prior written approval, execute any contract in Owner's name which (a) is not provided for in the Approved Budget, whether in total or partially; (b) extends beyond one (1) year and is not cancelable by Owner without penalty thereafter upon sixty (60) days' notice or less; (c) involves Capital Expenditures; or (d) provides for aggregate payments by Owner over the life of the contract (taking into account Owner's early termination rights, if any) in excess of $50,000. Manager shall execute in the Owner's name all leases of retail space in the Hotel, all of which shall be subject to the reasonable approval of both Owner and Manager.

### 5.04   **Meetings**

Unless otherwise agreed to by the parties, one or more of Owner's Representatives and one or more of Manager's Representatives, together with such additional support personnel as either party may reasonably deem necessary or appropriate, shall meet from time to time, but at least on a mutually agreed upon date on or before thirty (30) days prior to the beginning of each Fiscal Year. Meetings with respect to the Hotel shall be held more frequently than once per Fiscal Year as mutually agreed to by Owner and Manager. Such meetings shall be held at the Hotel or with the agreement of the parties at the Manager's office or any other location, as mutually agreed upon by the parties. At each such annual meeting, the parties will review the status of the following: (i) results of operations; (ii) capital replacments; and (iii) Annual Business Plan, or whatever both parties otherwise deem pertinent. An agenda of the additional items, if any, to be discussed at each meeting shall be prepared by Owner and delivered to Manager not less than fifteen (15) days prior to each meeting. Manager shall be entitled to add additional items to the agenda proposed by Owner by providing written notice to Owner within ten (10) days after the date Manager receives Owner's proposed agenda.

### 5.05   **Franchise**

Effective as of the Commencement Date, Owner expects to have entered into the Franchise. During the remainder of the Term, the Hotel shall operate under the trade name **"Red Lion Hotel & Suites"** ("***Trade Name***") pursuant to the Franchise. At Owner's sole cost and expense as otherwise provided in this Agreement, Owner shall be obligated to comply with any product improvement plan, Operational/Franchise Standards changes, or other requirements of the

Franchise, as may be imposed from time to time.  All costs, fees, royalties and expenses due and payable under, and to establish the Franchise shall be paid as Operating Costs.  This Section 5.05 shall survive the termination of this Agreement.

### 5.06    Definition of Marks

As used herein, "*Marks*" shall mean the Trade Name and any other name, service marks, trademarks, slogans and the like (including all improvements and additions whenever made to or associated with any of the Marks by the parties or anyone else) now or hereafter used by Manager pursuant to the Franchise or otherwise.

### 5.07    Rights Upon Termination of Franchise

If the termination of this Agreement or Owner's failure to comply with the standards of the Franchise results in the termination of the Franchise for any reason, including failure to authorize expenditures necessary to satisfy Franchise Operational/Franchise Standards, Owner shall pay all Franchise termination fees and expenses resulting from the same and shall reimburse Manager the Termination Payment under this Agreement.  This Section 5.07 shall survive the termination of this Agreement.

## ARTICLE 6
## OPERATION OF THE HOTEL

### 6.01    Licenses

Owner warrants that to its actual knowledge there are no covenants or restrictions, which would prohibit or limit Manager, provided that the necessary licenses and permits ("*Licenses*") therefor have been obtained, from operating the Hotel, including restaurants, lounges and other facilities, in accordance with the Operational/Franchise Standards.  In cooperation with Owner, Manager or an Affiliate of Manager shall apply for, process and take all necessary steps to procure (in Manager's name, and/or Owner's name to the extent required by local authorities), at Owner's sole cost and expense, all Licenses required for the operation of the Hotel and related facilities, including, at Manager's option, all liquor licenses for the sale of alcoholic beverages in the Hotel. Owner agrees to assist Manager with all requirements in connection with the application of such Licenses.  Manager undertakes to comply with any conditions set out in any such licenses and permits and at all times to operate and manage the Hotel in accordance with such conditions and any other legal requirements.  Upon the expiration or sooner termination of this Agreement, Manager agrees, to the extent permitted by applicable law, to assign, transfer and convey to Owner or its designee all of Manager's right, title and interest in and to all such Licenses (excluding liquor licenses), without additional charge (other than any expenses of transfer, which shall be Reimbursed Expenses); provided that Owner shall reasonably compensate Manager for its services and fully indemnify, defend and hold harmless (the "*License Indemnity*") Manager and its Affiliates, and their respective agents, officers, employees, directors and shareholders, from and against any and all losses, costs, liabilities, expenses and claims (whether administrative or judicial and including, without limitation, any attorneys' fees and expenses), arising from Owner's use of such Licenses pursuant to this Section 6.01.  The License Indemnity shall survive the termination

of this Agreement. Owner will also reimburse Manager for any out-of-pocket expenses incurred by Manager in connection with maintaining the Licenses for Owner's use.

### 6.02    **Operating Equipment and Operating Supplies**

Manager shall procure as an Operating Cost all Operating Supplies and Operating Equipment as Manager deems necessary to the normal and ordinary course of operation of the Hotel and to operate the Hotel in accordance with the Operational/Franchise Standards.

### 6.03    **Personnel**

(a)    All personnel employed at the Hotel at all times shall be the employees of Manager or an Affiliate of Manager, or employees under a co-employment association or relationship of Manager. As deemed necessary by Manager, other employees of Manager or an Affiliate of Manager may be assigned temporarily or on a part-time basis to perform services at the Hotel, and the allocable portion of such temporary or part-time employee's salary (including employee benefits) while performing services at the Hotel, and actual expenses incurred by such employee in traveling to and from the Hotel, will be reimbursed to Manager by Owner, as an Operating Expense, and such employees will be entitled to complimentary lodging, food and beverages, and other amenities, and use of Hotel facilities while performing such services. Manager shall have absolute discretion to hire, fire, promote, supervise, direct and train all employees at the Hotel, to fix their compensation and benefits, and generally to establish and maintain all policies relating to employment and employment benefits. All costs of every kind and nature pertaining to all employees at the Hotel arising out of the employer-employee relationship, including, without limitation, salaries, benefits (including medical related, non-refundable retirement plan participation funding of 10% of earned wages for eligible employees), vacation, sick and personal days and accruals at the accrual rate established by Manager, any payroll processing costs *("Payroll Burden")*, bonuses, relocation costs, reasonable employment-related legal costs (including but not limited to those costs, attorneys' fees, and/or expenses incurred by Manager as a result of an audit conducted or claim asserted under any federal, state, or local employment laws by any employee, or any federal, state or local employment agency or entity) costs incurred in connection with governmental laws and regulations and insurance roles, and such other expenses as Manager, in its reasonable discretion, may deem appropriate (e.g., costs of defense of employees charged with a crime in connection with the performance of their duties at the Hotel and costs of defending claims brought by Hotel employees against Owner, Manager or the Hotel) shall be an Operating Cost, and Owner shall reimburse, indemnify and hold harmless Manager from all costs, expenses, liabilities and claims incurred in connection therewith. Owner shall pay Manager monthly, in advance, on the 1st of each month, all payroll and Payroll Burden related costs for Executive Team employees that are paid directly by Manager. Payroll Burden costs as of the Commencement Date are fifty-eight (58) percent and are adjusted annually.

(b)    Owner agrees that it will not directly, or indirectly, employ, attempt to employ or cause to be employed anyone who serves as the General Manager or member of the Executive Team of the Hotel during the Term of this Agreement or, if this Agreement terminates for reasons other than the Manager's breach, for a period of not less than one year following the termination of this Agreement. As used herein, *"**General Manager**"* shall mean any person that is in the lead position at the Hotel and directs its daily operation on behalf of the Manager and *"**Executive**

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 12

***Team*** " shall mean the General Manager and those individuals employed from time to time as the controller and/or accounting manager, director of food and beverage and director of sales of the Hotel, or serving such functions, regardless of the specific titles given to such individual(s). If Owner does employ any member of the Executive Team, in breach of this provision, then Owner will pay Manager within ten (10) days after demand, as liquidated damages, an amount equal to one year's annual salary that was being paid to such Executive Team member when employed by Manager.

(c)     Manager utilizes a third party processor, currently PAYCOM, and/or a co-employment relationship, for all payroll activities and Owner agrees to use the Manager's processor or partner, employee leasing company of choice which may change from time to time. Any and all fees associated with the payroll related activities shall be an Operating Cost of the Hotel, including a ten dollar ($10.00) per employee, per payroll, processing fee. This fee may change throughout the Term but at no time shall increase more than five (5%) percent at any one time without prior notice to the Owner.

(d)     Upon expiration or other termination of this Agreement (other than pursuant to Section 13.02 hereof as a consequence of a default on the part of Manager hereunder), an escrow fund shall be established from Total Revenues (or, if Total Revenues are not sufficient, with funds provided by Owner) to reimburse Manager for all costs and expenses incurred by Manager, such as reasonable transfer costs, severance pay, unemployment compensation, WARN Act costs and other employee liability costs arising out of either the transfer or termination of Hotel employees. If the parties fail to agree within thirty (30) calendar days, with respect to the amount of the escrow fund, at the request of either party, the amount thereof shall be determined by Expert Resolution pursuant to the provisions of Article 20.

### 6.04    Labor Relations

When and where applicable, Manager shall be responsible for negotiating labor union contracts with its union employees in accordance with the provisions of the applicable Annual Business Plan regarding compensation and other applicable guidelines contained in the Annual Business Plan or which are otherwise agreed to by Owner and Manager. In connection with said contract negotiations, Manager agrees to advise and consult with Owner on a timely basis on the status of Manager's relationship with the union, in advance of and throughout the contract negotiations. Representatives of Owner shall be entitled to confer on an immediate basis with the person or persons selected by Manager to negotiate with representatives of a labor union during the course of any labor negotiations, but Owner's representatives shall not be entitled to participate in negotiations with union representatives without the prior written consent of Manager, which consent may be withheld, whenever, in Manager's judgment, the presence of Owner's representatives during the negotiations, would be detrimental to Manager's negotiations.

### 6.05    Professionals and Other Specialists

Manager shall have the right to retain legal counsel and such other professionals, consultants, and specialists as Manager deems necessary in connection with the management of the Hotel, the cost of which shall be an Operating Cost, whether budgeted or not. Owner agrees and acknowledges that it is difficult, if not impossible, to project these costs.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 13

Manager is not, and does not purport to be an expert, specialist or professional as it relates to the IT (information technology field, including any PCI DSS Compliance) field.  As such, Manager as a course of action hires professionals in this field to provide these services for the Hotel. Nothing in this Agreement is designed to profess Manager's ability to perform these functions, and furthermore, Owner agrees that Manager is not responsible under this Agreement for performing such, and indemnifies Manager, per Article 11, for any and all IT related activities performed, or not performed, at the Hotel including but not limited to PCI DSS Compliance. Manager will, if requested by Owner, hire professionals to handle such activities, but in no way makes any guarantees or assurances that such professionals will prevent any fines or penalties for failures to maintain any related compliances or systems.

### 6.06    Sales, Marketing, Advertising and Additional Promotional Programs

(a)    Manager shall arrange, contract for and carry out such advertising and promotion of the Hotel as Manager shall deem advisable and consistent with the Approved Budget.  Funds for advertising and promotion of the Hotel may be expended exclusively for or with respect to the Hotel and may be administered at and through Manager's regional or home office.  In the case of any joint or cooperative advertising or promotion (or other joint or cooperative efforts such as development and/or publication of standardized directories for hotel rooms), the costs thereof (without markup or profit to Manager or any Affiliate) shall be equitably allocated by Manager between the Hotel and any other affiliated hotels participating therein, considering the relative benefits received therefrom by each of the participants.

(b)    Manager shall include Hotel in its proprietary in-house revenue management program that will be specifically directed to driving and maximizing revenue at the Hotel.  This program is designed to replace franchise related services.  The monthly cost for this program shall be one thousand four hundred dollars ($1,100.00) and may be increased annually but by no more than 5% in any one year.

(c)    Manager shall reasonably coordinate with tour programs marketed by airlines, travel agents and government tourist departments when Manager deems the same to be advisable and in the best interests of the Hotel.  Manager, in its sole discretion, may cause the Hotel to participate in sales and promotional campaigns and activities involving complimentary rooms/suites, food and beverages, and other amenities to bona fide travel agents, tourist officials, airline representatives and other travel industry professionals where such is customary in the travel industry or in Manager's practice and policy.

### 6.07    Trades: Treatment Accorded

Manager may arrange for and make trades of goods and/or services (including, but not limited to, room/suite occupancy, food, beverages, incidental charge items and taxes relating to any thereof) furnished or to be furnished to others at the Hotel, for goods and/or services (including, but not limited to, advertising, air and ground transportation, rental vehicles and taxes relating to any thereof) furnished or to be furnished to or for the benefit of the Hotel or Manager. In such event, if the goods and/or services received in a particular trade are for the use or benefit of the Hotel (and not for the exclusive use or benefit of Manager), there shall be included in Total Revenues the then posted standard room rates and/or other standard charges for the goods and/or

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 14

services given therefore in such trade and the same amount shall be deemed contemporaneously expended as Operating Costs for such goods and/or services received.

### 6.08    Routine Maintenance and Repairs

Subject to the availability of sufficient funds therefore, Manager shall maintain the Hotel in good repair and condition and in conformity with the Operational/Franchise Standards and applicable laws and regulations, and shall make or cause to be made such routine maintenance, repairs and minor alterations, as Manager, from time to time, deems necessary for such purposes and in order for the Hotel to maintain a competitive position in the market place. The cost of such routine maintenance, repairs and alterations shall be paid from Total Revenues and shall be treated as an Operating Cost; to the extent that Hotel revenues are insufficient therefore, Owner shall, upon Manager's request, provide sufficient funds to pay for such costs when due. Expenditures under this Section 6.08 shall not be paid from the Reserve Fund. The determination of whether an expenditure is for an FF&E Replacement under Section 6.09 or, in the alternative, for routine repairs and maintenance under this Section 6.08 shall be made in accordance with this Agreement, Manager's accounting policy, and the Uniform System of Accounts. If and to the extent that the Uniform System of Accounts does not address and resolve the categorization of an expenditure, Manager shall make the determination, in good faith.

### 6.09    FF&E Replacements & Capital Expenditures

In addition to routine maintenance, repairs and alterations under Section 6.08, and subject to the limitations of the Approved Budget, Manager shall have the further right to replace FF&E and make such Capital Expenditures as Manager deems to be beneficial to the Hotel or its operation or which Manager determines to be necessary in order to maintain the Hotel's competitive position in the market place or to maintain the Hotel in accordance with the Operational/Franchise Standards. Expenditures under this Section 6.09 shall, to the extent provided in Section 6.10 hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account. The determination as to whether the expenditure is a Capital Expenditure will be made in accordance with generally accepted accounting principles for hotels (*"GAAP"*). As used herein, "*Capital Expenditures*" shall mean and include repairs, alterations, improvements, renewals and replacements to the Hotel which are normally capitalized under GAAP, including, without limitation, those items defined as FF&E repairs, alterations, improvements, renewals or replacements to the Building's structure or to its mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation systems, exterior and interior repainting, and resurfacing building walls, floors, roofs and parking areas and expenditures for computer hardware, software, materials, and related labor expenses. Design and installation of FF&E Replacements shall be under Manager's supervision. Design and completion of Capital Expenditures, if requested by Owner, shall be under Manager's supervision. To the extent Manager supervises or directs Capital Expenditures, or otherwise provide any project management services related thereto, Manager may agree to do so; provided, Manager shall be entitled to additional compensation therefor equal to four percent (4%) of all costs related to the Capital Expenditures. To the extent Owner engages any contractors, subcontractors or third parties to complete any work, repairs or improvements at the Hotel, such work shall be at the Owner's sole cost and expense. Owner agrees to indemnify and hold Manager harmless from all claims, costs, expenses and

liabilities arising from the same and further agrees that all such work shall be coordinated through Manager so as to minimize any disruption of the Hotel's operation by Manager.

### 6.10   FF&E and Capital Expenditures Estimates

Manager shall prepare plans and estimates of the expenditures necessary, in such detail as Owner shall reasonably require, for (a) FF&E Replacements (the "***FF&E Replacement Budget***"), and (b) Capital Expenditures (the "***Capital Expenditures Budget***") during each ensuing Fiscal Year, and shall submit such FF&E Replacement Budget and Capital Expenditures Budget to Owner for approval as a part of the Annual Business Plan described in Section 7.02.

### 6.11   Emergency Repairs: Repairs Required by Law

(a)     In the event a condition should exist in, on or about the Hotel of an emergency nature, including those defined as Capital Expenditures hereunder, which condition requires immediate action to preserve and protect the Hotel, to assure its continued operations, or to protect Hotel guests or employees, Manager, on behalf of and at the sole cost and expense of Owner, is authorized to take all steps and to make all expenditures necessary to repair and correct any such condition, whether or not provisions have been made in the Approved Budget for any such emergency expenditures.  Manager shall not expend more than $25,000 on any one occasion pursuant to this Subsection 6.11(a) without Owner's prior approval, unless Manager determines that the emergency condition constitutes an immediate threat to the life or safety of Hotel guests or employees or will result in further damage to the Hotel; and in any event, Manager shall advise Owner as promptly as possible of any expenditures made or to be made under this Subsection 6.11(a).  Expenditures under this Subsection 6.11(a) shall, to the extent provided in Subsection 6.12(a) hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account.

(b)     In the event that, at any time during the Term, repairs to or additions, changes or corrections in the Hotel of any nature shall be required by reason of any laws, ordinances, rules or regulations now or hereafter in force, or by order of any governmental or municipal power, department, agency, authority or officer, whether such repairs are Capital Expenditures or otherwise, such repairs, additions, changes or corrections shall be made at the direction of Manager and paid for by Owner, unless (and except for so long as) compliance therewith is in good faith being contested by Owner and enforcement is stayed in a manner reasonably satisfactory to Manager.     Expenditures under this Subsection 6.11(b) shall, to the extent provided in Subsection 6.12(a) hereof, be paid from the Reserve Fund and the balance, if any, shall be paid from the Bank Account.

(c)     To the extent any "***Hazardous Materials***" are found at the Hotel, Manager shall have the right, but not the obligation, to perform any environmental assessments at the Hotel and remediate any such Hazardous Materials from the Hotel; provided, Owner shall be responsible for all costs, expenses, liabilities and other claims resulting from the same and agrees to comply with all applicable laws with respect to the proper remediation of such Hazardous Materials.  Owner's failure to comply with this provision shall give Manager the immediate right to terminate this Agreement without notice under Section 13.02.  To Owner's knowledge, (a) no Hazardous Materials are or have been manufactured, generated, processed, used, handled, stored, disposed,

released or discharged at, on, in, over, under or from the Hotel, the Site or the real property adjacent to the Hotel, (b) there are no soil, water, air, mineral, chemical or environmental conditions or contamination at, on, in, over, under or from the Hotel, the Site or real property adjacent to the Hotel that does, or with the passage of time will, require any remediation, abatement, removal, clean up, monitoring or other corrective action, or notice or reporting to any Governmental Authority or employees or patrons of the Hotel, pose any threat to the health and safety of the employees or patrons of the Hotel or the environmental or natural resources in general, or otherwise require, based on Applicable Law or standards of prudent ownership, any remediation, abatement, removal, clean up, monitoring or other corrective action, (c) there exists no identifiable threat of the contamination of the Site by release of Hazardous Materials, substances or wastes or otherwise from existing sources adjacent to the Hotel, and (d) there are no underground storage tanks on the Site. "***Hazardous Materials***" means any of the following: (i) any "hazardous waste," "solid waste," "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "contaminant" as those or similar terms are defined or regulated under any Environmental Laws; (ii) any mold, mildew, fungus, or other potentially dangerous organisms ("***Mold***"); (iii) asbestos (whether or not friable) and asbestos-containing materials; (iv) any volatile organic compounds, including oil and petroleum products; (v) any substances which because of their quantitative concentration, chemical, radioactive, flammable, explosive, infectious or other characteristics, constitute or may reasonably be expected to constitute or contribute to a danger or hazard to health, safety or welfare of any person or to the environment, including any polychlorinated biphenyls (PCBs), infectious medical wastes (including tissue, syringes, needles, blood samples or any material contaminated with bodily fluids of any type), toxic metals, etchants, explosives, reactive metals and compounds, pesticides, herbicides, urea formaldehyde foam insulation and chemical, biological and radioactive wastes; (vi) radon gas; (vii) any other substance the presence of which on the Hotel is prohibited by any Environmental Laws; and (viii) any other substance which by any Environmental Laws requires special handling or notification of any Governmental Authority in its collection, storage, treatment, or disposal. However, for the purposes of the covenants and representations, but not the indemnification obligations, set forth in this Agreement, the term "Hazardous Materials" shall not include small quantities of materials, chemicals or substances normally used in connection with the use, management, operation, or ownership of the Hotel, provided that such materials, chemicals or substances are generated, produced, stored, handled, used transported and disposed in a safe and prudent manner in strict compliance with all Environmental Laws.

### 6.12   Reserve Fund

(a)   At the Commencement Date, Owner shall deposit and maintain $0.00 as a minimum in the Reserve Fund and thereafter deposit each month during the Term, an additional amount equal to 0.0% of Gross Room Revenues for the preceding month (the "***Reserve Percentage***"). The amounts so deposited in the Reserve Fund shall be recorded on the Hotel's books of account as "Reserve Fund." All deposits to, and the balance in, the Reserve Fund, from time to time, shall be placed into and maintained in, an interest-bearing account (the "***Reserve Fund***") established in Owner's name at a bank of Owner's selection with Manager's designees being the only authorized signatories on said account. Any expenditure for FF&E Replacements and Capital Expenditures during any Fiscal Year, to the extent provided for in the Approved Budget, may be made without Owner's further approval and shall be made by Manager from the Reserve Fund (including accrued interest and unused accumulations from earlier years). Any

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 17

amounts remaining in the Reserve Fund at the close of each Fiscal Year shall be carried forward and retained in the Reserve Fund until fully used as herein provided.

(b)     To the extent the Reserve Fund is insufficient at a particular time or to the extent the Reserve Fund plus anticipated contributions for the ensuing year are below the amount provided therefore in the Approved Budget for the ensuing year, then in either such event, Manager shall give Owner written notice thereof at least forty-five (45) calendar days before the anticipated date such funds will be needed.  Owner shall supply the necessary funds by deposit to the Reserve Fund at least thirty (30) calendar days prior to the anticipated date such funds will be needed. Upon termination of this Agreement for whatever reason, Manager's right to expend any unused portion of the Reserve Fund shall terminate and the balance of the fund shall be paid over to Owner, less any sums then due Manager.

### 6.13    Cash Management

Manager shall manage all cash balances from the operation of the Hotel and may invest the same on behalf of Owner, from time to time, as reasonably determined by Manager.

### ARTICLE 7
### FISCAL MATTERS

### 7.01    Accounting Matters

(a)     Manager shall strive to maintain an accurate accounting system, in accordance with the definitions of this Agreement, substantially in the form and layout of the P&L in Exhibit C, and the Uniform System of Accounts with its management of the Hotel.  For all purposes under this Agreement, "*__Uniform System of Accounts__*" shall mean the Uniform System of Accounts for the Lodging Industry, Ninth Revised Edition, 1996, as adopted by the American Hotel and Motel Association and any future amendments thereto as may be approved by Manager. Definitions in this Agreement will prevail over a dispute in terminology. The books and records reflecting the Hotel operations shall be maintained either at the Hotel, at the principal office of Manager or at a regional accounting office, at Manager's option.  Such books and records will be compiled using Manager's proprietary accounting system which use shall be offered to Owner during the Term of this Agreement for the fees detailed in the Agreement.  Owner, the Mortgagee(s), and the independent accounting firms of Owner, the Mortgagee(s) and Manager shall each have the right and privilege of examining said books and records at any reasonable time during normal business hours following fifteen (15) calendar days advance notice to Manager.  Any such review shall be completed without material disruption to the Hotel operations.

(b)     Upon request of Owner and at Owner's sole cost and expense, a certified audit of the Hotel operations shall be performed by a nationally recognized, independent Certified Public Accounting firm with expertise in the lodging industry as appointed by Owner.  Manager shall cooperate in good faith with Owner and its representatives to facilitate such audit.

(c)     Manager shall prepare and furnish to Owner, within twenty (20) calendar days after the end of each calendar month, one copy of the profit and loss statement for the Hotel setting forth the financial position and results of operations of the Hotel for such calendar month and the calendar year-to-date, with comparisons to the then current Operating Budget and the previous

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 18

year's results if the previous year's results have been prepared by Manager or provided to Manager in an acceptable form, for an additional fee. These documents will be provided in an online format where the Owner can download them and print as many copies as they require. Additional hard copies may be provided by Manager at Owner's prior written request, at Owner's cost of $135.00 per additional copy. Manager shall also provide Owner with such additional operating and financial data as Owner may reasonably request, the cost of providing said data to be an Operating Cost of the Hotel.

(d)     Owner may from time to time request that Manager provide services outside the normal services defined by this Agreement, which Manager may accept or decline in its sole discretion.

(e)     Manager shall not be required to provide any additional reporting requirements or any services for the Owner, or appointed trustee or receiver of the court, as the result of a bankruptcy filing by Owner. If Owner files bankruptcy, and Manager is asked to provide services outside of the normal services defined by this Agreement as a result, Manager may at its own discretion decide to do so for additional fees, which fees shall be paid together with all other amounts under this Agreement as a first priority administrative expense in any such bankruptcy proceeding. Should Manager provide such services, Owner agrees to pay Manager Additional Fees of $500.00 per financial projection or report as defined in Section 7.04 of this Agreement, and an additional variable fee of $100.00 per hour for any other services provided (the ***"Bankruptcy Fees"***). The Bankruptcy Fees shall be considered Operating Costs whether or not they are included in the Approved Budget and will be considered earned and due when billed.

### 7.02     Annual Business Plan

(a)     Manager shall submit to Owner an Operating Budget for Fiscal Year one at least ninety (90) days prior to the Open Date, if applicable, or within ninety (90) days of the Commencement Date if the Hotel is already open as of the Commencement Date. Upon submission, the Annual Business Plan for Fiscal Year one shall be subject to review and approval by Owner in the manner described in Subsection 7.02(b) hereof. Until such time as an Approved Budget becomes effective with respect to operation of the Hotel for Fiscal Year one, Manager shall operate the Hotel in accordance with the standards it currently operates similar hotels.

(b)     At least thirty (30) days prior to the commencement of each subsequent Calendar Year, Manager shall submit to Owner an annual forecast for the operation of the Hotel for such Fiscal Year containing revenue projections and budgets of expenses (the ***"Operating Budget"***). The Operating Budget shall be substantially in form consistent with Exhibit C. Manager shall, at the same time, also submit to Owner the FF&E Replacement Budget and the Capital Expenditures Budget, which, together with the Operating Budget, will comprise the "***Annual Business Plan***". Manager shall provide Owner, upon request, additional detail, information and assumptions used in preparation of the Annual Business Plan. Manager shall review the Annual Business Plan with Owner, and subject to Owner's approval, which shall not be unreasonably withheld, Manager shall implement such Annual Business Plan during the successive Fiscal Year (during which it shall be referred to as the "***Approved Budget***"). Owner shall approve the proposed Annual Business Plan or state its specific objections thereto (or to any specific item or items therein) within thirty (30) days after the Annual Business Plan is submitted by Manager to Owner. In the event Owner

objects to the Annual Business Plan or any specific line item or items of the Annual Business Plan prior to commencement of the Fiscal Year in question, pending resolution thereof, the Annual Business Plan or the specific line item or items of expense (not revenue) that have not been approved shall be suspended and replaced for the Fiscal Year in question by an amount equal to the amount of such budget item or items for the Fiscal Year prior thereto. If either Owner or Manager determines that the Annual Business Plan, or any specific line item or items therein, cannot be agreed to by the parties, then either Manager or Owner may require the matter to be submitted to Expert Resolution in accordance with Article 20 hereof. Notwithstanding the foregoing, in the event Owner fails to respond with any objections to the Annual Business Plan, in writing, within thirty (30) days after submittal by Manager, then the Annual Business Plan shall be deemed approved. **FAILURE OF OWNER AND MANAGER TO REACH AGREEMENT ON AN APPROVED BUDGET SHALL AT NO TIME BE CONSIDERED AN EVENT OF DEFAULT UNDER THIS AGREEMENT.**

(c)     Notwithstanding anything to the contrary contained in this Agreement, Manager may, without Owner's approval, make aggregate expenditures in any year which exceed the Approved Budget, provided that such excess does not exceed such expenditures as provided in the Approved Budget by more than five percent (5%). In addition, Manager may expend in excess of said five percent (5%) limitation under the following circumstances (provided such expenditures are reasonable in nature and amount based on such circumstances):

(i)     as the result of increased costs due to increases in the volume of Total Revenues (by reason of increased occupancy rates or otherwise); or

(ii)     as the result of increases in franchise fees, travel agent fees, or legal fees for Hotel related activities; or

(iii)     as the result of an emergency, as described in Section 6.11, or of uncontrollable expenditures, such as insurance, real estate taxes, weather-related costs, and increases in the cost of utilities based upon changes in utility rates; or

(iv)     as the result of earned benefits from employee bonus plans; or

(v)     as Manager deems necessary in good faith to maximize Net Profit/Loss.

References in this Agreement to the limitations imposed by the Approved Budget (and phrases of similar import) shall be deemed to incorporate Manager's authority to expend funds in excess of the Approved Budget as set forth in this Section 7.02(c). Manager shall promptly notify Owner of any expenditures that have been or are expected to be made in excess of the Approved Budget and of the reasons therefore. Delivery of the monthly profit and loss statement will satisfy this notice requirement.

(d)     Manager makes no assurances that the actual performance of the Hotel shall correspond to its estimates in the Annual Business Plan. Manager agrees to use all reasonable efforts to operate the Hotel within the Approved Budget and in a manner designed to maximize Gross Rooms Revenues and Income Before Fixed Charges.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 20

(e)　　At the time of the review by Owner with Manager of the Annual Business Plan and at any additional meetings during the Fiscal Year reasonably called by Owner and Manager, Manager shall, as needed, consult with Owner on matters of policy concerning operations, sales, room rates, wage scales, personnel, general overall operating procedures, economics and operation and other matters affecting the operation of the Hotel.

### 7.03　　Bank Accounts

Manager shall establish in the name of Owner and for Owner's account such bank accounts ("**_Bank Account_**") as Manager deems necessary for the management of the Hotel at a bank or banks approved by Owner into which all funds advanced to the Hotel by Owner or otherwise derived from the operation of the Hotel shall be deposited.  All Bank Accounts shall provide that Manager's designees shall be the only parties authorized to draw upon the Bank Accounts. Manager shall have control of such Bank Account, and any and all monies received from the operation of the Hotel shall pass through such Bank Account.  Nothing herein contained shall be construed to deprive Manager of the right to maintain petty cash funds at the Hotel and to make payments therefrom pursuant to the standard practices employed in the hospitality industry; provided Manager shall make a complete accounting for the same as required under this Agreement.

### 7.04　　Reimbursement of Out-of-Pocket Expenses and Additional Fees

It is agreed that Owner shall reimburse Manager and its Affiliates for actual, reasonable and necessary out-of-pocket costs incurred as an Operating Cost by them in the performance of this Agreement.  Such costs shall include, but not be limited to, reasonable travel, entertainment, telephone, telegraph, reproduction, electronic communication, postage, air express, costs of recruitment (including applicable agent's fee), franchise conference attendance, training seminars or similar fees benefiting Hotel or facilitating Manager's performance under this Agreement  and other incidental expenses.  Additionally, any financial proformas, budgets, forecasts or similar projections in excess of those referenced in Article 7.02 of this Agreement, will be billed at a rate of $500.00 per projection and payable to Manager in accordance to this Article.  It is agreed that Manager shall be entitled to reimbursement of these expenses directly from the Bank Account at the time incurred.  Such reimbursements shall be in addition to the Operating Fee Total and other fees and payments due hereunder.  Any Additional Fees earned and billed will be billed at an hourly rate of $200.00 per hour.

### 7.05　　Tax Matters

(a)　　Manager shall prepare and remit taxes for operational taxes only, including occupancy, sales and use, beverage and telecommunications as required by the Hotel's respective governmental jurisdiction.  Tax accounts will be established in the Owner's name by Manager. Beverage taxes will be reported under the respective Beverage License Holder's tax account. Owner's tax filing information is:

> Entity Name:　　　　　　　Newstream Hotel Partners-IAH, LLC
> Federal Tax ID Number:　　_____

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO　　　　Page 21

Type of Organization:    Limited Liability Company

State Organized:    Texas

(b)    Manager is not responsible for the preparation or returns or remittance of payments for local, state or federal income taxes due by Owner. Owner will be responsible for all income tax matters.

(c)    Should Owner desire Manager to engage the services of a property tax consultant for any disputes, or should Owner desire Manager to ensure timely payment of any and all property taxes (both real and personal), Owner will advise Manager of this election, in writing. Owner understands that Manager will not provide these services unless directed to do so by Owner.

## ARTICLE 8
## PAYMENTS TO MANAGER

### 8.01    Base Operating Fee

In consideration of the management of the Hotel by Manager, Owner agrees to pay to Manager the Operating Fee Total. The "***Base Operating Fee***" shall mean and refer to a fee equal to a monthly fee of (i) $5,000.00 for each month of the Construction/Acquisition Term until the Make Ready Date, if applicable, or (ii) the greater of (a) 3.5% of Total Revenues, or (b) $5,000.00 for each month (or prorata portion thereof) during the Term of this Agreement. The Base Operating Fee for the immediately preceding month shall be paid monthly, in arrears by no later than the 10th of the month, to Manager from the Bank Account.

### 8.02    Incentive Operating Fee

In addition to the Base Operating Fee, beginning with Fiscal Year two, Owner also agrees to pay Manager an amount equal to 10% of the year-over-year increase, calculated monthly, in Income Before Fixed Charges ("***Incentive Operating Fee***"). For the purposes of calculating Incentive Operating Fee for the second Fiscal Year when the Fiscal Year one is a partial period (less than twelve months), the month-over-month Incentive Operating Fee comparison shall be calculated by subtracting either (i) the applicable line item in the Fiscal Year two Operating Budget (for such months with no Actual Income Before Fixed Charges), or (ii) the actual monthly Income Before Fixed Charges for the prior year to the extent available, from the actual monthly Income Before Fixed Charges of the second Fiscal Year. The Incentive Operating Fee shall not exceed one (1.0) percent of Total Revenues for any Fiscal Year period. The Incentive Operating Fee shall be calculated and paid monthly to Manager from the Bank Account following the issuance of the monthly financial statements.

### 8.03    Accounting Fee

Owner also agrees to pay Manager a fee (***"Accounting Fee"***) in an amount equal to $1,000.00 per month for accounting services and for the use of Manager's proprietary accounting system and human resource database systems (***"Systems"***). The Systems will only be offered for use by the Owner during the Term of this Agreement. Any subsequent use after the Term shall require a separate agreement. The Accounting Fee shall be paid monthly by no later than the 5th of the month, to Manager from the Bank Account.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO    Page 22

## ARTICLE 9
## DISBURSEMENTS

### 9.01    Disbursement of Funds

All funds derived from the operation of the Hotel shall be deposited into the Bank Account created pursuant to the requirements of Section 7.03. There shall in turn be disbursed by Manager for and on behalf of Owner, funds from the Bank Account toward the following items to the extent available (with appropriate reserves established to cover items payable less frequently than monthly) in the following order of priority:

(a)    all Operating Costs, including the Operating Fee Total, charges for additional services, and all reimbursable expenses due Manager;

(b)    payments pursuant to any equipment leases or installment sale contracts approved by Manager; and

(c)    all other Fixed Expenses.

### 9.02    Adjustment to Bank Account

After the disbursements pursuant to Section 9.01, any excess funds remaining in the Bank Account over the Minimum Balance shall be disbursed monthly to Owner. Correspondingly, Owner agrees to make-up any deficiency in the Bank Account as required in Section 2.03. Notwithstanding that Manager is authorized to and shall make the above described disbursements to the extent funds are available, Owner will be solely liable for (i) all Operating Costs, specified Fixed Expenses and other Fixed Expenses and (ii) all sales taxes, excise taxes, or other taxes which may be assessed by any taxing authority against or upon Manager with respect to any payments, receipts or earnings received by Manager pursuant to this Agreement, including, without limitation, the fees received by Manager pursuant to Article 8, excluding in any case, however, any federal, state or local income, franchise or other taxes levied against Manager based upon its assets or income.

## ARTICLE 10
## INSURANCE

### 10.01    Insurance Coverage

Manager agrees to procure and maintain to the best of its ability, as either an Operating Cost or Fixed or Capital Expenses, such comprehensive general liability insurance and other insurance coverage as is set forth in said Exhibit "B". In connection with all significant construction at the Hotel, Owner or Manager (whichever is the contracting party) will cause the general contractor to maintain, with a reputable insurer, comprehensive general liability insurance (with products, completed operations and independent contractor's coverage) in at least the amount of $5,000,000, and to issue evidence of such coverage to Owner and Manager, naming Owner and Manager as named insureds.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 23

If Owner chooses to employ any or all of the employees of the Hotel, then Owner is required to carry comprehensive Worker's Compensation and Employers' Liability Insurance, at the minimum limits depicted in Exhibit B of this Agreement that would have otherwise been carried by the Manager if they employed the employees. Owner is further required to provide Manager proof of such coverage by issuing Manager a Certificate of Insurance evidencing such coverage for the Owner.

### 10.02   **Insurance Policies**

(a)     All insurance provided for under this Article 10 shall be effected by policies issued by insurance companies of good reputation and of sound financial responsibility and shall be subject to Manager's approval. Such insurance may be carried under blanket policies covering the Hotel and other locations provided such policies otherwise comply with all of the requirements of Exhibit "B".

(b)     Certificates of Insurance shall be delivered to Owner and Manager on or before the Open Date if new construction, or the Commencement Date if an existing and operating Hotel as of the Commencement Date. All insurance policies shall be renewed, and proof of such renewals shall be delivered to Owner and Manager at least ten (10) days prior to their respective expiration dates.

(c)     All insurance policies procured by Manager under Section 10.01 shall be written in the name of Manager with Owner, any lessor, any Mortgagee(s) and any other appropriate parties designated by Owner or Manager being named thereon as additional insureds (as their respective interests may appear), except for worker's compensation insurance and other insurance with respect to which it is impractical and inappropriate to name other parties as additional insureds.

(d)     All property insurance policies shall be endorsed specifically to the effect that the proceeds of any building, contents or business interruption losses shall be made payable to Owner, the Mortgagee(s), and Manager jointly, as their interests may appear, unless otherwise required by any Mortgagee. Each party shall use all reasonable efforts to cause any policy, which it is responsible to obtain under Exhibit "B" to provide that the insurer shall not have any rights of subrogation to any claim, which either party hereto may have or acquire against the other. Neither Owner nor Manager shall have any claim against the other with respect to the failure of any insurance carrier to provide the coverage or protection placed with such carrier as contemplated by this Agreement.

(e)     Certificates of Insurance (and copies of policies, to the extent required) shall be sent to Manager and to Owner at their respective addresses set forth in Article 14 hereof and to the Mortgagee(s) at such addressees as the Mortgagee(s) shall designate.

(f)     Manager shall have the right to set insurable values of the Hotel on behalf of Owner if Owner does not request specific insured values, in writing at least ninety (90) days in advance of each new policy renewal term, be placed by Manager. If such request is made, Manager shall use reasonable efforts to accommodate Owner's request, but should Manager's insurance carrier have minimum coverage limits in excess of Owner's coverage request, Manager shall have the authority to bind coverage under those minimum limits.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 24

(g)     All coverage limits and deductible amounts set forth in Exhibit "B" shall be reviewed by Owner and Manager from time to time for the purpose of determining the coverage limits and deductible amounts then appropriate for properties similar in type and construction to the Hotel and for the nature of the business being conducted.  Manager and Owner shall cooperate in good faith to arrive at an agreement on such matters.

### 10.03   **Manager's Blanket Insurance Coverage**

Manager may, at its option (but shall not be obligated to) make available to Owner the opportunity to participate in blanket insurance policies carried by Manager for other properties, including, without limitations other affiliated hotels, and which cover all or any portion of the insurance coverage specified in Exhibit "B" (including all or any portion of that insurance required to be procured and maintained by Owner under Section 10.01).  Owner agrees to participate in such blanket policies if (a) Manager determines to make such coverage available to Owner, and (b) the premiums for, and the coverage and financial strength provided by the insurer(s) under such blanket policies applicable to the Hotel shall be competitive with the premiums for, and the coverage and financial strength provided by the insurer(s) from which Owner would otherwise obtain such insurance.  In such event, notwithstanding the provisions of Section 10.01 and Exhibit "B" hereof, Manager shall be responsible for procuring and maintaining, at the expense of Owner, all insurance coverage represented by such blanket policies.

### 10.04   **Waiver of Subrogation**

Anything in this Agreement to the contrary notwithstanding, Owner and Manager each hereby waives any and all rights of recovery, claim, action or cause of action, against the other, its agents (including partners, both general and limited), officers, directors, shareholders or employees, for any loss or damage that may occur to the Hotel, or any improvements thereto, or any property of such party therein, by reason of fire, the elements, or any other cause which could be insured against under the terms of the fire and extended coverage insurance policy to be carried pursuant to this Agreement, regardless of cause or origin, including negligence of the other party hereto, its agents, officers or employees and covenants that no insurer shall hold any right of subrogation against such other party.

## ARTICLE 11
## RESPONSIBILITY FOR CLAIMS, ETC.

(a)     ALL DEBTS AND LIABILITIES ARISING IN THE COURSE OF BUSINESS OF THE HOTEL OR OTHERWISE IN CONNECTION WITH THE USE, OCCUPANCY OR OPERATION THEREOF (INCLUDING, WITHOUT LIMITATION, ALL SUCH LIABILITIES UNDER OR WITH RESPECT TO ENVIRONMENTAL LAWS, HAZARDS OR CLAIMS) DURING THE TERM ARE AND SHALL BE THE OBLIGATION OF OWNER, AND MANAGER SHALL NOT BE LIABLE OR OTHERWISE RESPONSIBLE FOR ANY SUCH DEBTS OR LIABILITIES BY REASON OF ITS MANAGEMENT, SUPERVISION AND OPERATION OF THE HOTEL DURING SAID TERM, EXCEPT FOR ANY SUCH DEBT OR LIABILITY THAT ARISES BECAUSE OF MANAGER'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  **MANAGER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS OWNER AND ITS AFFILIATES, AND THEIR RESPECTIVE AGENTS,**

OFFICERS, EMPLOYEES, DIRECTORS AND SHAREHOLDERS, FROM AND AGAINST ANY AND ALL LOSSES, COSTS, LIABILITIES, EXPENSES AND CLAIMS (WHETHER ADMINISTRATIVE OR JUDICIAL), INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES (ALL OF THE FOREGOING BEING REFERRED TO AS *"LOSSES"*), TO THE EXTENT ARISING FROM MANAGER'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (EXCLUDING, HOWEVER, ANY SUCH LOSS, COST, LIABILITY, EXPENSE OR CLAIM COVERED BY THE INSURANCE REQUIRED TO BE MAINTAINED IN ACCORDANCE WITH THIS AGREEMENT OR OTHERWISE ARISING FROM MANAGER'S ORDINARY NEGLIGENCE). THE ACT OR OMISSION OF A HOTEL EMPLOYEE WHO IS NOT THE GENERAL MANAGER, WHICH ACT OR OMISSION IS WILLFUL OR CONSTITUTES FRAUD OR GROSS NEGLIGENCE ON THE PART OF SUCH EMPLOYEE, SHALL NOT CONSTITUTE FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF MANAGER UNLESS MANAGER'S HOME OFFICE OR REGIONAL STAFF, OR THE GENERAL MANAGER, ACTED WITH GROSS NEGLIGENCE IN EMPLOYING, TRAINING, SUPERVISING OR CONTINUING THE EMPLOYMENT OF SUCH EMPLOYEE.

(b)    EXCEPT AS TO SPECIFIC ACTS OR OMISSIONS FOR WHICH MANAGER HAS AGREED TO INDEMNIFY OWNER IN PARAGRAPH (A) ABOVE, OWNER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD MANAGER AND ITS AFFILIATES, AND THEIR RESPECTIVE AGENTS, OFFICERS, EMPLOYEES, PARTNERS, MEMBERS, DIRECTORS AND SHAREHOLDERS, HARMLESS FROM AND AGAINST LOSSES OCCURRING OUT OF OR BY REASON OF THIS AGREEMENT OR OTHERWISE ARISING IN CONNECTION WITH THE OWNERSHIP, USE, OCCUPANCY OR OPERATION OF THE HOTEL, INCLUDING LOSSES ARISING OUT OF MANAGER'S ORDINARY NEGLIGENCE.

(c)    No person or entity shall be deemed to be a third party beneficiary of any term or provision of this Agreement, including, without limitation, the terms and provisions of this Article 11, and no person or entity shall have any rights of subrogation or similar rights under this Article 11, other than Affiliates of Owner and Manager, respectively, entitled to indemnification pursuant to the provisions of this Article 11. All indemnification obligations under this Agreement and the provisions of this Article 11 shall survive the expiration and any termination of this Agreement.

Manager's Initials                                  Owner's Initials

### ARTICLE 12
### CASUALTY AND CONDEMNATION

**12.01  Casualty**

(a)    If, during the Term, the Hotel incurs minor damage by fire, casualty or other cause, Owner shall, at its sole cost and expense and with all reasonable diligence, repair or replace the damaged portion of the Hotel to the reasonably same condition as existed previously. To the extent

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 26

available, proceeds from the insurance described in Article 10 shall be applied to such repairs or replacements.

(b)    In the event damage or destruction to the Hotel from any cause materially and adversely affects the operation of the Hotel, Owner shall promptly commence and complete repairing, rebuilding or replacement of the Hotel to substantially the same character as existed prior to the damage or destruction provided replacement is justified in comparison to the anticipated profitability of the Hotel during the remaining Term, and provided that the available insurance proceeds (plus the amount of the deductible with respect thereto) permit such repair, rebuilding or replacement.  In the event Owner chooses to not undertake the repairs, rebuilding or replacements specified above, Manager may terminate this Agreement upon sixty (60) days advance written notice, respectively, to the Owner without the payment of a termination fee or other penalty of any kind; provided, however, in the event Owner or any Affiliate (but not any unrelated third party transferee of Owner) shall reopen the Hotel as a hotel within two (2) years after the date of such casualty, on or before the date of reopening, Owner shall pay Manager a termination payment in an amount equal to the aggregate amount of the Operating Fee paid to Manager hereunder during the twenty-four (24) full months immediately preceding the date of such casualty.

### 12.02    Condemnation

(a)    In the event all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Hotel shall be so taken, but the result is that it is uneconomic to continue to operate the Hotel as a hotel of the same character and class, this Agreement shall terminate.  Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any damages to which they may be entitled.

(b)    In the event a portion of the Hotel shall be taken by the events described in Subsection 12.02(a) or the entire Hotel is affected but on a temporary basis, and the result is not to make it unreasonable to continue to operate the Hotel, this Agreement shall not terminate.  However, provided that Owner determines that the cost of repair, rebuilding or replacement is justified in comparison to the anticipated profitability of the Hotel during the remaining term of this Agreement, so much of any award for any such partial taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event shall be used for such purpose; the balance of such award, if any, shall be paid to Owner.

### 12.03    Business Interruption Insurance

Any proceeds from business interruption insurance payable to Owner or Manager hereunder, including, without limitation, payments made in connection with, or with respect to periods before or after, the termination of this Agreement pursuant to Sections 12.01 or 12.02, shall be fairly and equitably apportioned between Owner and Manager in accordance with their respective interests and equities to the end that the fair value of Manager's expectable compensation under this Agreement for the period covered by such business interruption insurance shall be paid to Manager.  Any business interruption insurance paid to Manager pursuant to this

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 27

Section 12.03 in respect of the period subsequent to the date of termination of this Agreement shall be credited against any termination payment payable by Owner to Manager pursuant to Section 12.01(b).

**ARTICLE 13**
**DEFAULT AND TERMINATION**

### 13.01   Events of Default

It shall be an event of default hereunder (an **"*Event of Default*"**) if any one or more of the following events shall occur:

(a)      If either party fails to timely perform any of its obligations and agreements under this Agreement;

(b)      If either party shall (i) voluntarily or involuntarily be dissolved (except that if either party is a partnership and is dissolved solely by reason of the death, insanity, disappearance, bankruptcy or lack of legal capacity of one or more of its general partners and its remaining partners, within sixty (60) days, elect, pursuant the partnership agreement of such partnership to continue such partnership's business, then such party shall not be considered as "dissolved" for the purposes hereof; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of all or a substantial part of its assets; (iii) file a voluntary petition in bankruptcy or otherwise voluntarily avail itself of any federal or state laws for the relief of debtors; (iv) admit in writing its inability to pay its debts as they become due; (v) make a general assignment for the benefit of creditors; (vi) file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law or file an answer admitting the material allegations of any petition filed against it in any bankruptcy, reorganization or insolvency proceeding; (vii) be the subject of an order, judgment or decree entered by any court of competent jurisdiction, in the application of any one or more creditors of such party adjudicating it a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of its assets, and such order, judgment or decree shall become final; or

(c)      If Franchisor terminates the Franchise due to Owner's failure to maintain the Operational/Franchise Standards.

### 13.02   Termination

(a)      Upon the occurrence of any Event of Default under Subsection 13.01(a) by or with respect to one of the parties hereto (the **"*Defaulting Party*"**), the other party hereto (the **"*Non-Defaulting Party*"**) shall have the right (exercisable by the giving of notice to the Defaulting Party) to terminate this Agreement if the Defaulting Party fails to remedy such Event of Default within three (3) days after its receipt of notice to remedy if such default relates to the payment of a sum of money, immediately without notice if such default relates to Owner's failure to remedy a life-safety issue or Hazardous Materials violation under Section 6.11 and, in all other cases, within thirty (30) days after its receipt of notice to remedy; provided, however, that if such Event of Default be of a non-monetary nature and if it cannot reasonably be remedied within said thirty (30) day period, then such thirty (30) day period shall be deemed to be extended for such additional period as may reasonably be required to remedy the same if the Defaulting Party shall promptly

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 28

commence to remedy upon receipt of notice from the Non-Defaulting Party and shall continue therewith with due diligence.

(b)    With respect to the occurrence of an Event of Default under Subsection 13.01(b), this Agreement shall terminate, at the election of the Non-Defaulting Party, upon such occurrence, or at any time after such occurrence provided such Event of Default has not been remedied.

(c)    Manager shall have the right to terminate this Agreement at will by providing written notice to Owner should it determine, in its' own discretion, that the Owner is in violation of any part or parts of Articles 2 – Subsection 2.03, Article 5,  or Article 8 or that Owner has become unreasonable in its' operational expectations for the Hotel.

(d)    Manager shall have the right to terminate this Agreement at will, without penalty of any sort, if Manager deems, in its sole discretion, that its ability to fulfill its obligations under this Agreement are being impeded by Owner, Owner's employees or representatives.

(e)    Following the first twenty-four (24) months of the Term, Owner may Terminate this Agreement at any time during the Term, by providing Manager with ninety (90) days written notice of such intent to terminate early, if the Hotel is sold to a non-affiliated entity of the Owner, owing only any fees earned and due to date, reimbursable expenses per this Agreement and the associated fees due during the subsequent ninety (90) day notice period.  If Manager is released prior to the ninety (90) days, then Owner will pay Manager liquidated damages in the amount of ninety (90) days fees, based on the average fees earned to date.  If new owner retains Manager under the terms of this Agreement or other negotiated terms, and Manager agrees to said terms, then Owner will owe only any fees earned and due to date and reimbursable expenses per this Agreement.  All other early terminations will be pursuant to the provisions of this Agreement.

(f)    If Agreement is terminated early, Manager, or it's affiliates, who have invested in the Hotel, shall be immediately repaid whatever the initial investment amount was including a return of fifteen (15) percent annual return on the amount invested.

(g)    The terms of this Agreement shall not be deemed to impair the right of any party to exercise any right or remedy, whether for damages, injunctions, specific performance or otherwise, upon any breach or wrongful termination hereof.

### 13.03    Hotel Reservations Honored

Upon termination of this Agreement for any reason, Owner agrees that Hotel reservations made by Manager in the ordinary and normal course of business, for dates not more than two (2) years after the date of termination and at rates prevailing for such reservations at the time they were made, shall be honored and remain in effect after the date of termination of this Agreement.

### 13.04    Termination Payment

Upon termination, as a result of Owner's default or early termination, Manager shall be entitled to immediate receipt of a termination payment (*"**Termination Payment**"*) payable by Manager from the Bank Account, which amount shall be liquidated damages and not a penalty, equal to the lesser of (i) two (2) years' Operating Fee Total's, or (ii) the sum of the future Operating

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 29

Fee Total's due during the remaining Term of this Agreement following the termination event, but never to be less than the sum of six (6) months of Operating Fee Totals. The Termination Payment shall be considered fully earned and due to Manager for services then rendered and constitutes the parties' best, good faith estimate of the damages which would be suffered by Manager in the event of a termination of this Agreement, the exact amount of damages being difficult or impractical to calculate. Owner shall also reimburse Manager for any and all fees incurred in the collection of the Termination Payment, inclusive of any collection and legal fees. Any future monthly Operating Fees due shall be based upon the greater of (i) the average Operating Fee Total paid during the preceding months under the Term, excluding any fees paid during the Construction/Acquisition Term, or (ii) a flat monthly fee of $10,000.00.

**ARTICLE 14**
**NOTICES**

All consents, approvals, notices or other communications provided for in this Agreement shall be in writing and delivered in person, or sent by reputable and traceable overnight delivery service or by postage prepaid, registered or certified mail, facsimile, or email, to the respective addresses for Owner and Manager set forth below, until such time as written notice, as provided hereby, of a change of address with a new address to be used thereafter is delivered to the other party. Notices will be deemed delivered upon confirmation of delivery at the current notice address referenced above, including verification of a successful facsimile transmission. Upon request, a party shall send copies of any notice or communication by ordinary mail as instructed by the other party.

All notices and other communications required or permitted to be given hereunder shall be given to the applicable party at the address set forth below:

| **If to Owner, to:** | **If to Manager, to:** |
|---|---|
| Newstream Hotel Partners-IAH, LLC | HMC Hospitality Operating Company |
| 301 South Oak Street | 17950 Preston Road |
| | Suite 710 |
| Roanoke, Texas 76262 | Dallas, Texas 75252 |
| | Fax: 972-934-2070 |
| Email: rob.lawson@newstreamcommercial.com | Email: Sullivan@hospitalitymgt.com |
| Attention: Rob Lawson | Attention:   Bill Sullivan |

In order to facilitate communications between Owner and Manager, the parties designate the above-referenced representatives to act pursuant to this Agreement. Upon notice to the other, the parties may, at any time, substitute or add a representative.

**ARTICLE 15**
**RELATIONSHIP, AUTHORITY AND FURTHER ACTIONS**

**15.01  <u>Relationship</u>**

Manager and Owner shall not be construed as joint venturers or partners of each other and neither shall have the power to bind or obligate the other except as set forth in this Agreement.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 30

Notwithstanding anything to the contrary contained herein, Manager will not be deemed to have a real property estate in the Site.

### 15.02   Further Actions

Owner agrees to execute all contracts, agreements and documents, and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

## ARTICLE 16
## APPLICABLE LAW AND VENUE

The laws of the State of Texas shall govern the interpretation, validity and performance of this Agreement.  In the event any court or appropriate judicial authority shall hold or declare that the law of another jurisdiction is applicable, this Agreement shall remain enforceable under the laws of that jurisdiction.   If any of the terms and provisions hereof shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall in no event affect any of the other terms or provisions hereof, all such other terms and provisions to be valid and enforceable to the fullest extent permitted by law.  The parties submit to the jurisdiction of the courts of the State of Texas in any litigation or other legal action or proceeding, arising out of or relating to this Agreement or any other dispute between the parties that is not subject to arbitration under this Section, and agree that all claims in respect of any such litigation, action or proceeding must be brought and/or defended in the state district courts of Collin County in the State of Texas, except with respect to matters that are under the exclusive jurisdiction of the Federal Courts of the United States, which shall be brought and/or defended in the Federal District Court sitting in Collin County, Texas. Owner agrees that service of process for purposes of any such litigation, action or proceeding need not be personally served or served within the State of Texas, but may be served with the same effect as if Owner were served within the State of Texas, by certified mail or any other means permitted by applicable law addressed to Owner at the address set forth herein.

## ARTICLE 17
## SUCCESSORS AND ASSIGNS

### 17.01   Assignment

(a)     Manager, without the consent of Owner, shall have the right to assign from time to time this Agreement and its rights and interests hereunder to (i) any successor or assignee of Manager which may result from any merger, consolidation or reorganization with, or any sale or assignment to, any corporation, individual, partnership or other entity which shall acquire all or substantially all of Manager's hotel management business, and (ii) as security for any existing or future indebtedness of Manager or its Affiliates.  Manager may also transfer from time to time this Agreement and its rights and interests hereunder without the consent of Owner to any Affiliate of Manager; provided, however, that no such transfer shall relieve Manager of any of its liabilities or obligations hereunder.  Any such assignee shall agree to be bound by the terms and conditions of this Agreement.

(b)     Owner shall have the right, without the payment of any transfer or similar fee, to assign this Agreement to any third party acquiring the Hotel, subject to Manager's prior written consent, which consent will not be unreasonably withheld or delayed. Owner must provide at least

thirty (30) days' notice to Manager, specifying in reasonable detail the nature of the transfer, the identity of the proposed transferee, and that the transferee has sufficient financial resources and liquidity to satisfy Owner's obligations under this Agreement. Any such assignee shall assume all obligations of Owner under this Agreement.

### 17.02   Binding Effect

Subject to the restrictions on assignment set forth elsewhere in this Agreement, this Agreement shall be binding upon and inure to the benefit of Owner and its successors and assigns, and shall be binding upon and inure to the benefit of Manager and its successors and assigns.

## ARTICLE 18
## AGREEMENT NOT AN INTEREST IN REAL ESTATE

This Agreement is not, and shall not be deemed or construed, at any time or for any purpose, to be or create any interest in real estate or any lien or other encumbrance of any kind whatsoever against the Hotel or the land upon which it is erected.

## ARTICLE 19
## FORCE MAJEURE

### 19.01   Operation of Hotel

If at any time during the term hereof it becomes necessary in Manager's reasonable opinion to cease operation of the Hotel in order to protect the Hotel and/or the health, safety and welfare of the guests and/or employees of the Hotel for reasons of Force Majeure such as, but not limited to, acts of war, insurrection, civil strife and commotion, labor unrest or acts of God ("*Force Majeure*"), then in such event Manager may close and cease operation of all or part of the Hotel, reopening and commencing operation when Manager, in consultation with Owner, deems that such may be done without jeopardy to the Hotel, its guests and employees.

### 19.02   Extension of Time

With respect to any obligation to be performed by a party during the Term other than the payment of the Operating Fee, such party shall in no event be liable for failure so to do when prevented by any Force Majeure cause beyond the reasonable control of such party such as strike, lockout, breakdown, accident, order or regulation of or by any governmental authority, failure of supply or inability, by the exercise of reasonable diligence, to obtain supplies, parts or employees necessary to perform such obligation, or war or other emergency. The time within which such obligation shall be performed shall be extended for a period of time equivalent to the delay from such cause.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                    Page 32

## ARTICLE 20
## ALTERNATIVE DISPUTE RESOLUTION

**20.01**     **Arbitration.**

(a)     Arbitration Required.  Subject to 20.02, the Parties agree for themselves, and each of their respective parent companies, and each their respective Affiliates, and each of the shareholders, trustees, beneficiaries, directors, officers, employees or agents of any of the foregoing, that all controversies, disputes, or claims arising from or relating to this Agreement (including the performance or non-performance of any obligations set forth herein or the relationship of the Parties hereunder) shall be subject to, and resolved in accordance with, this Article 20. For the purposes of this Article 20, the term "Party" shall refer to each of the Persons referenced in this Section 20.01(a).

(b)     Arbitration Procedures.  Any controversy, dispute, or claim between the Parties shall be submitted to final and binding arbitration upon demand by a Party by providing notice to the other Party. The arbitration shall be administered by the American Arbitration Association ("*AAA*") under its Commercial Arbitration Rules (the "*Arbitration Rules*") (if the AAA no longer exists, the Parties shall agree on a substitute arbitration service provider). The initiating Party shall file and serve its statement of claims concurrently with its delivery of an arbitration notice to the other Party. Within 20 days after the filing and service of the statement of claims, the Party against whom such claims have been asserted shall file and serve an answering statement. If a reply to the answering statement is necessary, the other Party shall file and serve such reply within 10 days after receipt of the answering statement. Each Party shall submit any claim that would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same arbitration proceeding as the claim to which it relates and any such claim that is not so submitted shall be barred. The Parties shall use good faith efforts to attempt to agree on one arbitrator, and if the Parties are unable to reach agreement within 30 days after the filing and service of all the Parties' respective pleadings, then the AAA shall appoint the arbitrator in accordance with the Arbitration Rules. The hearing of the arbitration shall be conducted in Dallas, Texas and shall commence as soon as practicable. The Parties acknowledge that the Arbitrator(s)' subpoena power is not subject to geographic limitations. The award and decision of the Arbitrator(s) shall be conclusive and binding on all Parties, and not subject to appeal, and judgment upon the award may be entered in any court of competent jurisdiction. Any right to contest the validity or enforceability of the award shall be governed exclusively by the Federal Arbitration Act or any successor law.

(c)     Arbitration Not Required for Certain Disputes.  Notwithstanding anything to the contrary in this Article 20, the Parties shall have the right to commence litigation or other legal proceedings with respect to any claims relating to the (a) preservation or protection of Manager's Marks or proprietary systems, and (b) enforcement of this Article 20.

(d)     Time Period for Claim.  Except as otherwise prohibited or limited by Applicable Law, any failure or delay of a Party in asserting a claim arising from or relating to this Agreement shall constitute a waiver of such claim and shall preclude the enforcement of any legal or equitable remedy with respect to such claim, unless written notice specifying such a claim is provided to the other Party within 24 months after the later of: (a) the date such claim arose; or (b) the date on

which the facts giving rise to such a claim were first known (or reasonably should have been known). Nothing in this Section 20.01 shall be deemed to extend or toll any applicable statute of limitations.

### 20.02   Expert Resolution.

(a)   Dispute Subject to Resolution by Expert.  Notwithstanding anything to the contrary in Section 20.01, any dispute, claim, or issue arising under this Agreement with respect to (a) the proper inclusion or exclusion of items in Total Revenues, Operating Costs, or Gross Operating Profit, (b) the proper computation of Operating Fees, the Accounting Fee, or reimbursable expenses, (c) the approval of the Operating Budget, or (d) other matter as to which this Agreement expressly provides for dispute resolution by the Expert, shall be resolved in accordance with this Section 20.02; provided, however, either Party shall have the right to pursue arbitration (rather than resolution by the Expert) if the dispute involves more than $200,000.

(b)   Designation of Expert.  Either Party may commence the Expert resolution process by providing notice to the other Party, in which case Manager shall select three qualified candidates to be the Expert within 30 days after receipt of such notice, and Owner shall select one of such candidates as the Expert to resolve the dispute within 15 days after notification by Manager. If Owner does not select one of the candidates proposed by Manager within such time period, Manager shall select one of the candidates as the Expert. The "Expert" (herein so called) shall (i) have at least 10 years of experience in the area of expertise on which the dispute is based (e.g., for operational matters, expertise in the management of hotels in the same class as the Hotel, for accounting matters, expertise in hotel accounting for hotels in the same class as the Hotel), and (ii) not have any conflict of interest with either Party.

(c)   Procedures. Each Party shall be entitled to make written statements and provide documents and materials to the Expert in support of its position, and the other Party shall have the right to respond to such statements, documents or materials. All statements, documents, materials and responses submitted by a Party shall be delivered concurrently to the Expert and the other Party. The Parties shall make available to the Expert all books and records relating to the issues in dispute and shall provide the Expert with any information or assistance reasonably requested by the Expert. The Expert shall establish a timetable for the making of submissions and replies, and notifying the Parties in writing of its decision within 30 days after the date on which the Expert has been selected (or such other period as the Parties may agree).

(d)   Decision by Expert. The Expert resolution shall be conducted in a "baseball" format pursuant to which each Party shall submit its proposed resolution of the dispute to the Expert (with a copy provided concurrently to the other Party), and the Expert shall decide in favor of one of the positions presented by the Parties, and may not make any determination other than by choosing one of the proposals presented by the Parties. The Expert's authority shall be limited to deciding the specific issue presented to it, and shall have no authority to award damages, issue orders or take any other action whatsoever. The decision of the Expert shall be final and binding upon the Parties and shall not be capable of appeal or other challenge, whether by arbitration or otherwise, except for manifest error or fraud.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO            Page 34

## ARTICLE 21
## GENERAL PROVISIONS

### 21.01  Authorization

Owner represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof. Manager represents that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof. On request, each party shall furnish to the other party evidence of such authority.

### 21.02  Interest

Any amount payable to Manager which shall not be paid when due shall accrue interest at the lesser of (a) the highest legal limit, or (b) 1% over the prime interest rate as published in the Wall Street Journal, or comparable publication as agreed to by the parties, as its prime rate, as the same may be changed from time to time.

### 21.03  Formalities

Any change to or modification of this Agreement must be in writing signed by both parties hereto. This Agreement shall be executed in one or more counterparts, each of which shall be deemed an original. The captions for each Article are intended for convenience only.

### 21.04  Documents

Throughout the Term, Owner shall furnish Manager copies of all property tax and insurance statements, executed franchise agreements (if applicable), all financing documents (including notes and mortgages) relating to the Hotel and such other documents pertaining to the Hotel as Manager shall request.

### 21.05  Consents

Except as otherwise expressly provided in this Agreement, wherever in this Agreement it is provided that an act or proposed act of Owner or Manager is subject to the consent or approval of the other, such consent or approval shall not be unreasonably withheld or delayed. The standard to be employed to determine reasonableness shall be the standard of practices and procedures employed at comparable hotels then being operated by Manager or its Affiliates. If the approval or consent of one party hereto is required for any act or matter contemplated by the other party, the party desiring such consent may give to the party whose consent is desired, notice specifying in reasonable detail, the matter to which consent is requested. Unless otherwise specified herein, if the party whose consent is requested does not, within twenty (20) business days after actual receipt of such notice, respond positively or negatively to such notice in writing, the requested consent shall conclusively be deemed given.

### 21.06  Estoppel Certificate

Either party shall, at any time and from time to time, upon not less than ten (10) days prior written request from the other, execute, acknowledge and deliver to the requesting party, in form

reasonably satisfactory to the requesting party, a written statement certifying (if true) (i) that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) that there is no outstanding notice of an Event of Default hereunder and, to the best of such party's knowledge, no event has occurred or condition exists which, with the giving of notice or the passage of time or both, would constitute an Event of Default hereunder, and (iii) such other accurate information as may be reasonably requested by the requesting party or by any of the Interested Persons (as hereinafter defined). It is intended that any such statement delivered pursuant to this Section 21.06 may be relied upon by the requesting party, any current or prospective Mortgagee or other party providing financing to Owner or Manager (as the case may be), a prospective purchaser of the Hotel or permitted assignee of Manager's rights and interests hereunder, and the respective successors and assigns of any of the foregoing (the *__"Interested Persons"__*).

### 21.07   __Extension of Date of Termination__

Notwithstanding any contrary provision of this Agreement, the date of termination of this Agreement, other than upon expiration pursuant to Section 3.02, shall be extended so that the date of termination after notice of termination is given to or by Manager shall be on a date which is not earlier than three (3) days plus the number of days, if any, Manager is required to give its employees advance notice of termination of employment as required by the WARN Act, or any similar federal or state statute.

### 21.08   __No Representations__

(a)       Owner and Manager acknowledge there have been no representations, inducements, promises or agreements made by Manager or Owner other than those specifically set forth herein.

(b)       Financial projections, budgets or similar forecasts as may have been prepared or in the future will be prepared by Manager or its Affiliates do not take into account, nor make provisions for, any rise or decline in local or general economic conditions or other factors beyond the control of Manager. Manager and its Affiliates cannot and do not warrant or guarantee in any way said financial projections, budgets or other forecasts. Any financial projections, budgets or forecasts provided have been prepared on the basis of information available at the time of such preparation and Manager's and its Affiliate's experience in the hotel industry. Said financial projections, budgets and forecasts have been prepared for information only and not as an inducement for action. Owner hereby acknowledges that in entering into this Agreement, Owner has not relied on any projection of earnings, statements as to the possibility of future success, or other similar information which may have been prepared by Manager or its Affiliates. Owner further understands and acknowledges that no guaranty is made or implied by Manager or its Affiliates as to the cost, or the future financial success or profitability, of the Hotel.

### 21.09   __Assistance with Proposed Sale, Financing, Refinancing__

Manager shall cooperate with and assist Owner from time to time in any attempt(s) by Owner to sell, finance or refinance the Hotel. Such cooperation may entitle Manager to additional reasonable compensation and reimbursement of all expenses. Manager shall not be deemed to be

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO                Page 36

acting as a broker unless Owner and Manager enter into a separate written agreement engaging Manager as broker with respect to the Hotel. Such cooperation shall include, without limitation, answering prospective purchasers' or lenders' questions about the Hotel or its operations, but not require Manager to sign any subordination agreements. Manager may, at their sole discretion, agree to sign such agreement, but in no instances shall be required to as part of this Agreement. Manager shall also provide, promptly upon request by Owner, an estoppel certificate executed by Manager, as set forth in Section 21.06 above.

### 21.10   **Prevailing Party's Expenses**

The prevailing Party in any arbitration, litigation or other legal proceeding arising out of or relating to this Agreement shall be entitled to recover from the losing Party all reasonable fees, costs and expenses for attorneys, experts and other third parties (including its share of the AAA fees and costs) incurred by the prevailing Party in connection with such arbitration, litigation or other legal proceeding (including any appeals and actions to enforce any arbitration awards and court judgments). If a Party prevails on some, but not all, of its claims, such Party shall be entitled to recover an equitable amount of such fees, costs and expenses, as determined by the applicable Arbitrator(s) or court.

### 21.11   **Confidentiality**

Except as provided below, all matters disclosed in the negotiation of this Agreement and the matters set forth in this Agreement are strictly confidential. Manager and its Affiliates may use information obtained through the operation of the Hotel in the operation of other hotels provided that such use is not to Owner's material detriment. Owner and Manager shall otherwise keep strictly confidential all information of a proprietary or confidential nature about or belonging to either party or to any Affiliate of either party to which the other party gains or has access by virtue of the relationship between Owner and Manager. Except as disclosure may be required to obtain the advice of professionals or consultants, or financing for the Hotel, or in furtherance of a permitted or proposed assignment of this Agreement, or as may be required by law or by the order of any government, regulatory authority or tribunal or otherwise to comply with Legal Requirements (including reporting requirements applicable to public companies), Owner and Manager shall make every effort to ensure that such information is not disclosed to the press or to any other third person without the prior consent of the other party. The obligations set forth in this Section shall survive any termination or expiration of this Agreement. Owner and Manager shall cooperate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance of their respective obligations under this Agreement.

### 21.12   **Severability**

If any term or provision of any Article or Section of this Agreement, or the application thereof to any persons or circumstances, shall to any extent or for any reason be invalid or unenforceable, the remainder of this Agreement and the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of any Article or Section of this Agreement shall be valid and enforced to the fullest extent permitted by law.

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO          Page 37

[Signature Page to Follow]

\

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement effective the Execution Date.

OWNER:

NEWSTREAM HOTEL PARTNERS-IAH, LLC,
a Texas limited liability company

By:    NEWSTREAM HOTEL & HOSPITALITY, LLC
      Its: General Partner

By:    _____
      Name: Timothy Nystrom
      Its:   Manager

      Date:   5/10/18

MANAGER:

HMC HOSPITALITY OPERATING COMPANY,
a Delaware corporation

By:    _____
      Name: Bill Sullivan
      Its:   CFO

      Date:   5/10/2018

HOTEL MANAGEMENT AGREEMENT-Red Lion Hotel, Springfield MO        Page 39

## EXHIBIT "A"

## Legal Description

Red Lion Hotel & Conference Center
500 N. Sam Houston Parkway East
Houston, Texas 77060
281-931-0101

EXHIBIT "A" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO
Solo Page

## EXHIBIT "B"

Manager, on behalf of Owner and at Owner's expense, shall procure the insurance coverages hereinafter set forth and ensure that they are in full force and effect on the Commencement Date and that they remain in full force and effect throughout the Term of this Agreement.  All cost(s) and expense(s) incurred by Manager in procuring the following insurance coverages shall be either Operating Costs or Fixed or Capital Expenses and shall be paid from the Bank Account(s):

| Coverages: | Amounts Of Insurance: |
|---|---|
| Workers' Compensation (Manager's employees only) | Statutory Benefits |
| | |
| Employer's Liability: | |
| Bodily Injury by Accident Each Accident | $500,000 |
| Bodily Injury by Disease Policy Limit | $500,000 |
| Bodily Injury by Disease Each Employee | $500,000 |
| | |
| Fidelity (Employee Dishonesty) | As required |
| Money and Securities | As required |
| | |
| Builders Risk | Completed value of the Hotel |

All risk for term of the initial and any subsequent Hotel construction and renovation

Real and Personal Property

Blanket Coverage

| Business Interruption | Calculated yearly based on estimated Hotel revenues |
|---|---|

Blanket Coverage for the perils insured against under Real and Personal Property in this Exhibit "B".  This coverage shall specifically cover Manager's loss of Operating Fees.  The business interruption insurance shall be for a twelve (12) month indemnity period

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

Commercial General Liability

|  |  |
|---|---|
| Including - | |
| General Aggregate (per location) | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Personal and Advertising Injury (per occurrence) | $1,000,000 |
| Liquor Liability/Dram Shop (if applicable) | $1,000,000 |

Automobile Liability                                                    $1,000,000

Owned Vehicles
Non-Owned Vehicles
Uninsured motorist where required by statute

Automobile Physical Damage (Optional)

Comprehensive                                        (To value if insured)
Collision

Umbrella Liability

Per Occurrence General Aggregate                    $10,000,000
Per Location                                        $10,000,000

EPLI Coverage

Per Occurrence                                        $1,000,000

All insurance coverages provided for under this Exhibit "B" shall be effected by policies issued by insurance companies (i) that are authorized to do business in the state in which the Hotel is located; and (ii) that are of good reputation and of sound and adequate financial responsibility, having a Best Rating A-VII or better, or a comparable rating if Best ceases to publish its ratings or materially changes its rating standards or procedures.

Owner hereby authorizes Manager to utilize the services of and/or place the insurance set forth in this Exhibit "B" with a third party insurance carrier, in each case meeting the specifications set forth above.

Manager shall deliver to Owner duly executed certificates, and, if requested by Owner and if available, duplicate copies of all policies of insurance to be procured hereunder, including existing, additional and renewal policies.

Each policy or insurance maintained in accordance with this Exhibit "B" to the extent obtainable, shall specify that such policies shall not be canceled or materially changed without at least thirty (30) days' prior written notice to Manager.

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

Except as otherwise provided in the Agreement, Manager and Owner each waives, releases and discharges the other, but only to the extent of collectible insurance proceeds, from all claims or demands which each may have or acquire against the other or the other's subsidiaries, affiliates, directors, officers, agents, employees, independent contractors or partners, with respect to any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to property or business arising out of the ownership, management, operation and maintenance of the Hotel, regardless whether any such claim or demand may arise because of the fault or negligence of the other party or its subsidiaries, affiliates, officers, employees, directors, agents or independent contractors. Each policy of insurance maintained in accordance with this Exhibit "B" shall contain a specific waiver of subrogation reflecting the above.

All policies of insurance provided for under this Exhibit "B" shall be carried in the name of the Owner and Manager, and losses thereunder shall be payable to the parties as their respective interests may appear.  All liability policies shall name the Owner and Manager, and in each case any of their affiliated or subsidiary companies, which they may specify, and their respective directors, officers, agents, employees and partners as additional named insureds.

All such policies of insurance shall be written on an "occurrence" basis to the extent obtainable.

Manager by notice to Owner shall have the right to require that the minimum amount of insurance to be maintained with respect to the Hotel under this Exhibit "B" be increased to make such insurance comparable with prudent industry standards and to reflect increases in liability exposures, taking into account the size and location of the Hotel.

EXHIBIT "B" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

# EXHIBIT "C"

## Sample P & L

**Sample Hotel**
STATEMENT OF INCOME AND EXPENSE - RECAP
DECEMBER 2011

| Budget | % | Actual | % | Last Yr | % | | Budget | % | Actual | % | Last Yr | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | *---- Year-to-Date ----* | | | | | |
| 21,483 | | 21,483 | | 21,483 | | AVAILABLE ROOMS | 252,945 | | 252,945 | | 252,945 | |
| 53.9 | | 65.2 | | 39.4 | | OCCUPANCY % | 61.5 | | 65.0 | | 59.1 | |
| $124.09 | | $133.25 | | $114.44 | | AVERAGE RATE | $140.98 | | $142.77 | | $136.31 | |
| $66.83 | | $86.84 | | $45.14 | | REV PAR | $86.76 | | $92.84 | | $80.57 | |
| 1,767,892 | 100.0 | 2,182,247 | 100.0 | 1,204,775 | 100.0 | TOTAL REVENUES | 27,094,357 | 100.0 | 29,594,490 | 100.0 | 25,334,284 | 100.0 |
| | | | | | | **ROOMS** | | | | | | |
| 1,435,717 | 81.2 | 1,865,645 | 85.5 | 969,723 | 80.5 | SALES | 21,944,482 | 81.0 | 23,483,451 | 79.4 | 20,379,197 | 80.4 |
| 200,596 | 14.0 | 206,949 | 11.1 | 140,346 | 14.5 | PAYROLL & BURDEN | 2,524,088 | 11.5 | 2,576,584 | 11.0 | 2,325,415 | 11.4 |
| 158,858 | 11.1 | 186,876 | 10.0 | 136,989 | 14.1 | OTHER EXPENSES | 2,110,427 | 9.6 | 2,140,201 | 9.1 | 1,986,604 | 9.7 |
| 1,076,263 | 75.0 | 1,471,821 | 78.9 | 692,389 | 71.4 | DEPARTMENT PROFIT | 17,309,968 | 78.9 | 18,766,666 | 79.9 | 16,067,178 | 78.8 |
| | | | | | | **FOOD** | | | | | | |
| 24,862 | 1.4 | 23,259 | 1.1 | 17,039 | 1.4 | OUTLET SALES | 333,866 | 1.2 | 336,580 | 1.1 | 282,484 | 1.1 |
| 121,815 | 6.9 | 136,394 | 6.3 | 84,944 | 7.1 | BANQUET SALES | 2,022,912 | 7.5 | 2,681,653 | 9.1 | 2,025,627 | 8.0 |
| 146,677 | 8.3 | 159,654 | 7.3 | 101,983 | 8.5 | NET SALES | 2,356,778 | 8.7 | 3,018,233 | 10.2 | 2,308,110 | 9.1 |
| 5,000 | 0.3 | 4,300 | 0.2 | 3,196 | 0.3 | BANQUET ROOM RENT | 86,296 | 0.3 | 70,388 | 0.2 | 88,110 | 0.3 |
| 30,000 | 1.7 | 9,651 | 0.4 | 7,639 | 0.6 | AUDIO VISUAL | 403,493 | 1.5 | 412,076 | 1.4 | 358,307 | 1.4 |
| 4,500 | 0.3 | 4,935 | 0.2 | 947 | 0.1 | OTHER SALES | 94,968 | 0.4 | 106,588 | 0.4 | 88,590 | 0.3 |
| 7,556 | 0.4 | 10,945 | 0.5 | 5,012 | 0.4 | SERVICE CHARGES | 134,619 | 0.5 | 197,768 | 0.7 | 113,940 | 0.4 |
| 193,733 | 11.0 | 189,485 | 8.7 | 118,776 | 9.9 | TOTAL REVENUE | 3,076,154 | 11.4 | 3,805,053 | 12.9 | 2,957,057 | 11.7 |
| 35,242 | 24.0 | 65,272 | 30.9 | 27,178 | 26.6 | COST OF SALES | 578,323 | 24.5 | 732,408 | 24.3 | 582,218 | 25.2 |
| 83,885 | 43.3 | 80,363 | 42.4 | 63,329 | 53.3 | PAYROLL & BURDEN | 1,022,951 | 33.3 | 1,038,625 | 27.3 | 924,210 | 31.3 |
| 35,594 | 18.4 | 41,431 | 21.9 | 23,713 | 20.0 | OTHER EXPENSES | 478,249 | 15.5 | 519,110 | 13.6 | 453,462 | 15.3 |
| 39,012 | 20.1 | 2,420 | 1.3 | 4,556 | 3.8 | DEPARTMENT PROFIT | 996,631 | 32.4 | 1,514,910 | 39.8 | 997,168 | 33.7 |
| | | | | | | **BEVERAGE** | | | | | | |
| 417 | 0.0 | 824 | 0.0 | 1,171 | 0.1 | OUTLET SALES | 6,807 | 0.0 | 14,980 | 0.1 | 8,267 | 0.0 |
| 24,484 | 1.4 | 23,989 | 1.1 | 17,031 | 1.4 | BANQUET SALES | 267,370 | 1.0 | 271,283 | 0.9 | 248,686 | 1.0 |
| 24,901 | 1.4 | 24,813 | 1.1 | 18,202 | 1.5 | NET SALES | 274,177 | 1.0 | 286,262 | 1.0 | 256,952 | 1.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER SALES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | SERVICE CHARGES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 24,901 | 1.4 | 24,813 | 1.1 | 18,202 | 1.5 | TOTAL REVENUE | 274,177 | 1.0 | 286,262 | 1.0 | 256,952 | 1.0 |
| 3,741 | 15.0 | 7,629 | 30.7 | 2,515 | 13.8 | COST OF SALES | 41,903 | 15.3 | 42,902 | 15.0 | 38,479 | 15.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | PAYROLL & BURDEN | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | OTHER EXPENSES | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | MUSIC/ENTERTAINMENT | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 21,160 | 85.0 | 17,184 | 69.3 | 15,687 | 86.2 | DEPARTMENT PROFIT | 232,274 | 84.7 | 243,360 | 85.0 | 218,473 | 85.0 |
| | | | | | | **MINOR DEPTS. NET** | | | | | | |
| (6,739) | -61.4 | (15,312) | -668.3 | (9,708) | -164.6 | TELEPHONE DEPT. | (54,218) | -36.3 | (78,766) | -60.7 | (50,688) | -37.7 |
| 12,637 | 63.8 | 4,488 | 38.2 | 6,994 | 59.4 | OTHER OPER. DEPTS | 218,135 | 69.0 | 271,884 | 74.3 | 179,354 | 66.0 |
| 82,775 | 100.0 | 88,269 | 100.0 | 80,397 | 100.0 | OTHER INCOME/RENTS | 1,333,752 | 100.0 | 1,524,038 | 100.0 | 1,334,928 | 100.0 |
| 1,225,108 | 69.3 | 1,568,870 | 71.9 | 790,315 | 65.6 | GROSS OPER. INCOME | 20,036,542 | 74.0 | 22,242,091 | 75.2 | 18,746,412 | 74.0 |

EXHIBIT "C" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

### Sample Hotel
### STATEMENT OF INCOME AND EXPENSE - RECAP
### DECEMBER 2011

| Budget | % | Actual | % | Last Yr | % | | Budget | % | Actual | % | Last Yr | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **ADMIN AND GENERAL** | | | | | | |
| 156,560 | 8.9 | 183,982 | 8.4 | 168,412 | 14.0 | PAYROLL & BURDEN | 1,568,660 | 5.8 | 1,522,359 | 5.1 | 1,505,267 | 5.9 |
| 68,608 | 3.9 | 36,302 | 1.7 | 46,973 | 3.9 | OTHER EXPENSES | 1,011,015 | 3.7 | 1,019,701 | 3.4 | 900,228 | 3.6 |
| 225,168 | 12.7 | 220,284 | 10.1 | 215,385 | 17.9 | TOTAL DEPT EXPENSE | 2,579,675 | 9.5 | 2,542,060 | 8.6 | 2,405,495 | 9.5 |
| | | | | | | **MARKETING** | | | | | | |
| 175,021 | 9.9 | 186,983 | 8.6 | 113,609 | 9.4 | PAYROLL & BURDEN | 1,644,438 | 6.1 | 1,687,928 | 5.7 | 1,487,896 | 5.9 |
| 169,440 | 9.6 | 220,866 | 10.1 | (65,625) | -5.4 | OTHER EXPENSES | 2,451,299 | 9.0 | 2,409,896 | 8.1 | 2,113,136 | 8.3 |
| 43,071 | 2.4 | 56,047 | 2.6 | 29,160 | 2.4 | FRANCHISE FEES | 668,286 | 2.5 | 740,512 | 2.5 | 413,989 | 1.6 |
| 387,532 | 21.9 | 463,897 | 21.3 | 77,143 | 6.4 | TOTAL DEPT EXPENSE | 4,764,024 | 17.6 | 4,838,336 | 16.3 | 4,015,021 | 15.8 |
| | | | | | | **PROPERTY OPERATION** | | | | | | |
| 46,658 | 2.6 | 42,053 | 1.9 | 41,554 | 3.4 | PAYROLL & BURDEN | 551,357 | 2.0 | 528,710 | 1.8 | 491,644 | 1.9 |
| 48,665 | 2.8 | 54,881 | 2.5 | 51,153 | 4.2 | OTHER EXPENSE | 585,937 | 2.2 | 553,175 | 1.9 | 489,280 | 1.9 |
| 105,120 | 5.9 | 61,218 | 2.8 | 61,207 | 5.1 | ENERGY COSTS | 1,517,765 | 5.6 | 1,240,399 | 4.2 | 1,283,557 | 5.1 |
| 200,443 | 11.3 | 158,152 | 7.2 | 153,914 | 12.8 | TOTAL DEPT EXPENSE | 2,655,058 | 9.8 | 2,322,283 | 7.8 | 2,264,481 | 8.9 |
| 813,143 | 46.0 | 842,333 | 38.6 | 446,442 | 37.1 | **TOTAL OVERHEAD DEPTS** | 9,998,756 | 36.9 | 9,702,679 | 32.8 | 8,684,996 | 34.3 |
| 411,965 | 23.3 | 726,537 | 33.3 | 343,873 | 28.5 | **INC BEFORE FIXD CHGS** | 10,037,786 | 37.0 | 12,539,412 | 42.4 | 10,061,416 | 39.7 |
| | | | | | | **CAPITAL EXPENSE** | | | | | | |
| 12,967 | 0.7 | 11,619 | 0.5 | 11,010 | 0.9 | TAXES | 153,036 | 0.6 | 140,433 | 0.5 | 130,228 | 0.5 |
| 41,400 | 2.3 | 0 | 0.0 | 61,772 | 5.1 | INSURANCE | 615,138 | 2.3 | 825,214 | 2.8 | 764,100 | 3.0 |
| 0 | 0.0 | 0 | 0.0 | 462,943 | 38.4 | INTEREST | 0 | 0.0 | (3,318,537) | -11.2 | 5,591,924 | 22.1 |
| 226,117 | 12.8 | 77,611 | 3.6 | 227,479 | 18.9 | RENT/LEASE | 1,073,092 | 4.0 | 932,789 | 3.2 | 1,062,539 | 4.2 |
| 44,197 | 2.5 | 54,556 | 2.5 | 30,119 | 2.5 | MANAGEMENT FEES | 677,397 | 2.5 | 739,939 | 2.5 | 633,357 | 2.5 |
| 20,000 | 1.1 | 20,000 | 0.9 | 20,000 | 1.7 | ASSET MGT. FEE | 248,807 | 0.9 | 257,054 | 0.9 | 199,081 | 0.8 |
| 344,681 | 19.5 | 163,786 | 7.5 | 813,324 | 67.5 | TOTAL CAPITAL EXPENSE | 2,767,470 | 10.2 | (423,107) | -1.4 | 8,381,228 | 33.1 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | NON-OPERATING ITEMS | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 8,000 | 0.5 | 9,621 | 0.4 | 6,771 | 0.6 | PARTNERSHIP EXPENSES | 48,473 | 0.2 | 117,422 | 0.4 | 244,396 | 1.0 |
| 8,000 | 0.5 | 61,902 | 2.8 | 0 | 0.0 | F,F, & E EXPENSE | 633,971 | 2.3 | 450,754 | 1.5 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | DISPOSED ASSET | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 0 | 0.0 | 0 | 0.0 | 260,261 | 21.6 | DEPRECIATION/AMORT. | 0 | 0.0 | 1,041,042 | 3.5 | 3,123,127 | 12.3 |
| 51,284 | 2.9 | 491,227 | 22.5 | (736,482) | -61.1 | **NET PROFIT/LOSS-** | 6,587,872 | 24.3 | 11,353,301 | 38.4 | (1,687,335) | -6.7 |
| 0 | 0.0 | 0 | 0.0 | 260,261 | 21.6 | PLUS DEPR/AMORT | 0 | 0.0 | 1,041,042 | 3.5 | 3,123,127 | 12.3 |
| 0 | 0.0 | 0 | 0.0 | 140,805 | 11.7 | LESS PRINCIPAL PAID | 0 | 0.0 | (2,532,205) | -8.6 | 1,653,052 | 6.5 |
| 51,284 | 2.9 | 491,227 | 22.5 | (617,027) | -51.2 | **CASH FLOW FROM OPER** | 6,587,872 | 24.3 | 14,926,548 | 50.4 | (217,259) | -0.9 |
| 0 | 0.0 | 0 | 0.0 | 291,778 | 24.2 | LESS CAPITAL ADDS | 1,190,000 | 4.4 | 906,135 | 3.1 | 653,931 | 2.6 |
| 51,284 | 2.9 | 491,227 | 22.5 | (908,805) | -75.4 | **CASH FLOW** | 5,397,872 | 19.9 | 14,020,413 | 47.4 | (871,190) | -3.4 |

EXHIBIT "C" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

## EXHIBIT "D"

### Franchise Required Language

EXHIBIT "D" TO HOTEL MANAGEMENT AGREEMENT- Red Lion Hotel, Springfield MO

## INDIVIDUAL GUARANTY

GUARANTY, dated as of May 10, 2018, by Rob Lawson, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)      He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)      He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery



of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)     His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)     He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.     Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions:  (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.     No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.     Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.     (A)     If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

(B)     This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner.  This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

(C)     Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

(D)     All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

(E)     No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof.  No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

(F)     Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

(G)     Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense.  This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

(H)     Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

      (I)    Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

      (J)    This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

      (K)    Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

      (L)    If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

      (M)    As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

      (N)    GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

**Rob Lawson, Individual**

Date: _5-10-18_

WITNESS:

Name: _ROB LAWSON_

Address: _8600 MAZZINI COURT_
_Flower Mound, TX 75022_

WITNESS:

Name: _GARI KIELE_

Address: _529 NE 37th ST._
_Pendleton, OR. 97801_

-4-

## INDIVIDUAL GUARANTY

*Louis Scott Carkwater*

GUARANTY, dated as of May 10, 2018, by ~~Rob Lawson~~, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)     He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)     He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery



of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)     His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)     He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.     Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions: (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.     No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.     Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.     (A)     If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

(B)     This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner.  This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

(C)     Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

(D)     All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

(E)     No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof.  No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

(F)     Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

(G)     Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense.  This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

(H)     Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

(I)    Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

(J)    This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

(K)    Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

(L)    If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

(M)    As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

(N)    GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

_____

~~Rob Lawson,~~ Individual

_Louis Scott Tarwater, Individual_

Date: _5.11.18_

WITNESS:

_____

Name: _Louis Scott Tarwater_

Address: _4613 Windmill Lane_

_Flower Mound, Tx 75028_

WITNESS:

_____

Name: _Donna R. Tarwater_

Address: _4613 Windmill Lane_

_Flower Mound, Tx 75028_

## INDIVIDUAL GUARANTY

GUARANTY, dated as of May 10, 2018, by Timothy Nystrom, 311 South Oak Street, Suite 250, Roanoke, Texas 76262 (individually and collectively "Guarantor") in favor of HMC Hospitality Operating Company and/or its affiliates. ("HMC"), 17950 Preston Road, Suite 710, Dallas, Texas 75252.

WHEREAS, Newstream Hotel Partners-IAH, LLC ("Owner") is now and may in the future be obligated to HMC for fees, expenses and other financial accommodations, including HMC's initial investment of $100,000.00 into the Hotel project, under that certain Management Agreement ("Agreement") dated May 10, 2018, between Owner and HMC, as same may be amended or modified from time to time, and

WHEREAS, to induce HMC to enter into the Manager's Agreement and invest one hundred thousand dollars into the project with Owner and/or make other financial accommodations to or on behalf of Owner, Guarantor has agreed to execute and deliver a guaranty of all present and future liabilities of Owner to HMC.

NOW, THEREFORE, in consideration of the foregoing premises to induce HMC to enter into the Estoppel and make other financial accommodations to or on behalf of Owner, and with full knowledge that said obligations would not be issued without this Guaranty, the undersigned Guarantor agrees as follows:

1.      The term "Liability of Owner" shall include all obligations and liabilities, direct or indirect, absolute or contingent, joint and several, now or hereafter existing, due or to become due of Owner to HMC for its own account or as agent for others, whether created directly or acquired by assignment or otherwise, including without limitation, all fees and reimbursable expenses owing under the Agreement and all costs and other expenses, including attorneys fees, on all present and future liabilities and indebtedness of Owner to HMC, and further including without limitation the obligation and liabilities arising under the Agreement and/or Estoppel.

2.      Each Guarantor hereby jointly and severally guarantees full, prompt and unconditional payment when due of each and every Liability of Owner to HMC, now existing or hereafter incurred, whether matured or unmatured, and the full, prompt, and unconditional performance of every term and condition of any transaction to be kept and performed by Owner to HMC.  This Guaranty is a primary obligation of the undersigned and shall be a continuing inexhaustible Guaranty without limitation as to the amount or duration and may not be revoked except by notice (the "Notice") in writing to HMC received at least thirty (30) days prior to the date set for such revocation; however, no Notice shall affect the liability under this Guaranty for any such Liability of the Owner arising prior to the date set for revocation whether made before or after the Notice.

3.      Guarantor hereby represents and warrants the following:

(A)      He has the power to execute, deliver and carry out the terms and provisions of this Guaranty which has been duly executed and delivered and constitutes Guarantor's binding, valid and enforceable obligation, enforceable in accordance with its terms, except as enforcement thereof may be limited, modified or prevented by any law relating to bankruptcy, insolvency or the like.

(B)      He is not in default under any agreement other instrument to which he is a party or by which he or any of his assets may be bound.  Neither the execution and delivery

- 1 -


EXHIBIT
D

of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof will to the best of his knowledge violate any law or regulation, or any order or decree of any court or governmental instrumentality, or will conflict with, or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, agreement or other instrument to which Guarantor is a party or by which he may be bound, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property of Guarantor thereunder.

(C)     His most recent financial statement furnished to HMC accurately represents his financial condition as of the date thereof and there has been no material adverse change in such condition from the date of said financial statement to the date hereof.

(D)     He has relied upon his own due diligence in making his own independent evaluation and appraisal of Owner, Owner's business affairs and financial condition including the Liability of Owner to HMC; will continue to be responsible for making his own independent appraisal of such matters; and Guarantor has not relied upon and will not hereafter rely upon HMC for information regarding Owner, any collateral or the Liability of Owner to HMC.

4.     Without incurring responsibility to Guarantor and without impairing or releasing Guarantor's obligation hereunder, HMC may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions:  (i) change the manner, place or terms of the Agreement, and/or change or extend from time to time the time for payment or renew or alter the Agreement, and this Guaranty shall apply to the Liability of Owner as so changed, extended, renewed or altered; (ii) exercise or refrain from exercising any rights against Owner or any surety, endorser or guarantor (including the Guarantor) ("Obligor") or against any security, or otherwise act or refrain from acting; (iii) release, settle or compromise any Liability of Owner or any obligation of any Obligor, with or without consideration, or any liability incurred directly or indirectly in respect thereof or hereof; and/or (iv) apply any sums by whomsoever paid or howsoever realized to any Liability of Owner.

5.     No invalidity or unenforceability of all or any part of the Liability of Owner, whether caused by any actions or inactions of HMC, or otherwise, shall affect, impair or be a defense to this Guaranty.  Guarantor hereby waives any right of subrogation to any security. Guarantor hereby waives any claim, right or remedy Guarantor may now have or hereafter acquire against the Owner that arises hereunder and/or as a result of Guarantor's performance hereunder including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy of HMC against Owner or any security which HMC now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

6.     Upon an Event of Default under the Liability of Owner, HMC may, without notice to Owner declare the Liability of Owner immediately due and payable by Guarantor.  If HMC refers this Guaranty to an attorney for collection, Guarantor shall pay HMC any and all reasonable attorneys' fees and other costs and expenses incurred by HMC in enforcing HMC's rights hereunder.

7.     (A)     If claim is ever made upon HMC for repayment or recovery of any amount or amounts received by HMC in payment or on account of any of the Liability of Owner and HMC repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over HMC or any of its property, or (b) any settlement or compromise of any such claim effected by HMC with any such claimant (including Owner), then, and in such event, Guarantor agrees that any such judgment, decree, order,

- 2 -

settlement or compromise shall be binding upon it, notwithstanding any revocation hereof or the cancellation of any instrument evidencing any Liability of Owner, and Guarantor shall be liable to HMC under this Guaranty for the amount so repaid or recovered to the same extent as if such amount had never originally been received by HMC.

(B)     This Guaranty shall remain in full force and effect, and shall be automatically reinstated, without any further action on the part of the HMC if HMC is required, in any bankruptcy, insolvency, or other proceeding involving the Owner, to return or rescind any payment made to or value received by HMC from or for the account of the Owner. This paragraph shall remain in full force and effect notwithstanding any revocation or termination of this Guaranty or release by HMC of Guarantor.

(C)     Settlement of any claim by HMC against Owner or any other Obligor, whether in any proceedings or not, and whether voluntary or involuntary, shall not reduce the amount due under this Guaranty except to the extent of any amount actually received by HMC under any such settlement that is applied to the Liability of Owner.

(D)     All rights, powers and remedies of HMC hereunder and under any agreement(s) between Owner or any other Obligor and HMC, now, or at any time hereafter in force, shall be cumulative and not alternative, and shall be in addition to all rights, powers and remedies given to HMC by law.

(E)     No delay on the part of HMC in exercising any of its options, powers or rights or partial or single exercise thereof shall constitute a waiver thereof. No waiver of any of HMC's rights hereunder and no modification or amendment of this Guaranty shall be deemed to be made by HMC unless the same shall be in writing, executed on behalf of HMC by a duly authorized officer, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of HMC or the obligations of Guarantor to HMC in any other respect at any other time.

(F)     Guarantor hereby authorizes HMC, in its sole discretion, to disclose any financial or other information about Guarantor to any present, future or prospective participant, or successor in interest in any loan, advance or other financial accommodation to the Owner from the HMC, or any regulatory body or agency having jurisdiction over HMC.

(G)     Guarantor shall indemnify, defend, and hold HMC harmless from any claim, cause of action, demand, or other matter that is brought or threatened against HMC by Owner, or by any third party including, without limitation, any receiver, trustee, or other person appointed in any bankruptcy, insolvency, or other proceeding involving Owner, and from all costs and expenses (including, without limitation, attorney's fees and expenses) relating to or arising out of HMC's relationship with Owner (each of which may be defended, compromised, settled, or pursued with counsel of HMC's selection) but at Guarantor's risk and expense. This paragraph shall remain in full force and effect notwithstanding any termination of this Guaranty or release by HMC of Guarantor.

(H)     Neither Guarantor's obligation to pay and perform in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof nor the amount of the Liability of Owner shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, discharge, release, limitation or stay of the Liability of Owner or the obligations of any of the Obligors or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the bankruptcy code of the United States or other statute, State or Federal, or from

- 3 -

the decision of any court interpreting any of the same, and Guarantor shall be obligated under this Guaranty and the amount of the Liability of Owner shall for the purposes of this Guaranty be determined as if no such impairment, stay, modification, change, discharge, release or limitation had occurred.

(I)     Guarantor waives notice of acceptance of this Guaranty and notice of any Liability of Owner to which it may apply and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor and all other notices to which Guarantor might otherwise be entitled, or which might be required by law to be given to it by HMC.

(J)     This Guaranty shall be binding upon Guarantor and its successors and shall inure to the benefit of HMC, its successors and assigns, and shall be construed in accordance with the laws of the State of Texas.

(K)     Guarantor agrees to furnish to HMC within ninety (90) days of the end of each year a financial statement in form satisfactory to HMC and a copy of his federal and state income tax returns within thirty (30) days of filing same.

(L)     If Guarantor consists of more than one person, the liabilities and obligations of each such person shall be joint and several and the word "Guarantor" means each of them, any of them and/or all of them.

(M)     As used herein, the singular shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

(N)     GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE LIABILITY OF OWNER TO HMC AND AGREES TO VENUE IN COLLIN COUNTY, TEXAS.

**Timothy Nystrom**, Individual

Date: _____5/10/18_____

WITNESS:

Name: _____Tim Nystrom_____

Address: _____1411 Stone Lakes Dr._____
_____Southlake, TX  76092_____

WITNESS:

Name: _____

Address: _____

- 4 -

Filed 2/12/2020 6:16 AM
Lynne Finley
District Clerk
Collin County, Texas
By Mackenzie Hollin Deputy
Envelope ID: 40762997

CAUSE NO. 380-05791-2019

| | | |
|---|---|---|
| NEWSTREAM HOTEL PARTNERS-IAH, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| V. | § § | |
| HMC HOSPITALITY OPERATING COMPANY, | § § § | COLLIN COUNTY, TEXAS |
| Defendant | § § | |
| V. | § § | |
| ROB LAWSON, SCOTT TARWATER, AND TIMOTHY NYSTROM, | § § § § | |
| Third Party Defendants. | § | 380TH JUDICIAL DISTRICT |

## NOTICE OF HEARING ON
## DEFENDANT HMC HOSPITALITY OPERATING COMPANY'S
## MOTION TO STAY PROCEEDING AND COMPEL ARBITRATION

Defendant and Counter-Plaintiff HMC Hospitality Operating Company filed its **Motion to Stay Proceeding and Compel Arbitration** on January 16, 2020.

Please take notice that a hearing has been set on Defendant/Counter-Plaintiff's Motion to Stay Proceeding and Compel Arbitration for **Wednesday, April 8, 2020, at 9:00 a.m. in the 380th District Court of Collin County, Texas, 2100 Bloomdale Road, McKinney, Texas, before the Honorable Benjamin N. Smith, Presiding Judge**

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

*/s/Aynsley K. Young*
Ross H. Parker
TX Bar No. 24007804
rparker@munsch.com
Aynsley K. Young
TX Bar No. 24102674
ayoung@munsch.com

500 N. Akard Street, Suite 3800
Dallas, Texas  75201
(214) 855-7500 (telephone)
(214) 855-7584 (facsimile)

**ATTORNEYS FOR DEFENDANT**
**COUNTER-PLAINTIFF HMC**
**HOSPITALITY OPERATING COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Notice of Hearing on Motion to Stay Proceeding and Compel Arbitration* has been served by ESERVE on this the 12th day of February, 2020, to:

Carlisle A. Braun
Carlisle.braun@solidcounsel.com
Brandi J. McKay
Brandi.mckay@solidcounsel.com
**SCHEEF & STONE, L.L.P.**
2600 Network Blvd., Suite 400
Frisco, Texas 75034

*/s/ Aynsley K. Young*
Aynsley K. Young

4837-7657-6948v.1 004489.00028

Filed 5/8/2020 4:25 PM
Lynne Finley
District Clerk
Collin County, Texas
By Brandi Bullard Deputy
Envelope ID: 42857875

## CAUSE NO. 380-05791-2019

| | | |
|---|---|---|
| **NEWSTREAM HOTEL PARTNERS-IAH, LLC,** | § § § | **IN THE DISTRICT COURT** |
| **Plaintiff and Counter-Defendant,** | § § § | |
| **v.** | § § § | |
| **HMC HOSPITALITY OPERATING COMPANY,** | § § § | **380th JUDICIAL DISTRICT** |
| **Defendant, Counter-Plaintiff and Third-Party Plaintiff,** | § § § § | |
| **v.** | § § | |
| **ROB LAWSON, SCOTT TARWATER AND TIMOTHY NYSTROM,** | § § § § | |
| **Third-Party Defendants.** | § | **COLLIN COUNTY, TEXAS** |

### PLAINTIFF NEWSTREAM HOTEL PARTNERS-IAH, LLC'S
### SUGGESTION OF BANKRUPTCY

Plaintiff Newstream Hotel Partners-IAH, LLC filed a petition under Chapter 11 of the United States Bankruptcy Code, in the Bankruptcy Court for the Eastern District of Texas, Sherman Division, Case No. 20-41064. Therefore, the proceedings in the above-styled and numbered cause is consequently stayed pursuant to Bankruptcy Code § 362 (11 U.S.C. § 362).

Respectfully submitted,

**SCHEEF & STONE, L.L.P.**


By: /s/ *Carlisle A. Braun*

      **CARLISLE A. BRAUN**
      Texas Bar No. 24058818
      carlisle.braun@solidcounsel.com
      **BRANDI J. MCKAY**
      State Bar Card No. 24075380
      brandi.mckay@solidcounsel.com


      2600 Network Blvd., Suite 400
      Frisco, Texas 75034
      (214) 472-2100 Telephone
      (214) 472-2150 Facsimile

      *ATTORNEYS FOR PLAINTIFF*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and correct copy of this document has this 8th day of May, 2020, been served upon the following counsel of record pursuant to the TEXAS RULES OF CIVIL PROCEDURE 21a:

    **<u>Via Electronic Filing/Service</u>**
    Ross H. Parker
    Aynsley K. Young
    MUNSCH HARDT KOPF & HARR, PC
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75201

    *Attorneys for Defendant, Counter-Plaintiff and Third-Party Plaintiff*


      /s/ *Carlisle A. Braun*

      **CARLISLE A. BRAUN**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michelle Garcia on behalf of Carlisle Braun
Bar No. 24058818
michelle.garcia@solidcounsel.com
Envelope ID: 42857875
Status as of 05/08/2020 16:24:28 PM -05:00

Associated Case Party: HMC Hospitality Operating Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ross Parker | | rparker@munsch.com | 5/8/2020 4:22:15 PM | SENT |
| Ta'Sauna Smith | | tsmith@munsch.com | 5/8/2020 4:22:15 PM | SENT |
| Aynsley Young | | ayoung@munsch.com | 5/8/2020 4:22:15 PM | SENT |
| Priscilla Beesley | | pbeesley@munsch.com | 5/8/2020 4:22:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brandi J.McKay | | brandi.mckay@solidcounsel.com | 5/8/2020 4:22:15 PM | SENT |
| Melissa Diaz | | melissa.diaz@solidcounsel.com | 5/8/2020 4:22:15 PM | SENT |
| Kari Stanish | | kari.stanish@solidcounsel.com | 5/8/2020 4:22:15 PM | SENT |
| Carlisle Braun | | carlisle.braun@solidcounsel.com | 5/8/2020 4:22:15 PM | SENT |